Ronald L. Motley, Esquire
Joseph F. Rice, Esquire
Mary F. Schiavo, Esquire
MOTLEY RICE LLC
Attorneys for Plaintiffs
28 Bridgeside Boulevard
Post Office Box 1792
Mount Pleasant, SC  29465
(843) 216-9000


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
                                                               :
                                                               :
                                                               :
IN RE SEPTEMBER 11, 2001 LITIGATION     :    21 MC 97 (AKH)
                                                               :
---------------------------------------------------------------x

This document relates only to:

*Falkenberg v. AMR Corp., et al.*        02 CV 7145 (AKH)
*Teague v. AMR Corp., et al.*             03 CV 6800 (AKH)


### PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT AMERICAN AIRLINES, INC.

PLEASE TAKE NOTICE that, pursuant to Fed. R. Civ. P. 56, Plaintiff Ruth Falkenberg, as Personal Representative of the Estate of Leslie Ann Whittington, deceased, and Plaintiff Elaine Teague, as Personal Representative of the Estate of Sandra D. Teague, deceased, (collectively, "Plaintiffs") hereby move for summary judgment against defendant American Airlines, Inc. ("American") because there is no genuine issue of material fact that:

1)  Defendant is strictly liable under Article 17 of the Warsaw Convention for the wrongful deaths of Plaintiffs' decedents who were killed on board American Airlines Flight 77 ("Flight 77") during the course of international travel to be performed by successive air carriers;

     2) Defendant is strictly liable under the Warsaw Convention, as supplemented by the IATA Intercarrier Agreement incorporated in American's tariff, for Plaintiffs' full compensatory damages because Defendant did not take all necessary measures to stop terrorists from hijacking and crashing Flight 77 into the Pentagon, killing Plaintiffs' decedents, nor was it impossible for Defendant to take such measures; and

     3) Defendant is liable under Article 22(4) of the Warsaw Convention as amended by The Hague Protocol for attorneys' fees and litigation expenses of Plaintiffs, as Representatives of passengers killed during the course of international travel from the United States to Australia.

    Pursuant to Fed. R. Civ. P. 56(c) summary judgment is proper and the moving party is entitled to judgment as a matter of law where there is no genuine issue of fact as established by the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. Fed.R.Civ. P 56 (c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 106 S.Ct. 2548. Although the facts must be viewed in a favorable light towards the non-moving party, the non-moving party must set forth affirmative evidence that there is a genuine issue as to any material fact. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 106 S.Ct. 2505. Under Fed. R. Civ. P. 56(e) the defendants must put forth specific facts showing that there is a genuine issue for trial and may not rely upon the mere allegations or denials of their pleadings. Fed.R.Civ.P. 56(e). <u>Celotex Corp. v. Catrett</u>.

    Plaintiffs' motion for summary judgment is supported by the accompanying Statement of Material Facts Under Local Rule 56.1, as well as by the accompanying Memorandum of Law and Exhibits attached thereto.

Dated:  March 21, 2007 Respectfully submitted,

**MOTLEY RICE LLC**

**By:** _s/Mary Schiavo_____
Ronald L. Motley, Esquire
Joseph F. Rice, Esquire
Jodi Westbrook Flowers, Esquire
Don Migliori, Esquire
Mary Schiavo, Esquire
Michael E. Elsner, Esquire (ME-8337)
Elizabeth Smith, Esquire
Justin Kaplan, Esquire
Vincent I. Parrett, Esquire (VP-5092)
Motley Rice LLC
28 Bridgeside Boulevard
Post Office Box 1792
Mount Pleasant, SC 29465
Telephone:  (843) 216-9000

Ronald L. Motley, Esquire
Joseph F. Rice, Esquire
Mary F. Schiavo, Esquire
MOTLEY RICE LLC
Attorneys for Plaintiffs
28 Bridgeside Boulevard
Post Office Box 1792
Mount Pleasant, SC  29465
(843) 216-9000

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
                                                               :
                                                               :
IN RE SEPTEMBER 11, 2001 LITIGATION        :        21 MC 97 (AKH)
                                                               :
---------------------------------------------------------------x
This document relates only to:

*Falkenberg v. AMR Corp., et al.*        02 CV 7145 (AKH)
*Teague v. AMR Corp., et al.*             03 CV 6800 (AKH)


**PLAINTIFFS' STATEMENT OF MATERIAL FACTS UNDER LOCAL RULE 56.1
IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
<u>AGAINST DEFENDANT AMERICAN AIRLINES, INC. (AMERICAN)</u>**

