Ronald L. Motley, Esquire
Joseph F. Rice, Esquire
Mary F. Schiavo, Esquire
MOTLEY RICE LLC
Attorneys for Plaintiffs
28 Bridgeside Boulevard
Post Office Box 1792
Mount Pleasant, SC  29465
(843) 216-9000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                                :
                                                :

IN RE SEPTEMBER 11, 2001 LITIGATION    :      21 MC 97 (AKH)
                                                :
------------------------------------------------------------x

This document relates only to:

*Falkenberg v. AMR Corp., et al.*  02 CV 7145 (AKH)
*Teague v. AMR Corp., et al.*      03 CV 6800 (AKH)

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AGAINST DEFENDANT AMERICAN AIRLINES, INC.**

<u>**TABLE OF CONTENTS**</u>

Table Of Authorities……………………………………………………………iii

Introduction……………………………………………………………………1

Parties………………………………………………………………………… 2

Undisputed Material Facts……………………………………………………3

Summary Judgment Is Appropriate…………………………………………4

ARGUMENT…………………………………………………………..…………5

I.    Defendant Is Strictly Liable Under Article 17 Of The Warsaw Convention
      For The Deaths Of Passengers Leslie Ann Whittington & Sandra D. Teague
      Who Were Killed On Board Flight 77 In The Course Of
      International Transportation……………………………………..……………5

      A.    On September 11, 2001, Plaintiffs' Decedents Were Engaged
            In International Air Transportation To Be Performed
            By Successive Air Carriers………………………………….………..5

      B.    Plaintiffs' Decedents Were Killed On Board Flight 77 By The Unexpected
            And Unusual Event External To These Passengers Of Terrorists Hijacking
            And Crashing Flight 77 Into The Pentagon…………………………………6

II.   Defendant Is Strictly Liable For Plaintiffs' Full Compensatory Damages Under
      The IATA Intercarrier Agreement Because Defendant Did Not Take All
      Necessary Measures To Stop Terrorists From Hijacking & Crashing Flight 77
      Into The Pentagon, Killing Plaintiffs' Decedents………………………………...7

III.  Plaintiffs, As Representatives Of Passengers Killed During The Course Of
      International Travel From The U.S. To Australia, Are Entitled To Recover
      Attorneys' Fees & Litigation Expenses Under The Hague Protocol……...…………12

      A.    The Hague Protocol Amended The Warsaw Convention To Authorize
            Courts To Award Plaintiffs' Court Costs & Litigation Expenses,
            Including Attorneys' Fees…………………………………………...12

      B.    Under Second Circuit Law, The United States Was Bound
            On September 11, 2001 To The Provisions Of The Hague Protocol
            Vis-à-Vis Countries That Were Parties To Montreal Protocol No. 4
            Such As Australia……………………………………………..…...13

Conclusion……………………………………………………………………15

## <u>TABLE OF AUTHORITIES</u>

*Page*

### FEDERAL CASES

*Air France v. Saks*,
470 U.S. 392 (1985)………………………………………………………………4, 6, 7

*Avero Belgium Ins. v. American Airlines, Inc.*,
423 F.3d 73 (2d Cir. 2005)……………………………………………………………2, 14

*Celetox Corp. v. Catrett*,
477 U.S. 317 (1986)……………………………………………………………………4

*Cortes v. American Airlines, Inc.*,
177 F.3d 1272 (11th Cir. 1999)……………………………………………… 8, 9

*Day v. Trans World Airlines, Inc.*,
528 F.2d 31 (2d Cir, 1975)……………………………………………………………..7

*Domangue v. Eastern Air Lines, Inc.*,
722 F.2d 256 (5th Cir. 1984)…………………………………………………………..12

*Enwerenuzor v. Iberia Airlines of Spain*,
No. CV 92-3275, 1994 WL 3407 (E.D.N.Y. Jan. 5. 1994)…………………………….………1

*Evangelinos v. Trans World Airlines, Inc.*,
550 F.2d 152 (3rd Cir. 1977)(*en banc*)……………………………………………….………7

*Fujitsu Ltd. v. Federal Express Corp.*,
247 F.3d 423 (2d Cir. 2001)………………………………………………….…...14

*Girard v. American Airlines, Inc., AMR Corp., et al.*,
2003 WL 21989978 (E.D.N.Y., Aug. 21, 2003)…………………………………….………6

*In re Air Crash At Little Rock Arkansas, on June 1, 1999*,
291 F.3d 503 (8th Cir. 2002)……………………………………………………8, 10

*In re Air Crash at Little Rock, Arkansas, on June 1, 1999*,
109 F. Supp.2d 1022 (E.D. Ark. 2000)…………………………………………...10

*In re Air Crash Off Point Mugu, California, on January 30, 2000*,
145 F. Supp.2d 1156 (N.D. Cal. 2001)……………………………………………..9

*Krystal v. British Overseas Airways Corp.*,
403 F. Supp.1322 (C.D. Cal. 1975)……………………………………………...7

*Motorola, Inc. v. Kuehne & Nagel, Inc.*,
208 F. Supp.2d 910 (N.D. Ill. 2002)……………………………………………..…12

*Motorola, Inc. v. Federal Express Corp.*,
308 F. 3d 995 (9th Cir. 2002)……………………………………………………12

*Pflug v. Egyptair Corp.*,
961 F.2d 26 (2d Cir. 1992)……………………………………..…….…….……..7

*Sompo Japan Ins. Inc. v. Nippon Cargo Airlines, Co.*,
2006 WL 2579706 (N.D. Ill., Sept. 4, 2006)……………………………………12

*Stratis v. Eastern Air Lines, Inc.*,
682 F.2d 406 (2d Cir. 1982)……………………………………………...……………5

*Swiss Bank Corp. v. Brink's-MAT Ltd.*,
2 Lloyd's Rep. 79, 101 (Eng. C.A., 1986)……………………………………12

*Tishman & Lipp, Inc. v. Delta Air Lines*,
413 F.2d 1401 (2d Cir. 1969)……………………………………………….…1

## TREATIES & STATUTES

Convention for the Unification of Certain Rules Relating to International Carriage by Air,
Oct. 12, 1929, 49 Stat. 3000 (1934), T.S. No. 876, 137 L.N.T.S. 11 (1934),
*reprinted in note following* 49 U.S.C.A. § 40105 (1997)
(original Warsaw Convention)……………………………………………………*passim*

Convention for the Unification of Certain Rules Relating to International Carriage
by Air Signed at Warsaw on 12 October 1929 as Amended by the Protocol Done
at The Hague on 28 September 1955, 478 U.N.T.S. 371
("The Hague Protocol")………………………………………………1, 2, 4, 12, 13, 14, 15

Montreal Protocol No. 4 To Amend the Convention for the Unification of Certain Rules
Relating to International Carriage by Air Signed at Warsaw on 12 October 1929
as Amended by the Protocol Done at The Hague on 28 September 1955,
2145 U.N.T.S. 36
("Montreal Protocol No. 4")……………………………………………… 1, 2, 13, 14

## IATA INTERCARRIER AGREEMENTS

International Air Transport Association ("IATA") Intercarrier Agreement on
Passenger Liability ("IIA"), available at
http://www.iata.org/nr/contentconnector/cs2000/siteinterface/sites/legal/file/iia.pdf……*passim*

Agreement on Measures to Implement the IATA Intercarrier Agreement ("MIA"), available at
http://www.iata.org/nr/contentconnector/cs2000/siteinterface/sites/legal/file/mia.pdf…… …1

Air Transport Association of America Provisions Implementing the IATA Intercarrier Agreement to be Included in Conditions of Carriage and Tariffs ("IPA")……………………1

## MISCELLANEOUS AUTHORITIES

**Desmond T. Barry, Jr. and Thomas J. Whalen,** *Unlimited Liability:*
*The New Ball Game In International Transportation By Air*,
**64 Defense Counsel Journal 381 (1997)…………………………………….…………..9**