Under Local Civil Rule 56.1, Plaintiff Ruth Falkenberg, as Personal Representative of the Estate of Leslie Ann Whittington, deceased, and Plaintiff Elaine Teague, as Personal Representative of the Estate of Sandra D. Teague, deceased, (collectively, "Plaintiffs") contend there is no genuine issue to be tried as to the following material facts:

1) On September 11, 2001, Leslie Ann Whittington was an international American Airlines passenger ticketed and on board American Airlines Flight 77 ("Flight 77") in the course of international carriage from the United States to Australia to be performed by successive air carriers American Airlines ("American") and Qantas Airlines; *(Falkenberg v. AMR Corp., et al.*, 02 CV 7145

(AKH), Third Amended Complaint ("3AC") at ¶ 1; American Airlines Production of Documents, Passenger Ticket, AAL000684, "AAL000684").

2) Leslie Ann Whittington's transportation from the United States to Australia was international:

> Foreign Air Transportation means the carriage by aircraft of persons or property as a common carrier for compensation or hire, or the carriage of mail by aircraft, in commerce between a place in the United States and any place outside of the Untied States, whether that commerce moves wholly by aircraft or partly by aircraft and partly by other forms of transportation.

14 CFR1.1 effective January 1, 2001

> For the purposes of this Convention the expression "international carriage" means any carriage in which, according to the contract made by the parties, the place of departure and the place of destination, whether or not there be a break in the carriage or a transshipment, are situated either within the territories of two High Contracting Parties, or within the territory of a single High Contracting Party, if there is an agreed stopping place with a territory subject to the sovereignty, suzerainty, mandate or authority of another Power, even though that Power is not a party to this Convention…
>
> A carriage to be performed by several successive air carriers is deemed, for the purposes of this Convention, to be one undivided carriage, if it has been regarded by the parties as a single operation, whether it had been agreed upon under the form of a single contract or a series of contracts, and it does not lose its international character merely because one contract or a series of contracts is to be performed entirely within a territory subject to the sovereignty, suzerainty, mandate or authority of the same High Contracting Party.

Warsaw Convention Article 1(2), (3)

3) Leslie Ann Whittington's international transportation on September 11, 2001 was to be performed by successive air carriers American and Qantas Airlines (AAL000684);

4) On September 11, 2001, Leslie Ann Whittington was killed on board Flight 77 during the course of her international carriage from United States to Australia (*Falkenberg* 3AC at ¶ 1; Death Certificate) ;

5) Leslie Ann Whittington's death on September 11, 2001, was caused by an accident,

specifically by the unexpected or unusual event external to this passenger of terrorists hijacking and crashing Flight 77 into the Pentagon.  The 9/11 Commission Report, 8-10, (WW. Norton & Company 1st Edition), ("9/11 CR"); *Falkenberg* 3AC at ¶ 1);

6) Leslie Ann Whittington's severe injuries and death took place on board the aircraft (*Falkenberg* 3AC at ¶ 1; 9/11 Commission Staff Report, August 26, 2004 Declassified, Record Group No. 148, p. 34 ("9/11 CSR"));

7) On September 11, 2001, Sandra D. Teague was a passenger on board Flight 77 in the course of international carriage in the course of international carriage from the United States to Australia to be performed by successive air carriers American and Qantas Airlines (*Teague v. AMR Corp., et al.,* 03 CV 6800 (AKH), Second Amended Complaint ("AC") at ¶ 1; American Airlines Production of Documents, Passenger Ticket, AAL000680, "AAL000680");

8) Sandra D. Teague's transportation from the United States to Australia was international:

> Foreign Air Transportation means the carriage by aircraft of persons or property as a common carrier for compensation or hire, or the carriage of mail by aircraft, in commerce between a place in the United States and any place outside of the Untied States, whether that commerce moves wholly by aircraft or partly by aircraft and partly by other forms of transportation.

14 CFR1.1 effective January 1, 2001

> For the purposes of this Convention the expression "international carriage" means any carriage in which, according to the contract made by the parties, the place of departure and the place of destination, whether or not there be a break in the carriage or a transshipment, are situated either within the territories of two High Contracting Parties, or within the territory of a single High Contracting Party, if there is an agreed stopping place with a territory subject to the sovereignty, suzerainty, mandate or authority of another Power, even though that Power is not a party to this Convention…

> A carriage to be performed by several successive air carriers is deemed, for the purposes of this Convention, to be one undivided carriage, if it has been regarded by the parties as a single operation, whether it had been agreed upon under the form of a single contract or a series of contracts, and it does not lose its international character merely because one contract or a series of contracts is to be performed entirely within a territory subject to the sovereignty, suzerainty, mandate or authority of the same High Contracting Party.