A. Lowenfeld & A. Mendelsohn*, The United States and the Warsaw Convention*,
80 Harv. L. Rev. 497 (1967)……………………………………………………………...12

Blanca I. Rodriguez, *Recent Developments in Aviation Liability Law*,
66 J. Air. L. & Com. 21 (2000)……………………………………………….…….…...8

Strobe Talbott, U.S. Deputy Secretary of State, Letter Accompanying President
William Jefferson Clinton's transmission to the Senate of the
Montreal Convention (June 23, 2000)……………………………………………………14

Thomas J. Whalen & Michelle L. Carey, *Changes in the Warsaw Convention*
*and Its Effects on Aviation Liability*, in *Litigating The Aviation Case*
(Desmond T. Barry, Jr., Editor, 2d Ed., 1998)……………………………………………9

## Introduction

This Honorable Court should grant the motion for summary judgment of Plaintiff Ruth Falkenberg, as Personal Representative of the Estate of Leslie Ann Whittington, deceased, and Plaintiff Elaine Teague, as Personal Representative of the Estate of Sandra D. Teague, deceased, (collectively, "Plaintiffs") against defendant American Airlines, Inc. ("American") because there is no genuine issue of material fact that:

1)    Defendant is strictly liable under Article 17 of the Warsaw Convention,[1] as supplemented by IATA Intercarrier Agreements[2] incorporated in American's tariff,[3] for the wrongful deaths of Plaintiffs' decedents who were killed on board American Airlines Flight 77 ("Flight 77") during the course of international carriage to be performed by successive air carriers on September 11, 2001; and

2)    Defendant is liable without limitation for Plaintiffs' compensatory damages under the Warsaw Convention, as supplemented by the IATA Intercarrier Agreements incorporated in American's tariff, because Defendant did not take all necessary measures to avoid terrorists hijacking and crashing Flight 77 into the Pentagon, killing Plaintiffs' decedents, nor was it

---

[1] The Warsaw Convention is a multilateral treaty that, *inter alia*, governs liability of international carriage of persons by aircraft. Originally adopted in 1929, the Warsaw Convention was amended at The Hague in 1955 and again in Montreal in 1975. *See* Convention for the Unification of Certain Rules Relating to International Carriage by Air, Oct. 12, 1929, 49 Stat. 3000 (1934), T.S. No. 876, 137 L.N.T.S. 11 (1934), *reprinted in note following* 49 U.S.C.A. § 40105 (1997)(original Warsaw Convention); The Convention for the Unification of Certain Rules Relating to International Carriage by Air Signed at Warsaw on 12 October 1929 as Amended by the Protocol Done at The Hague on 28 September 1955, 478 U.N.T.S. 371 ("The Hague Protocol"); Montreal Protocol No. 4 To Amend the Convention for the Unification of Certain Rules Relating to International Carriage by Air Signed at Warsaw on 12 October 1929 as Amended by the Protocol Done at The Hague on 28 September 1955, 2145 U.N.T.S. 36 ("Montreal Protocol No. 4").

[2] The Agreements are: the International Air Transport Association ("IATA") Intercarrier Agreement on Passenger Liability ("IIA"), available at http://www.iata.org/nr/contentconnector/cs2000/siteinterface/sites/legal/file/iia.pdf, attached hereto as Exhibit 1; (2) the Agreement on Measures to Implement the IATA Intercarrier Agreement ("MIA"), available at http://www.iata.org/nr/contentconnector/cs2000/siteinterface/sites/legal/file/mia.pdf, attached hereto as Exhibit 2; and (3) the Air Transport Association of America Provisions Implementing the IATA Intercarrier Agreement to be Included in Conditions of Carriage and Tariffs ("IPA"), attached hereto as Exhibit 3.

[3] The rights and liabilities between an airline and its passenger are determined by the carrier's tariffs. *See Tishman & Lipp, Inc. v. Delta Air Lines*, 413 F.2d 1401, 1403 (2d Cir. 1969); *Enwerenuzor v. Iberia Airlines of Spain*, No. CV 92-3275, 1994 WL 3407 at *3 (E.D.N.Y. Jan. 5. 1994). American's tariff incorporating the terms of the IPA is attached hereto as Exhibit 4.

impossible for Defendant to take such measures;

    3)  Defendant is liable under Article 22(4) of the Warsaw Convention as amended by The Hague Protocol for attorneys' fees and litigation expenses of Plaintiffs, as Representatives of passengers killed during the course of international travel from the United States to Australia.[4]

## Parties

    Plaintiff Ruth Falkenberg is the Personal Representative of the Estate of Leslie Ann Whittington, deceased, who was a passenger killed on board Flight 77 on September 11, 2001, during the course of international carriage to be performed by successive air carriers American and Qantas Airways, traveling on Flight 77 from Washington Dulles International Airport to Los Angeles International Airport to a connecting flight to Sydney, Australia.

    Plaintiff Elaine Teague is the Personal Representative of the Estate of Sandra D. Teague, deceased, who was a passenger killed on board Flight 77 on September 11, 2001, during the course of international carriage to be performed by successive air carriers American and Qantas Airways, traveling on Flight 77 from Washington Dulles International Airport to Los Angeles International Airport to a connecting flight to Sydney, Australia.

    Defendant American Airlines, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in the State of Texas.  American

---

[4]  Art. XI of The Hague Protocol amends Warsaw Convention Article 22(4) to authorize the Court to award "the court costs and . . . the other expenses of the litigation incurred by the plaintiff."  Under recent Second Circuit precedent, the United States was bound by The Hague Protocol vis-à-vis Australia on September 11, 2001.  *Avero Belgium Ins. v. American Airlines, Inc.*, 423 F.3d 73, 83-89 (2d Cir. 2005).  *Avero's* reasoning teaches that because the United States and Australia on September 11, 2001 were both parties to Montreal Protocol No. 4, which by its express terms adopts The Hague Protocol, the United States was thus bound to The Hague Protocol vis-à-vis Australia (a party to Montreal Protocol No. 4).  *Id.* at 89 ("All parties agree that, from the perspective *of a State that is also a party to Montreal Protocol No. 4*, the United States was 'bound by the provisions of The Hague Protocol' as amended by Montreal Protocol No. 4")(emphasis added).  Hence, The Hague Protocol entitles Plaintiffs, whose decedents were killed during international carriage from the U.S. to Australia, to attorneys' fees and litigation expenses.  Moreover, Article 22(4) as amended by The Hague Protocol, authorizing attorneys' fees and expenses, was *not* modified by Montreal Protocol No 4 (which amended other provisions of The Hague Protocol, *see* fn. 1 above), nor by the IATA intercarrier agreement, nor by American's tariff – and hence remained in force on September 11, 2001.

2

Airlines is a certified air carrier with extensive domestic and international routes.  American Airlines' operation of Flight 77 on September 11, 2001, was covered by liability insurance coverage maintained by that air carrier.

The Air Transportation Safety and System Stabilization Act (ATSSSA) Public Law 107-42-September 22, 2001, 115 STAT. 240, provided as follows:

> SEC. 408 LIMITATION ON AIR CARRIER LIABILITY
> (a) IN GENERAL. – Notwithstanding any other provision of law, liability for all claims, whether for compensatory or punitive damages, arising from terrorist-related aircraft crashes of September 11, 2001, against any air carrier shall not be in an amount greater than the limits of the liability coverage maintained by the air carrier.

The ATSSSA was in part amended by the Aviation and Transportation Security Act, Public Law 107-71-November 19, 2001, 115 STAT. 597, which further provided:

> "(a) IN GENERAL. –
> "(1) LIABILITY LIMITED TO INSURANCE COVERAGE. – Notwithstanding any other provision of law, liability for all claims, whether for compensatory or punitive damages or for contribution or indemnity, arising from the terrorist-related aircraft crashes on September 11, 2001, against an air carrier, aircraft manufacturer, airport sponsor, or person with a property interest in the World Trade Center, on September 11, 2001, whether fee simple, leasehold or easement, direct or indirect, or their directors, officers, employees, or agents, shall not be in an amount greater than the limits of liability insurance coverage maintained by that air carrier, aircraft manufacturer, airport sponsor or person."