Warsaw Convention Article 1(2), (3)

9) Sandra D. Teague's international transportation on September 11, 2001 was to be performed by successive air carriers American and Qantas Airlines (AAL000680);

10) On September 11, 2001, Sandra D. Teague was killed on board Flight 77 during the course of her international carriage from United States to Australia (*Teague* 2AC at ¶ 1; Death Certificate);

11) Sandra D. Teague's death on September 11, 2001, was caused by an accident, specifically by the unexpected or unusual event external to this passenger of terrorists hijacking and crashing Flight 77 into the Pentagon (*Teague* AC at ¶ 1; The 9/11 CR pgs. 8-10);

12) Sandra D. Teague's severe injuries and death took place on board the aircraft (*Teague* 2AC at ¶ 1; 9/11 CSR p. 34);

13) The Warsaw Convention[1] entered into force in the United States on October 29, 1934;

14) The Warsaw Convention entered into force in Australia on October 30, 1935 (Paul Stephen Demsey and Michael Milde, International Air Carrier Liability: The Montreal Convention of 1999, 331(2005));

15) American signed the Provisions Implementing the IATA Intercarrier Agreement To Be Included In The Conditions of Carriage And Tariffs, on July 8, 1996; (See Exhibits to Plaintiffs'

---

1 The Warsaw Convention is a multilateral treaty that, *inter alia*, governs liability of international carriage of persons by aircraft. Originally adopted in 1929, the Warsaw Convention was amended at The Hague in 1955 and again in Montreal in 1975. *See* Convention for the Unification of Certain Rules Relating to International Carriage by Air, Oct. 12, 1929, 49 Stat. 3000 (1934), T.S. No. 876, 137 L.N.T.S. 11 (1934), *reprinted in note following* 49 U.S.C.A. § 40105 (1997)(original Warsaw Convention); The Convention for the Unification of Certain Rules Relating to International Carriage by Air Signed at Warsaw on 12 October 1929 as Amended by the Protocol Done at The Hague on 28 September 1955, 478 U.N.T.S. 371 ("The Hague Protocol"); Montreal Protocol No. 4 To Amend the Convention for the Unification of Certain Rules Relating to International Carriage by Air Signed at Warsaw on 12 October 1929 as Amended by the Protocol Done at The Hague on 28 September 1955, 2145 U.N.T.S. 36 ("Montreal Protocol No. 4").

Memorandum of Law provided herein)

16)  The IATA Intercarrier Agreement was incorporated into American's tariffs since November 1996; (See Exhibits to Plaintiffs' Memorandum of Law provided herein)

17)  Montreal Protocol No. 4 (to amend the Warsaw Convention as amended by the Hague Protocol) entered into force in the United States on March 4, 1999; (See Exhibits to Plaintiffs' Memorandum of Law provided herein)

18)  Montreal Protocol No. 4 (to amend the Warsaw Convention as amended by the Hague Protocol) entered into force in Australia on June 14, 1998; (See Exhibits to Plaintiffs' Memorandum of Law provided herein)

19)  The Hague Protocol entered into force in the United States on December 14, 2003; (See Exhibits to Plaintiffs' Memorandum of Law provided herein)

20)  The Hague Protocol entered into force in Australia on August 1, 1963; (See Exhibits to Plaintiffs' Memorandum of Law provided herein)

21)  On and prior to September 11, 2001, American was a commercial carrier engaged in the business of carrying passengers for hire and operated regularly scheduled passenger flights (Answer to *Falkenberg* Third Amended Complaint at ¶ 4; Answer to *Teague* Second Amended Complaint at ¶ 4);

22)  On and prior to September 11, 2001, American was required and undertook to develop, implement, operate, maintain, supervise and control an airline and airport security program, including passenger screening and other security activities, that would ensure the safety of persons traveling in air transportation against acts of hijacking, violence and piracy:

Sec. 108.5  Security program: Adoption and implementation.

    (a) Each certificate holder shall adopt and carry out a security program that meets the requirements of Sec. 108.7 for each of the following scheduled or public charter passenger operations:
    (1) Each operation with an airplane having a passenger seating configuration of more than 60 seats.