American Airlines was and is covered and insured for death, bodily injury and property damage in the amount of $1,500,000,000.00 per aircraft, per occurrence and by an excess insurance policy in the amount of $200,000,000.00 per aircraft, per occurrence.  Neither policy contains any exclusions or limitations which apply to these events.  See letter of Desmond T. Barry of November 2, 2003, with attached documents, produced in response to paragraph number five of the Court's Supplemental Case Management Order, dated October 24, 2003. Thus American Airlines Flight 77 is covered by at least $1.5 billion in liability insurance.

Therefore, pursuant to the ATSSSA, as amended, American Airlines may be adjudged liable for the deaths of Wittington and Teague in amounts up to and including $1.5 billion, or possibly more with the excess coverage.

### Undisputed Material Facts

Plaintiffs incorporate and respectfully refer the Court to Plaintiffs' Local Rule 56.1 Statement of Material Facts and the Plaintiffs' Statement of Material Facts annexed hereto which includes for each statement of material fact citations to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e).  There is no genuine liability issue to be tried, and no genuine dispute about the following facts:

1)  It is undisputed that on September 11, 2001, Leslie Ann Whittington and Sandra D. Teague were passengers aboard Flight 77 in the course of international carriage from the United States to Australia to be performed by successive air carriers American Airlines and Qantas Airlines;

2)  It is undisputed that transportation of Leslie Ann Whittington and Sandra D. Teague from the United States to Australia was international under Article 1(2) of the Warsaw Convention;

3)  It is undisputed that the international transportation of Leslie Ann Whittington and Sandra D. Teague on September 11, 2001 was to be performed by successive air carriers under Article 1(3) of the Warsaw Convention;

4)  It is undisputed that on September 11, 2001, Leslie Ann Whittington and Sandra D. Teague were killed on board Flight 77 during the course of their international carriage from the United States to Australia;

5)  It is undisputed that the deaths of Leslie Ann Whittington and Sandra D. Teague on September 11, 2001, were caused by an accident, specifically by the unexpected or unusual event external to these passengers of terrorists hijacking and crashing Flight 77 into the Pentagon; [5]

6)  It is undisputed that the severe injuries and deaths of Leslie Ann Whittington and Sandra D. Teague took place on board the aircraft; and

7)  It is indisputable that, as a matter of law and/or a matter of fact, Defendant did not take all necessary measures to avoid terrorists hijacking and crashing Flight 77 into the Pentagon, killing Leslie Ann Whittington and Sandra D. Teague, nor was it impossible to take such measures.

### Summary Judgment Is Appropriate

As there is no genuine issue to be tried over the material facts set forth above, Plaintiffs are entitled to summary judgment as a matter of law that:

(1)  Defendant is strictly liable under Article 17 of the Warsaw Convention for the wrongful deaths of Plaintiffs' decedents;

(2)  Defendant is strictly liable under the Warsaw Convention, as supplemented by the IATA intercarrier agreement, for Plaintiffs' full compensatory damages without limitation, as Defendant did not take all necessary measures to avoid terrorists hijacking and crashing Flight 77 into the Pentagon, killing Plaintiffs' decedents, nor was it impossible to take such measures; and

(3)  Defendant is strictly liable under Article 22(4) the Warsaw Convention as amended by The Hague Protocol for Plaintiffs' attorneys' fees and litigation expenses. *See* Fed. R. Civ. P. 56; *Celetox Corp. v. Catrett*, 477 U.S. 317, 322 (1986)("Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together

---

[5] *See Air France v. Saks*, 470 U.S. 392, 405 (1985)(construing "accident" under Article 17 of the Warsaw Convention as an "unexpected or unusual event or happening that is external to the passenger").

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'")

(4) Plaintiffs are entitled to summary judgment on these issues.

(5) The only remaining issues to be tried would be the amounts of damages and attorneys and costs to be awarded.

## ARGUMENT

I.    **Defendant Is Strictly Liable Under Article 17 Of The Warsaw Convention For The Deaths Of Passengers Leslie Ann Whittington & Sandra D. Teague Who Were Killed On Board Flight 77 In The Course Of International Transportation.**

A.    **On September 11, 2001, Plaintiffs' Decedents Were Engaged In International Air Transportation To Be Performed By Successive Air Carriers**

As noted above, the Warsaw Convention is a multilateral treaty that governs liability of international air carriage of persons.  *See* fn. 1 *supra*.  Article 1 of the Warsaw Convention makes plain that this treaty applies to "all international transportation of persons," and that the term "international transportation" means "any transportation in which, according to the contract made by the parties, the place of departure and the place of destination . . . are situated . . . within the territories of two High Contracting Parties."  Warsaw Convention Art. 1(1) & (2).  On September 11, 2001, the United States[6] and Australia[7] were both parties to the Warsaw Convention.

Here, Plaintiffs' decedents were passengers on board Flight 77 in the course of international air transportation to be performed by successive air carriers on September 11, 2001. Specifically, Leslie Ann Whittington and Sandra D. Teague were passengers traveling from the United States to Australia aboard successive air carriers American Airlines and Qantas Airlines. The Warsaw Convention expressly applies to international carriage to be performed by

---

[6] The Warsaw Convention entered into force in the United States on October 29, 1934.
[7] The Warsaw Convention entered into force in Australia on October 30, 1935.

successive air carriers.  *See* Warsaw Convention Art. 1(3) ("Transportation to be performed by several successive air carriers shall be deemed, for the purposes of this convention, to be one undivided transportation. . . ."); *see also*, *Stratis v. Eastern Air Lines, Inc.*, 682 F.2d 406, 412, 412 n.8 (2d Cir. 1982) (Warsaw Convention applies to carrier on domestic leg of international flight where passenger "had reason to know his overall flight was international. . . .  It cannot be argued that 'the contract' here related only to the flights with domestic destinations, for 'a series of contracts' involving 'several successive air carriers' is subject to the Convention even if one contract or a series of them is to be performed entirely domestically.") (*quoting* Warsaw Convention Art. 1(3)).[8]

Accordingly, the Warsaw Convention applies to the international transportation of passengers Leslie Ann Whittington and Sandra D. Teague on September 11, 2001.

### B.    Plaintiffs' Decedents Were Killed On Board Flight 77 By The Unexpected And Unusual Event External To These Passengers Of Terrorists Hijacking And Crashing Flight 77 Into The Pentagon

This Defendant is well aware that "Article 17 of the Warsaw Convention provides for strict liability of an air carrier for personal injuries sustained by a passenger in international travel."  *Girard v. American Airlines, Inc., AMR Corp., et al.,* 2003 WL 21989978 at *3 (E.D.N.Y., Aug. 21, 2003).  The plain text of Article 17 imposes strict liability "for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft. . . ."  Warsaw Convention Art. 17.

---

[8] *See also*, Warsaw Convention Art. 30(1)("In the case of transportation to be performed by various successive carriers and falling within the definition set out in the third paragraph of article 1, each carrier who accepts passengers, baggage or goods shall be subject to the rules set out in this convention. . . ."  Moreover, the opening paragraph of American's tariff incorporating the terms of the intercarrier agreement, *see* fn 3 *supra*, expressly states: "**Carriage to be performed under one ticket** or under a ticket and any conjunction ticket issued in connection therewith **by several successive carriers is regarded as a single operation**." (emphasis added).

Moreover, the U.S. Supreme Court has resolved that an "accident" triggering Article 17 strict liability of the carrier is any "unexpected or unusual event or happening that is external to the passenger." *Air France v. Saks*, 470 U.S. 392, 405 (1985). Applying *Saks*, it is the well-settled law of the Second Circuit that a terrorist hijacking of a plane is an "accident" triggering Article 17 strict liability. *Pflug v. Egyptair Corp.*, 961 F.2d 26, 29 (2d Cir. 1992) (recognizing terrorist hijacking of a plane as "accident" under Warsaw Convention). And *Saks* itself cited with approval lower court cases holding that terrorist attacks or hijacking were "accidents" triggering Article 17 strict liability. *See Saks*, 470 U.S. at 405 (citing *Evangelinos v. Trans World Airlines, Inc.*, 550 F.2d 152 (3rd Cir. 1977) (*en banc*) (terrorist attack); *Day v. Trans World Airlines, Inc.*, 528 F.2d 31 (2d Cir, 1975) (same); *Krystal v. British Overseas Airways Corp.*, 403 F. Supp. 1322 (C.D. Cal. 1975) (hijacking)).