14 C.F.R. § 108.5 (2001)

    Sec. 108.7 Security program: Form, content, and availability.
    (a) Each security program required by Sec. 108.5 shall –
    **(1) Provide for the safety of persons and property traveling in air transportation and intrastate air transportation against acts of criminal violence and air piracy.**

    [Emphasis added]

14 C.F.R. § 108.7 (2001)

    Sec. 108.29 Standards for security oversight
    (a) Each certificate holder shall ensure that:
    (1) Each person performing a security-related function for the certificate holder has the knowledge of the provisions of this part 108, applicable Security Directives and Information Circulars promulgated pursuant to Sec. 108.18, and the certificate holder's security program to the extent that the performance of the function imposes a need to know

    (b) The requirements prescribed in paragraph (a) of this section apply to all security-related functions performed for the certificate holder whether by a direct employee or a contractor employee

14 C.F.R. § 108.29 (2001)

    Policy Setting and Implementation. As the United States responded to attacks on commercial aviation, particularly the rash of hijackings in the 1970s, and high-profile disasters such as Pan Am 103, the roles and responsibilities for planning, implementing, and enforcing the nation's aviation security system took shape, and were vested in five primary institutions:
    …
    2. Air carriers were responsible for screening passengers and baggage for weapons and prohibited items (explosives and incendiary devices), controlling access to aircraft, and training crews in emergency response.
    …

9/11 CSR p 60

    23) On September 11, 2001, American operated a Boeing 757-200 aircraft, registration no. N644AA, as Flight 77, which departed from Washington Dulles International Airport (the "subject airport") to Los Angeles International Airport (9/11 CSR pg. 28, 34);

    24) On September 11, 2001, American was operating under its air carrier standard security program which has been produced herein (AAL 011164 – 011420).

    25) Defendant did not take all necessary measures to avoid terrorists hijacking and crashing Flight 77 into the Pentagon, which killed Leslie Ann Whittington and Sandra D. Teague, nor was it impossible to take such measures, a few (but far from all) of the many examples of this failure to take all necessary measures are as follows:

> Washington Dulles: American 77
>
> …Nawaf al Hazmi set off the alarms for both the first and second metal detectors and was then hand-wanded before being passed. …The video footage indicates that he was carrying an unidentified item in his back pocket, clipped to its rim.
>
> …We asked a screening expert to review the videotape of the hand-wanding, and he found the quality of the screener's work to have been "marginal at best." The screener should have "resolved" what set off the alarm; and in the case of both Moqed and Hazmi, it was clear he did not.

9/11 CR pg. 3, 11

> While the airlines had been instructed by the FAA to "demonstrate a high degree of alertness," neither of the senior operations executives of the airlines whose planes were hijacked on 9/11 were aware of the heightened threat environment that summer.

9/11 CSR pg. 57

> In fact, under Aviation Security Alert Level III which was an effect on 9/11, screeners were supposed to physically search or screen, with an approved device, the carry-on property of CAPPS selectees, and "hand-wand or pat down that person." This practice was not required by the security directive implementing CAPPS and was not in evidence at either the Portland Jetport or Dulles Airport where surveillance video recorded the checkpoint screening of hijackers.

9/11 CSR pg. 71

> On September 11, 2001:
> - Checkpoint screener performance and the detection rate of prohibited items at airport checkpoints were spotty, and these weaknesses were widely known.

9/11 CSR pg. 84;

>Flight 77 hijackers were reported by a passenger to have box cutters.

9/11 CSR pg. 8;

>Barbara Olsen called her husband, Ted Olsen, the Solicitor General of the United States. She reported that the flight had been hijacked and the hijackers had knives and box cutters.

9/11 CSR pg. 9;

26) A Boeing 757-200 aircraft has more than 60 seats.

The depositions of various defendants and agents of defendants also contain many instances of screener, supervisor and other security personnel failures related to American Airlines Flight 77. Because of the ongoing Transportation Security Administration (TSA) security protocols attendant to the depositions, plaintiffs request leave and reserve the right to present such further evidence at any hearing on this matter under such conditions as this Court deems necessary, such as under seal, to prevent unauthorized disclosures.

27) On September 11, 2001, Leslie Ann Whittington, was a fare-paying international passenger to Sydney, Australia, ticketed and on board Flight 77 to Los Angeles, and ticketed to connect onto a Qantas Airlines flight to Australia (AAL 000684);

28) On September 11, 2001, Sandra D. Teague was a fare-paying international passenger to Sydney, Australia, ticketed and on board Flight 77 to Los Angeles, and ticketed to connect onto a Qantas Airlines flight to Australia (AAL000680);

29) On and prior to September 11, 2001, American by its officers, agents, employees, servants or representatives operated, controlled and supervised the airline and airport security system at the subject airport and the ticketing check-in and boarding processes, including identification and document checks for the subject aircraft and flight

>Security screening for Flight 77 was conducted at the east and west checkpoints in the Main Terminal. United Air Lines had custodial responsibility for the screening and contracted out

    the work to Argenbright Security.