Accordingly, as a matter of law, Defendant is strictly liable under Article 17 for the deaths of Plaintiffs' decedents on board Flight 77 caused by the unexpected and unusual event external to these passengers of terrorists hijacking and crashing Flight 77 into the Pentagon.

## II. Defendant Is Strictly Liable For Plaintiffs' Full Compensatory Damages Under The IATA Intercarrier Agreement Because Defendant Did Not Take All Necessary Measures To Stop Terrorists From Hijacking & Crashing Flight 77 Into The Pentagon, Killing Plaintiffs' Decedents

On July 8, 1996, American Airlines signed the Provisions Implementing the IATA Intercarrier Agreement To Be Included In The Conditions of Carriage And Tariffs, which is attached hereto at Exhibit 3. *See* fn. 2 *supra*. Since as early as November 1996, the IATA Intercarrier Agreement was incorporated into American's tariff, which is attached hereto at Exhibit 4. *See* fn. 3 *supra*. Hence, on September 11, 2001, the Warsaw Convention, as supplemented by the IATA Intercarrier Agreement incorporated in American's tariff, governed

the claims of American's passengers engaged in international carriage such as Plaintiffs' decedents.[9]

American's tariff incorporating the IATA intercarrier agreement specifically states:  "The carrier shall not avail itself of any defense under Article 20(1) of the Convention with respect to that portion of such claim which does not exceed 100,000 Special Drawing Rights (SDR)."  *See* Exhibit 4 hereto at ¶ 55(B)(1)(b) ("Liability of Carriers").  Article 20(1) of the Warsaw Convention provides:  "The carrier shall not be liable if he proves that he and his agents have taken **all necessary measures** to avoid the damage or that it was impossible for him or them to take such measures."  Warsaw Art. 20(1) (emphasis added).  Accordingly, under the IATA intercarrier system American bound itself to be:

> strictly liable for the first 100,000 SDR's ("special drawing rights" – an International Monetary Fund currency unit which takes inflation into account and is calculated according to the currencies of France, the United States, Germany, England and Japan.) Beyond that amount, the passenger may prove and recover damages according to the law of the passenger's domicile, ***unless the carrier can prove it took "all necessary measures" to avoid the damages***, *Cortes v. American Airlines, Inc.*, 177 F.3d 1272, 1282 n.5 (11th Cir. 1999), *cert. denied*, 528 U.S. 1136, ***a standard described "nearly insurmountable***" by one commentator.

*In re Air Crash At Little Rock Arkansas, on June 1, 1999*, 291 F.3d 503, 508 n. 4 (8th Cir. 2002)(citing commentator Blanca I. Rodriguez, *Recent Developments in Aviation Liability Law*, 66 J. Air. L. & Com. 21, 35 (2000) (emphasis added)).

---

[9]  American Airlines by operation of law and by their own agreements and admissions must concede that the Warsaw Convention, supplemented by the IATA Intercarrier Agreement, governs claims of American's passengers in international travel on September 11, 2001; American Airlines' defense counsel in these 9/11 cases (Desmond T. Barry, Jr. of Condon & Forsyth LLP) for American and AMR recently argued to SDNY Judge Sweet that the Warsaw Convention, supplemented by the IATA Intercarrier Agreement, governs claims of passengers in international travel by American on November 12, 2001.  *See* Defendants' Memorandum Of Law In Support Of Motion For Determination Of Applicable Law On Certain Issues, at pages 26-30 (Defendants American and AMR arguing:  "Point IV:  The Warsaw Convention, As Supplemented By Intercarrier Agreements Incorporated Into American's Tariffs, Is Applicable To All Passenger Claims Against American"), filed on July 19, 2005, *In Re: Air Crash At Belle Harbor, New York on November 12, 2001*, MDL No. 1448 (RWS), 02 Civ. 0439 (RWS)(SDNY). The IATA intercarrier agreement governs Defendants' international transportation of passengers on September 11, 2001, just as it did on November 12, 2001.  *Id.*

By incorporating the IATA Intercarrier Agreement in its tariff, American by special contract bound itself to pay: (1) all compensatory damages of its passengers killed or injured during international travel up to 100,000 SDR's regardless of fault, and (2) all compensatory damages of its passengers killed or injured during international travel *above* 100,000 SDR's unless American could prove the Article 20(1) defense that it took "all necessary measures to avoid the damage or that it was impossible for [the carrier or its agents] to take such measures." *See Cortes v. American Airlines, Inc.*, 177 F.3d 1272, 1282 n.5 (11th Cir. 1999) (under IATA Intercarrier Agreement, "the carrier has contractually agreed to pay all [of] a passenger's damages over $130,000 [100,000 SDR's, at that time,] unless the carrier can show it took all necessary measures to avoid the damages"); *In re Air Crash Off Point Mugu, California, on January 30, 2000*, 145 F. Supp.2d 1156, 1161 (N.D. Cal. 2001) (under the IATA intercarrier agreement, "a carrier such as Alaska assumes liability for an injury caused by an accident within the meaning of the Warsaw Convention unless it can prove that it took all necessary measures to avoid the accident.")

The burden is on American Airlines to prove it took all necessary measures. It cannot. Self-authenticating government documents and reports and clear videotape evidence played on international television and reviewed and commented upon by the 9/11 Commission concluded these were clear and obvious violations of the Checkpoint Operations Guide and the Air Carrier Standard Security Program, which have the effect of federal regulations.

It is legally and factually impossible for American Airlines to prove they took all necessary measures when it is indisputable they did not complete even those minimum measures required by federal regulations, much less all necessary measures which were not impossible.

Therefore, it is beyond any credible dispute by Defendant that it did not take "all necessary measures" to stop terrorists from hijacking and crashing Flight 77 into the Pentagon, nor was it "impossible" to take such measures. Indeed, Defendant's lead counsel Desmond T. Barry, Jr., has long lamented as follows:

> absent evidence of contributory negligence, *the carrier will be* strictly liable up to at least 100,000 SDRs and *presumptively liable under Article 17 for unlimited damages*. If the scope of Article 20(1) is broad as most aviation counsel believe, *the Article 20(1) defense will have little force above 100,000 SDRs. The carrier will find it extremely difficult, if not impossible, to prove that it and its agents took "all necessary measures" to avoid the damage or that it was impossible to do so.*

Desmond T. Barry, Jr. and Thomas J. Whalen, *Unlimited Liability: The New Ball Game In International Transportation By Air*, 64 Defense Counsel Journal 381, 384 (1997) (emphasis added). Conceding the impotence of the "all necessary measures" defense, his co-author Thomas J. Whalen frankly advises that "the burden of proving this defense is *probably impossible except in the rarest of cases*." Thomas J. Whalen & Michelle L. Carey, *Changes in the Warsaw Convention and Its Effects on Aviation Liability*, in *Litigating The Aviation Case* at p. 107 (Desmond T. Barry, Jr., editor, 2d Ed., 1998) (emphasis added).

Indeed, this "all necessary measures" defense has proven so "extremely difficult" and virtually "impossible" to overcome, that American has publicly *waived* this defense in some cases governed by the IATA intercarrier regime. As one district court explained:

> The IATA [intercarrier agreement] establishes a contractual absolute liability to all international passengers up to a cap of SDR 100,000. For claims in excess of SDR 100,000, the carriers' defenses are limited. Under Article 20 of the Warsaw Convention, the carrier may show that it took "all necessary measures to avert the disaster or that it was impossible for them to take such measures." *See, Kreindler, Aviation Accident Law* (Matthew Bender, 1999) § 10.11, 10.11[3]. *American has waived this defense in the case at bar. Thus, American has agreed, by contract, to absolute liability with regard to compensatory damages to its international passengers.* The only issue is the amount of compensatory damages owed to them.