9/11 CSR pg. 27

    Sec. 108.3 Definitions
    (a) Certificate holder means a person holding an FAA operating certificate when that person engages in scheduled passenger or public chartered passenger operations or both

14 C.F.R. § 108.3 (2001)

    Sec. 108.29 Standards for security oversight
    (a)Each certificate holder shall ensure that:
    (1) Each person performing a security-related function for the certificate holder has the knowledge of the provisions of this part 108, applicable Security Directives and Information Circulars promulgated pursuant to Sec. 108.18, and the certificate holder's security program to the extent that the performance of the function imposes a need to know

    (b) The requirements prescribed in paragraph (a) of this section apply to all security-related functions performed for the certificate holder whether by a direct employee or a contractor employee

14 C.F.R. § 108.29 (2001)

    30) At various times prior to September 11, 2001, the Department of Transportation Office of Inspector General, the U.S. Federal Aviation Administration, the Government Accounting Office and others documented and reported numerous security breaches involving unauthorized access to secure areas (including ramps and aircraft) and warned the defendant American Airlines that security was at risk and the passenger and carry-on baggage screening system was vulnerable; those reports detailed dangerous, long-standing flaws in airport security and warned the Defendant that the airline and airport security system was unsafe and needed significant improvements in staffing, training and equipment in order to ensure the safety of persons traveling by air transportation against acts of criminal violence and air piracy; and Defendant was repeatedly warned that the ability of the airline and airport security system to detect threat objects located on passengers or contained on their carry-on luggage was unsafe and had been significantly worsening for nearly 20 years:

    Indeed, since 1996, the domestic aviation system had operated at a security level that was, in

> effect, a permanent code orange. Specifically, it was the level required when "information indicates that a terrorist group or other hostile entity with a known capability of attacking civil aviation is likely to carry out attacks against U.S. targets; or civil disturbances with a direct impact on civil aviation have begun or are imminent.
> …
> Numerous documents, reports and assessments produced by the FAA's intelligence division through the late 1990s and up to 9/11 reported on the growing threat posed by terrorists. For example, between March 14 and May 15, 2001, the FAA's Office of Civil Aviation Intelligence conducted a series of classified briefings for security officials at 19 of the nation's largest airports, including Newark, Boston's Logan and Washington Dulles. The briefing highlighted the threat posed by terrorists in general and Bin Ladin in particular, including his threats against aviation. The renewed interest in hijacking by terrorist groups was also covered.

9/11 CSR pgs. 54, 55

> FAA security inspections, Department of Transportation Inspector General audits, and General Accounting Office investigations found persistent deficiencies in all areas of aviation security.

9/11 CSR pg. 60

*Falkenberg* 3AC at ¶ 47, 50-54; *Teague* 2AC at ¶ 46, 49-53

31) On September 11, 2001, hijackers penetrated said airline and airport security system, brought dangerous weapons onto the subject aircraft and used said dangerous weapons to seize control of the aircraft, operate it in an unusual and extreme manner causing injuries, fear of impending death, and then death to Leslie Ann Whittington and Sandra D. Teague, when Flight 77 crashed into the Pentagon, killing all on board including Leslie Ann Whittington and Sandra D. Teague (9/11 CSR pg. 27-34; *Falkenberg* 3AC at ¶ 39, 42; *Teague* 2AC at ¶ 38, 41).

Wherefore, defendant American failed to take all reasonable measures, which many were not only not impossible, but were mandated by federal regulations and defendant American's own air carrier standard security program and the Checkpoint Operations Guide.

Dated:  March 21, 2007 Respectfully submitted,

**MOTLEY RICE LLC**

**By:** __s/ Mary Schiavo_____
Ronald L. Motley, Esquire
Joseph F. Rice, Esquire
Mary Schiavo, Esquire
Jodi Westbrook Flowers, Esquire
Don Migliori, Esquire
Michael E. Elsner, Esquire (ME-8337)
Elizabeth Smith, Esquire
Justin Kaplan, Esquire
Vincent I. Parrett, Esquire (VP-5092)
Motley Rice LLC
28 Bridgeside Boulevard
Post Office Box 1792
Mount Pleasant, SC 29465
Telephone:  (843) 216-9000