11

*In re Air Crash at Little Rock, Arkansas, on June 1, 1999*, 109 F. Supp. 2d 1022, 1024-25 (E.D. Ark. 2000)(emphasis added), *aff'd in part*, *In re Air Crash At Little Rock Arkansas, on June 1, 1999*, 291 F.3d 503 (8th Cir. 2002).

The only genuine issue to be resolved by the trier of fact should be the amount of compensatory damages owed by Defendant for the deaths of international passengers Leslie Ann Whittington and Sandra D. Teague.  This Honorable Court should rule now as a matter of law and/or fact that Defendant did not take "all necessary measures" to avoid the terrorists from hijacking and crashing Flight 77 into the Pentagon.  Not only have government reports concluded, but the checkpoint video surveillance of the hijackers passing through security indisputably shows, Defendant utterly failed to take *all* necessary and reasonable measures to prevent the terrorists from boarding Flight 77 with dangerous weapons, hijacking the aircraft, and crashing it into the Pentagon.  At a minimum, if Defendant had taken all necessary and reasonable measures to prevent the terrorists from hijacking and crashing Flight 77 into the Pentagon, the hijackers would have been properly screened and dangerous items, such as box-cutters, would not have been permitted on board the aircraft.  The 9/11 Commission report concluded, among other things, the following:

a) The Solicitor General of the United States of America reported his wife Barbara Olsen called him twice and reported the hijackers were armed with box-cutters;

b) Box cutters were found in the wreckage of the aircraft;

c) Box cutters were prohibited by the Checkpoint Operations Guide;

d) The checkpoint video clearly showed the passenger screening, item inspection and hand-wanding were inadequate;

e) Clearly visible on the video was an item or item concealed in the pants of one of the hijackers;

f) Those dangerous items, not allowed by regulation to pass into the sterile area of the airport were indisputably used by hijackers to carry out their hijacking of the aircraft on 9/11.

Therefore, there is no *genuine issue of fact* that:

- Defendant did not take all necessary measures to stop the hijackers from penetrating the airline and airport security system, nor was it "impossible" for Defendant to take such measures. (The 9/11 Commission Report, 3, 11, (WW. Norton & Company 1st Edition, ("9/11 CR"); 9/11 Commission Staff Report, August 26, 2004 Declassified, Record Group No. 148, pg. 57, 71, 73-75, 84, ("9/11 CSR"));

- Defendant did not take all necessary measures to stop the hijackers from carrying dangerous weapons aboard Flight 77, nor was it "impossible" for Defendant to take such measures. (9/11 CR pg. 3, 11; 9/11 CSR pg. 57, 71, 73-75, 84)

- Defendant did not take all necessary measures to stop the hijackers from seizing control of the aircraft, nor was it "impossible" for Defendant to take such measures (9/11 CR pg. 3, 11; 9/11 CSR pg. 57, 71, 73-75, 84)

- Defendant did not take all necessary measures to stop the hijackers from operating the aircraft in an unusual and extreme manner, nor was it "impossible" for Defendant to take such measures. (9/11 CR pg. 3, 11; 9/11 CSR pg. 57, 71, 73-75, 84)

- Defendant did not take all necessary measures to stop the terrorists from hijacking and crashing Flight 77 into the Pentagon, nor was it "impossible" for Defendant to take such measures. (9/11 CR pg. 3, 11; 9/11 CSR pg. 57, 71, 73-75, 84)

As there is no genuine dispute as to these material facts, Defendant's Article 20(1) "all necessary measures" defense fails as a matter of law.  Hence, Defendant, American Airlines is liable without limitation for Plaintiffs' full compensatory damages for the deaths of international passengers Leslie Ann Whittington and Sandra D. Teague.

III.    **Plaintiffs, As Representatives Of Passengers Killed During The Course Of International Travel From The U.S. To Australia, Are Entitled To Recover Attorneys' Fees & Litigation Expenses Under The Hague Protocol**

A.    **The Hague Protocol Amended The Warsaw Convention Article 22(4) To Authorize Courts To Award Plaintiffs' Court Costs & Litigation Expenses, Including Attorneys' Fees**

The 1955 Hague Protocol[10] explicitly amended the Warsaw Convention to authorize courts to award "court costs and . . . the other expenses of the litigation incurred by the plaintiff," including attorneys fees.  Hague Protocol Art. XI, amending Article 22(4) of the Warsaw Convention.  As recently explained by one federal court:

> At the 1955 conference at The Hague, the United States had made it known that it was interested in more substantial recoveries for the injured parties or their survivors, since attorneys' fees and court costs reduced the amount actually received by the plaintiff.  A. Lowenfeld & A. Mendelsohn*, The United States and the Warsaw Convention*, 80 Harv. L. Rev. 497, 507 (1967).  Accordingly, the United States proposed that Article 22 of the Warsaw Convention be amended to allow the award of litigation expenses, including attorneys' fees, in addition to the primary award.   Article 22(4) of the Warsaw Convention was eventually amended to reflect the proposal, although there was opposition because the provision was regarded as unnecessary – '[n]o one outside the United States had previously thought that the Warsaw Convention prevented a charge on the defendant for the plaintiff's costs.'  *Id.* at 507-609.

*Motorola, Inc. v. Kuehne & Nagel, Inc.*, 208 F. Supp.2d 910, 912 n.3 (N.D. Ill. 2002); *Domangue v. Eastern Air Lines, Inc.*, 722 F.2d 256, 261 (5th Cir. 1984) (same); *see also*, *Motorola, Inc. v. Federal Express Corp.*, 308 F. 3d 995, 1004 (9th Cir. 2002) (noting that the English Court of Appeal "[o]bserved that Article 22 of The Hague Protocol had made explicit that attorney's fees and costs *may* be awarded in excess of liability caps") (emphasis in original)

---

[10] *See* fn. 1 *supra*

14

(citing *Swiss Bank Corp. v. Brink's-MAT Ltd.*, [1986] 2 Lloyd's Rep. 79, 101 (Eng. C.A.));

*Sompo Japan Ins. Inc. v. Nippon Cargo Airlines, Co.*, 2006 WL 2579706 at *8 (N.D. Ill., Sept. 4, 2006) (same).

Moreover, Article 22(4) as amended by The Hague Protocol, authorizing attorneys' fees and expenses, was *not* modified by Montreal Protocol No 4 (which amended the Warsaw Convention *as amended by* The Hague Protocol, *see* fn. 1 above), nor by the IATA intercarrier agreement, nor by American's tariff – and hence remained in force on September 11, 2001. Accordingly, the Court may award attorneys' fees and litigation expenses to Plaintiffs, as the provisions of The Hague Protocol apply to the international carriage of Plaintiffs' decedents on September 11, 2001.

### B.    Under Second Circuit Law, The United States On September 11, 2001 Was Bound To The Provisions Of The Hague Protocol Vis-à-vis Countries That Were Parties To Montreal Protocol No. 4 Such As Australia.

On September 11, 2001, both the United States and Australia were parties to Montreal Protocol No. 4.[11]  By the express terms of Montreal Protocol No. 4, the United States and Australia consented to adhere to the Hague Protocol.  Hence, on September 11, 2001, the United States was bound by the provisions of The Hague Protocol vis-à-vis Australia.

To be sure, whereas Australia was a party to The Hague Protocol since August 1, 1963, President George Walker Bush did not ratify The Hague Protocol on behalf the United States until December 14, 2003.  Hence, at first blush, Defendant might argue that on September 11, 2001, the United States was not bound by the provisions of The Hague Protocol.

Any such argument by defendant must fail.  As noted above, since March 4, 1999, the United States *was* a party to Montreal Protocol No. 4, by which the United States expressly

---

[11] Montreal Protocol No. 4 (to amend the Warsaw Convention as amended by the Hague Protocol) entered into force in the United States on March 4, 1999.  Montreal Protocol No. 4 (to amend the Warsaw Convention as amended by the Hague Protocol) entered into force in Australia on June 14, 1998.

consented to adhere to The Hague Protocol.  Specifically,  Article XVII(2) of Montreal Protocol

No. 4 states:

> Ratification of this Protocol by any State which is not a party to the Warsaw Convention *as amended at The Hague*, *1955, shall have the effect of accession to the Warsaw Convention as amended by The Hague, 1955,* and by the Protocol No. 4 of Montreal, 1975.

Montreal Protocol No. 4 Art. XVII(2) (emphasis added); *see also*, *Fujitsu Ltd. v. Federal

Express Corp.*, 247 F.3d 423, 431 (2d Cir. 2001) (explaining that the United States was not

governed by The Hague Protocol "until another international agreement, Montreal Protocol No.

4, was ratified by the Senate on September 28, 1998, and became effective on March 4, 1999");

June 23, 2000 Letter of U.S. Deputy Secretary of State Strobe Talbott accompanying President

Clinton's transmission to the Senate of the Montreal Convention, which explained the effect of

the earlier ratification of Montreal Protocol No. 4 as follows:  "In accordance with the provisions

of Montreal Protocol No. 4, **the United States also became bound by the provisions of The

Hague Protocol when it ratified Montreal Protocol No. 4**.") (hereinafter, "Talbott Letter")

(emphasis added).

Moreover, the Second Circuit in *Avero Belgium Ins. v. American Airlines, Inc.*, 423 F.3d

73 (2d Cir. 2005), recently held that while the United States was not bound to The Hague

Protocol vis-à-vis States that were *not* parties to Montreal Protocol No. 4, the United States *was*

bound to The Hague Protocol vis-à-vis states that were parties to Montreal Protocol No. 4.  *Id.* at

83-88.  The Second Circuit explained:

> All parties agree that, from the perspective of a State ***that is also a party to Montreal Protocol No. 4***, the United States was "bound by the provisions of The Hague Protocol" (as amended by Montreal Protocol No. 4) by virtue of having ratified Montreal Protocol No. 4.  That is the sum and substance of the Talbott Letter.

*Avero*, 423 F.3d at 88 (quoting and construing Talbott Letter, *supra*)(emphasis added). Hence, the Second Circuit made clear that vis-à-vis Australia, which was also a party to Montreal Protocol No. 4 on September 11, 2001, the United States *was* bound by the provisions of The Hague Protocol.

Accordingly, Plaintiffs, as Representatives of passengers killed during the course of international travel between the United States and Australia on September 11, 2001, are entitled to recover from defendant American Airlines, attorneys' fees and litigation expenses under Article 22(4) of the Warsaw Convention as amended by The Hague Protocol.

## Conclusion

For the above reasons, Plaintiffs motion for summary judgment should be granted.

Dated:  March 21, 2007                         Respectfully submitted,

**MOTLEY RICE LLC**

**By:**    __s/_ Mary Schiavo_____
Ronald L. Motley, Esquire
Joseph F. Rice, Esquire
Mary Schiavo, Esquire
Jodi Westbrook Flowers, Esquire
Don Migliori, Esquire
Michael E. Elsner, Esquire (ME-8337)
Elizabeth Smith, Esquire
Justin Kaplan, Esquire
Vincent I. Parrett, Esquire (VP-5092)
Motley Rice LLC
28 Bridgeside Boulevard
Post Office Box 1792
Mount Pleasant, SC 29465
Telephone:  (843) 216-9000

# EXHIBIT 1

**International Air Transport Association ("IATA")
Intercarrier Agreement on Passenger Liability**

**INTERCARRIER AGREEMENT ON PASSENGER LIABILITY**

**EXPLANATORY NOTE**

The Intercarrier Agreement is an "umbrella accord"; the precise legal rights and responsibilities of the signatory carriers with respect to passengers will be spelled out in the applicable Conditions of Carriage and tariff filings.

The carriers signatory to the Agreement undertake to waive such limitations of liability as are set out in the Warsaw Convention (1929), The Hague Protocol (1955), the Montreal Agreement of 1966, and/or limits they may have previously agreed to implement or were required by Governments to implement.

Such waiver by a carrier may be made conditional on the law of the domicile of the passenger governing the calculation of the recoverable compensatory damages under the Intercarrier Agreement.   But this is an option.  Should a carrier wish to waive the limits of liability but not insist on the law of the domicile of the passenger governing the calculation of the recoverable compensatory damages, or not be so required by a governmental authority, it may rely on the law of the court to which the case is submitted.

The Warsaw Convention system defences will remain available, in whole or in part, to the carriers signatory to the Agreement, unless a carrier decides to waive them or is so required by a governmental authority.



# IATA
# INTERCARRIER AGREEMENT ON
# PASSENGER LIABILITY

**WHEREAS**: The Warsaw Convention system is of great benefit to international air transportation; and

**NOTING THAT**: The Convention's limits of liability, which have not been amended since 1955, are now grossly inadequate in most countries and that international airlines have previously acted together to increase them to the benefit of passengers;

### The undersigned carriers agree

1.      To take action to waive the limitation of liability on recoverable compensatory damages in Article 22 paragraph 1 of the Warsaw Convention[*] as to claims for death, wounding or other bodily injury of a passenger within the meaning of Article 17 of the Convention, so that recoverable compensatory damages may be determined and awarded by reference to the law of the domicile of the passenger.

2.      To reserve all available defences pursuant to the provisions of the Convention; nevertheless, any carrier may waive any defence, including the waiver of any defence up to a specified monetary amount of recoverable compensatory damages, as circumstances may warrant.

3.      To reserve their rights of recourse against any other person, including rights of contribution or indemnity, with respect to any sums paid by the carrier.

4.      To encourage other airlines involved in the international carriage of passengers to apply the terms of this Agreement to such carriage.

5.      To implement the provisions of this Agreement no later than 1 November 1996 or upon receipt of requisite government approvals, whichever is later.

6.      That nothing in this Agreement shall affect the rights of the passenger or the claimant otherwise available under the Convention.

7.      That this Agreement may be signed in any number of counterparts, all of which shall constitute one Agreement. Any carrier may become a party to this Agreement by signing a counterpart hereof and depositing it with the Director General of the International Air Transport Association (IATA).

8.      That any carrier party hereto may withdraw from this Agreement by giving twelve (12) months' written notice of withdrawal to the Director General of IATA and to the other carriers parties to the Agreement.

*Signed this_____ day of _____ 199__*

_____

_____

[*] *"WARSAW CONVENTION" as used herein means the Convention for the Unification of Certain Rules Relating to International Carriage by Air signed at Warsaw, 12th October 1929, or that Convention as amended at The Hague, 28th September 1955, whichever may be applicable.*

# EXHIBIT 2

## Agreement on Measures to Implement the IATA Intercarrier Agreement ("MIA")



## AGREEMENT ON MEASURES TO IMPLEMENT THE
## IATA INTERCARRIER AGREEMENT

I.    Pursuant to the IATA Intercarrier Agreement of 31 October 1995, the undersigned carriers agree to implement said Agreement by incorporating in their conditions of carriage and tariffs, where necessary, the following:

    1.    **{CARRIER}** shall not invoke the limitation of liability in Article 22(1) of the Convention as to any claim for recoverable compensatory damages arising under Article 17 of the Convention.

    2.    **{CARRIER}** shall not avail itself of any defence under Article 20(1) of the Convention with respect to that portion of such claim which does not exceed 100,000 SDRs* [unless option II(2) is used ].

    3.    Except as otherwise provided in paragraphs 1 and 2 hereof, **{CARRIER}** reserves all defences available under the Convention to any such claim. With respect to third parties, the carrier also reserves all rights of recourse against any other person, including without limitation, rights of contribution and indemnity.

II.    At the option of the carrier, its conditions of carriage and tariffs also may include the following provisions:

    1.    **{CARRIER}** agrees that subject to applicable law, recoverable compensatory damages for such claims may be determined by reference to the law of the domicile or permanent residence of the passenger.

    2.    **{CARRIER}** shall not avail itself of any defence under Article 20(1) of the Convention with respect to portion of such claims which does not exceed 100,000 SDRs, except that such waiver is limited to the amounts shown below for the routes indicated, as may be authorised by governments concerned with the transportation involved.

**[Amounts and routes to be inserted]**

---

\* **Defined if necessary**

# EXHIBIT 3

**Air Transport Association of America
Provisions Implementing the
IATA Intercarrier Agreement to be Included in
Conditions of Carriage and Tariffs ("IPA")**



Air Transport Association

### PROVISIONS IMPLEMENTING THE IATA INTERCARRIER AGREEMENT TO BE INCLUDED IN CONDITIONS OF CARRIAGE AND TARIFFS

I.  Pursuant to the IATA Intercarrier Agreement of 31 October 1995 (IIA), and the Agreement on Measures to Implement the IATA Intercarrier Agreement (MIA), each of the undersigned carriers ("the Carrier") shall, on or before November 1, 1996, include the following in its conditions of carriage, including tariffs embodying conditions of carriage filed by it with any government:

"The Carrier agrees in accordance with Article 22(1) of The Convention for the Unification of Certain Rules Relating to International Transportation by Air signed at Warsaw October 12, 1929 or, where applicable, that Convention as amended by the Protocol signed at The Hague on 28 September 1955 ("the Convention") that, as to all international carriage or transportation hereunder as defined in the Convention:

(1)  The Carrier shall not invoke the limitation of liability in Article 22(1) of the Convention as to any claim for recoverable compensatory damages arising under Article 17 of the Convention.

(2)  The Carrier shall not avail itself of any defense under Article 20(1) of the Convention with respect to that portion of such claim which does not exceed 100,000 SDRs.[1]

(3)  Except as otherwise provided in paragraphs 1 and 2 hereof, the Carrier reserves all defenses available under the Convention to such claims. With respect to third parties, the Carrier reserves all rights of recourse against any other person, including without limitation, rights of contribution and indemnity.

(4)  The Carrier agrees that subject to applicable law recoverable compensatory damages for such claims may be determined by reference to the law of the domicile or permanent residence of the passenger."

II,  The Carrier shall, at the time of delivery of the ticket, furnish to each passenger whose transportation is governed by the Convention, the following notice:

### "ADVICE TO INTERNATIONAL PASSENGERS ON CARRIER LIABILITY

Passengers on a journey involving an ultimate destination or a stop in a country other than the country of departure are advised that a treaty known as the Warsaw Convention may apply to the entire journey, including any portion thereof entirely within a country. For such passengers, the Warsaw Convention, including special contracts of carriage embodied in applicable tariffs, governs the liability of the Carrier for death of or injury to passengers.

---

[1]  Special Drawing Rights.

The names of carriers party to such special contracts are available at all ticket offices of such carriers and may be examined upon request."

III.   The implementation of this Agreement shall constitute a withdrawal by the Carrier from the intercarrier agreement, approved by CAB Order E-23680 and dated May 13, 1966, relating to the liability limits of the Convention for the Unification of Certain Rules Relating to International Transportation by Air signed at Warsaw October 12, 1929, and said withdrawal shall be effective on the date the provisions in the Carrier's conditions of carriage adopted pursuant to Paragraph I of this Agreement become effective.

IV.   Nothing in this Agreement shall be deemed to affect the rights of the passenger, the claimant and/or the Carrier under the Convention, other than as set forth in Paragraph I herein.  If any provision of this Agreement is determined by a court of competent authority to be prohibited or unenforceable, it shall as to that jurisdiction be ineffective only to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Agreement.  Any such prohibition or unenforceability in one jurisdiction shall not invalidate or render unenforceable that provision in any other jurisdiction.

V.   The Carrier may encourage other carriers engaged in international carriage or transportation as defined in the Convention to become party to the IIA and the MIA, and to this Agreement or any other satisfactory implementation of the IIA and the MIA.

VI.   This Agreement shall be filed with the U.S. Department of Transportation for approval pursuant to 49 U.S.C. sections 41308 and 41309 and filed with other governments as required.   This Agreement shall become effective upon approval by that Department under 49 U.S.C. section 41309, and action by that Department to provide that the adherence to, and the implementation of, this Agreement by the Carrier shall constitute compliance with all regulations of that Department that incorporate the intercarrier agreement referred to in paragraph III of this Agreement.

VII.   This Agreement may be signed in any number of counterparts, all of which shall constitute one agreement.  Any carrier may become a party to this Agreement by signing a counterpart hereof and depositing it with the U.S. Department of Transportation.

__July 8, 1996__
Date

Michael W. Gunn        (signature and title)
Senior Vice President
Marketing

                              (address of Carrier)
May 16, 1996

AMERICAN AIRLINES, INC.

4333 Amon Carter Blvd.

Fort Worth, Texas  76155

2

# EXHIBIT 4

**Tariff of American Airlines, Inc.,
Incorporating the Terms of the IPA
(Provisions Implementing the
IATA Intercarrier Agreement)**

55  LIABILITY OF CARRIERS

(A) <u>SUCCESSIVE CARRIERS</u>
Carriage to be performed under one ticket or under a ticket and any conjunction ticket issued in connection therewith by several successive carriers is regarded as a single operation.

(B) <u>LAWS AND PROVISIONS APPLICABLE</u>
(1) <u>Warsaw Convention</u>  the carrier agrees in accordance with Article 22(1) of the Convention for the Unification of Certain Rules Relating to International Transportation by Air signed at Warsaw, October 12, 1929 or, where applicable, that Convention as amended by the Protocol signed at The Hague on September 28, 1955 ("the Convention") that, as to all international carriage or transportation hereunder as defined in the Convention:
  (a) the carrier shall not invoke the limitation of liability in Article 22(I) of the Convention as to any claim for recoverable compensatory damages arising under Article 17 of the Convention.
  (b) The carrier shall not avail itself of any defense under Article 20(I) of the Convention with respect to that portion of such claim which does not exceed 100,000 Special Drawing Rights (SDR).
  (c) Except as otherwise provided in paragraphs (a) and (b) hereof, the carrier reserves all defenses available under the Convention to such claims. With respect to third parties, the carrier reserves all rights of recourse against any other person, including without limitation, rights of contribution and indemnity.
  NOTE:  Paragraph 1 shall expire as provided in U.S. Department of Transportation Order 97-1-2 and be replaced in accordance with any final action or order of the Department entered in Docket OST-96-1607.
  (d) The carrier agrees that, subject to applicable law, recoverable compensatory damages for such claims may be determined by reference to the law of the domicile or permanent residence of the passenger.
(2) <u>Other Persons</u>  Nothing herein shall be deemed to affect the rights and liability of the carrier with regard to any claims brought by, on behalf of, or in respect of any person who has willfully caused damage which resulted in death, wounding, or other bodily injury of a passenger.

(C) <u>LIMITATION OF LIABILITY</u>
Except as the convention or other applicable law may otherwise require:
(1) Carrier is not liable for any death, injury, delay, loss, or other damage of whatsoever nature (hereinafter in this tariff collectively referred

to as "damage") to passengers or unchecked baggage arising out of or in connection with carriage or other services performed by carrier incidental thereto, unless such damage is caused by the negligence of carrier. Assistance rendered to the passenger by carrier's employees in loading, unloading, or transshipping baggage shall be considered as gratuitous service to the passenger. (See NOTE, paragraph (B)(1) above.)

(2) Carrier is not liable for any damage directly and solely arising out of its compliance with any laws, government regulations, orders, or requirements or from failure of passenger to comply with same, or out of any cause beyond carrier's control.

(3) (a) Any liability of carrier is limited to $20.00 (250 French gold francs, consisting of 65 1/2 milligrams of gold with a fineness of nine hundred thousandths) per kilogram in the case of checked baggage and $400.00 (5,000 French gold francs) per passenger in the case of unchecked baggage or other property, unless a higher value is declared in advance and additional charges are paid pursuant to carrier's regulations. In that event the liability of the carrier shall be limited to such higher declared value. In no case shall the carrier's liability exceed the actual loss suffered by the passenger. All claims are subject to proof of amount of loss.

(b) The foregoing limitation shall not apply when the passenger can prove that the carrier has failed to comply with the notice provisions of Section 221.176 of Part 221 of the Department of Transportation's Economic Regulations.

NOTE 1: Under no circumstances will the carrier be liable for the loss, delay or damage to unchecked baggage or cabin baggage not attributed to the negligence of the carrier. Assistance rendered to the passenger by the carrier's employees in loading, unloading or trans-shipping of unchecked or cabin baggage shall be considered as a gratuitous service to the passenger.

NOTE 2: (Applicable only to transportation entirely via AA or interline transportation where AA is the originating carrier.) For the purpose of determining liability under the Convention with respect to passenger baggage acceptable for checking under Rule 97 (B)(ACCEPTANCE OF BAGGAGE), the weight of each piece of such baggage shall be deemed to be the maximum free allowable weight for each piece of such baggage under the rule, NOT TO EXCEED A MAXIMUM OF 32 KILOGRAMS/70 POUNDS.

(4) (a) In any event liability of carrier for delay of a passenger shall not exceed 125,000 French gold francs, or its equivalent.

(b) In any event liability of carrier for death or injury shall not exceed 125,000 French gold francs, or its equivalent. (See NOTE, paragraph (B)(1) above.)

(5) In the event of delivery to the passengers of part but not all of his

checked baggage, or in the event of damage to part but not all of such baggage, the liability of the carrier with respect to the undelivered or damaged portion shall be reduced proportionately on the basis of weight, notwithstanding the value of any part of the baggage or contents thereof.

(6) Carrier is not liable for damage to a passenger's baggage caused by property contained in the passenger's baggage. Any passenger whose property caused damage to another passenger's baggage or to the property of carrier shall indemnify carrier for all losses and expenses incurred by carrier as a result thereof.

(7) Carrier is not liable for loss, damage to, or delay in the delivery of fragile or perishable articles, money, jewelry, silverware, negotiable papers, securities, or other valuables, business documents, or samples that are included in the passenger's checked baggage, with or without the knowledge of carrier.

(8) Carrier may refuse to accept any articles that do not constitute baggage as such term is defined herein, but if delivered to and received by carrier, such articles shall be deemed to be within the baggage valuation and limit of liability, and shall be subject to the published rates and charges of carrier.

(9) (a) Liability of carrier for damages shall be limited to occurrences on its own line, except in the case of checked baggage as to which the passenger also has a right of action against the first or last carrier.

    (b) A carrier issuing a ticket or checking baggage for carriage over the lines of another carrier does so only as agent. (See NOTE, paragraph (B)(1) above.)

(10) Carrier shall not be liable in any event for any consequential or special damage arising from carriage subject to this tariff, whether or not carrier had knowledge that such damages might be incurred.

(11) Any exclusion or limitation of liability of carrier under this tariff or the ticket shall apply to agents, servants, or representatives of the carrier acting within the scope of their employment and also to any person whose aircraft is used by the carrier and its agents, servants or representatives acting within the scope of their employment.

(12) (Applicable to AA only for interline transportation where any other carrier is the originating carrier) Carrier shall not be liable for the loss, damage, or delay in delivery of any property which is not acceptable for transportation in accordance with Rules 97 (<u>ACCEPTANCE OF BAGGAGE</u>), 100 (<u>CONDITIONS AND CHARGES FOR ACCEPTANCE OF SPECIAL ITEMS</u>), and 105 (<u>ACCEPTANCE OF PETS AND ANIMALS</u>) or for any other loss or damage of whatever nature resulting from any such loss or damage or from the transportation of such property. This exclusion is applicable whether the nonacceptable property is included in the passenger's checked baggage with or without the knowledge of the carrier.

(13) (Applicable only when AA is the originating carrier) When carrier

has exercised the ordinary standard of care, it shall not be liable for delay in delivery of any perishables, nor for damage to, or damage caused by, fragile articles which are unsuitably packed and which are included in a passenger's checked baggage without carrier's knowledge. Carrier shall not be liable for the damage or delay in delivery of a passenger's checked baggage or property accepted pursuant to the execution of a release (See Rule 100), to the extent that such release relieves carrier of liability.

> EXCEPTION:    This exclusion shall not apply to personal eyeglasses or contact lenses contained in a suitable case, one camera per passenger and reasonable quantities of personal toiletries.
>
> NOTE:  For the purpose of this rule, fragile and perishable articles are as described in Rule 100(H).

(14)  The owner of a pet shall be responsible for compliance with all governmental regulations and restrictions, including furnishing valid health and rabies vaccination certificates when required. Carrier will not be liable for loss or expense due to the passenger's failure to comply with this provision, and carrier will not be responsible if any pet is refused passage into or through any country, state or territory.

(D)  <u>TIME LIMITATIONS ON CLAIMS AND ACTIONS</u>

(1)  No action shall lie in the case of damage to baggage unless the person entitled to delivery complains to the carrier forthwith after the discovery of the damage, and, at the latest, within seven days from the date of receipt; and in the case of delay, or loss, complaint must be made at the latest within 21 days from the date on which the baggage has been placed at his disposal (in the case of delay), or should have been placed at his disposal (in the case of loss). Every complaint must be made in writing and dispatched within the time aforesaid. Where carriage is not "international carriage" as defined in the Convention, failure to give notice shall not be a bar to suit where claimant proves that

(a)  it was not reasonably possible for him to give such notice, or
(b)  that notice was not given due to fraud on the part of carrier, or
(c)  the management of carrier had knowledge of damage to passenger's baggage.

(2)  Any right to damages against carrier shall be extinguished unless an action is brought within two years reckoned from the date of arrival at the destination, or from the date on which the aircraft ought to have arrived, or from the date on which the carriage stopped.

(E)  <u>OVERRIDING LAW</u>

Insofar as any provision contained or referred to in the ticket or in this tariff may be contrary to a law, government regulation, order or requirement which severally cannot be waived by agreement of the parties such provisions shall remain applicable and be considered as part of the contract of carriage to the extent only

that such provision is not contrary thereto. The invalidity of any provision shall not affect any other part.

(F) <u>MODIFICATION AND WAIVER</u>

No agent, servant, or representative of carrier has authority to alter, modify, or waive any provisions of the contract of carriage of this tariff.

(G) <u>GRATUITOUS TRANSPORTATION</u>

(1) Gratuitous transportation by carrier of persons as hereinafter described shall be governed by all the provisions of this rule, except subparagraph (2) below and by all other applicable rules of this tariff.

    (a) Transportation of persons injured in aircraft accidents on the lines of carrier and physicians and nurses attending such persons.

    (b) Transportation of persons, the object of which is that of providing relief in general epidemics, pestilence or other calamitous visitation.

    (c) Transportation of persons, which is required by and authorized pursuant to Part 223 of the Economic Regulations of the Department of Transportation of the United States of America.

    (d) Transportation of persons which is subject to the Convention.

    (e) Transportation of officers, employees and servants of carrier traveling in the course of their employment and in the furtherance of carrier's business.

(2) Except in respect of gratuitous transportation of persons described in paragraph (G) (1) above, carrier in furnishing gratuitous transportation shall not be liable (the provisions of Rule 55(B) and (C) to the contrary notwithstanding) under any circumstances whether of its own negligence or that of its officers, agents, representatives or employees, or otherwise, and the person using such free transportation on behalf of himself, his heirs, legal representative, defendants and other parties in interest, and their representatives, assignees, releases and agrees to indemnify carrier, its officers, agents, representatives and employees from all liability (including cost and expenses), for any and all delay, and for failure to complete passage, and from any and all loss or damage to the property of such person.