UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| : | No.: 21 MC 97 (AKH) |
| : | |
| : | **THIS DOCUMENT RELATES TO:** |
| : | |
| : | *Falkenberg v. AMR Corp., et al.* |
| : | **02 CV 7145 (AKH)** |
| : | |
| : | *Teague v. AMR Corp., et al.* |
| : | **03 CV 6899 (AKH)** |

IN RE SEPTEMBER 11 LITIGATION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# MEMORANDUM OF LAW OF DEFENDANT AMERICAN AIRLINES, INC. IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

CONDON & FORSYTH LLP
Desmond T. Barry, Jr. (DB 8066)
Times Square Tower
7 Times Square
New York, New York 10036
(212) 490-9100

- and -

DEBEVOISE & PLIMPTON LLP
Roger E. Podesta (RP 1749)
919 Third Avenue
New York, New York 10022
(212) 909-6000

Attorneys for Defendant
AMERICAN AIRLINES, INC.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

ARGUMENT ............................................................................................................................ 4

I.  SUMMARY JUDGMENT IN FAVOR OF PLAINTIFFS IS NOT APPROPRIATE IN
    THESE TWO WARSAW CONVENTION ACTIONS ...................................................... 4

II. AMERICAN CAN AVAIL ITSELF OF THE "ALL NECESSARY MEASURES"
    DEFENSE BY SHOWING THAT IT TOOK ALL REASONABLE MEASURES TO
    PREVENT THE PLAINTIFFS' LOSSES ......................................................................... 6

III. ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT. ...................... 10

IV. PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED AS
    PREMATURE. .................................................................................................................. 15

    A.  The Applicable Standard of Care Must be Determined by the Court Before This
        Motion Can Be Decided. ....................................................................................... 17

    B.  Plaintiffs' Motion Is Premature Because Discovery is Incomplete ........................ 19

V.  THE HAGUE PROTOCOL DOES NOT APPLY BECAUSE THE UNITED STATES
    WAS NOT A PARTY TO THE HAGUE PROTOCOL IN 2001 ...................................... 22

CONCLUSION ........................................................................................................................ 26

# TABLE OF AUTHORITIES

## CASES:

*Air France v. Saks*, 470 U.S. 392 (1985)...................................................7, 24

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)......................................19, 20

*Avero Belgium Ins. v. Am. Airlines, Inc.*, 423 F.3d 73 (2d Cir. 2005)..............22, 23, 24

*Berger v. United States*, 87 F.3d 60 (2d Cir. 1996).........................................20

*Brink's Ltd. v. South African Airways*, 93 F.3d 1022 (2d Cir. 1996).......................25

*Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919
(2d Cir. 1985).............................................................................5

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)..............................................5

*Continental Ins. Co. v. Federal Express Corp.*, 454 F.3d 951 (9th Cir. 2006)...........24

*CPH Int'l v. Phoenix Assurance Co.*, No. 92 Civ. 2729(SS) (NRB), 1994 WL
259810 (S.D.N.Y. June 9, 1994)............................................................8

*D&N Property Mgmt. & Dev. Corp. v. Copeland Co.*, 127 F. Supp. 2d 456
(S.D.N.Y. 2001)...........................................................................5

*Day v. Trans World Airlines, Inc.*, 528 F.2d 31 (2d Cir. 1975)..............................7

*Eastern Airlines, Inc. v. Floyd*, 499 U.S. 530 (1991).......................................7

*El Al Israel Airlines, Ltd. v. Tseng*, 525 U.S. 155 (1999)..............................6, 24

*EUA Cogenex v. N. Rockland Cent. School Dist.*, 124 F. Supp. 2d 861
(S.D.N.Y. 2001)...........................................................................5

*Fishman v. Delta Air Lines, Inc.*, 938 F. Supp. 228 (S.D.N.Y. 1996), *aff'd*,
132 F.3d 138 (2d Cir. 1998)...............................................................7

*Gallo v. Prudential Residential Servs. Ltd.*, 22 F.3d 1219 (2d Cir. 1994).................4

*Hellstrom v. U.S. Dep't of Veterans Affairs*, 201 F.3d 94 (2d Cir. 2000).................20

*Herman v. United Airlines, Inc.*, 157 F. Supp. 65 (D. Colo. 1957)........................12

*In re Air Disaster at Lockerbie, Scotland on December 21, 1988*, 928 F.2d 1267
(2d Cir.), *cert. denied*, 502 U.S. 920 (1991)................................................................7

*In re Sept. 11 Litig.*, 280 F. Supp. 2d 279 (S.D.N.Y. 2003), *denying leave to
appeal*, 2003 WL 22251325 (S.D.N.Y. Oct. 1, 2003).....................................6

*In re Stanton's Will*, 236 N.Y.S.2d 358 (N.Y. Sur. 1963)..................................25

*In re World Trade Ctr. Disaster Site Litig.*, 456 F. Supp. 2d 520 (S.D.N.Y. 2006)......6

*Jang Sool Kwon v. Sing. Airlines*, 356 F. Supp. 2d 1041 (N.D. Cal. 2003).................8

*King v. Am. Airlines, Inc.*, 284 F.3d 352 (2d Cir. 2002)......................................7

*Lahey v. Singapore Airlines, Ltd.*, 115 F. Supp. 2d 464 (S.D.N.Y. 2000)..................25

*Lee v. Am. Airlines, Inc.*, No. CIV A3:01-CV-1179-P, 2004 WL 2624647
(N.D. Tex. 2004).........................................................................8, 9, 10, 16

*Magan v. Lufthansa German Airlines*, 339 F.3d 158 (2d Cir. 2003)..........................7

*Mfrs. Hanover Trust Co. v. Alitalia Airlines*, 429 F. Supp. 964
(S.D.N.Y.) (emphasis added), *aff'd*, 573 F.2d 1292 (2d Cir. 1977),
*cert. denied*, 435 U.S. 971 (1978)...................................................2, 8, 9, 10, 16

*Mayore Estates, LLC v. Port Auth. of N.Y. & N.J.*, No. 02 Civ. 7198 (AKH),
2003 WL 22232918 (S.D.N.Y. Sept. 26, 2003)..............................................6

*Medina v. Am. Airlines, Inc.*, No. 02-22133 CIV, 2006 WL 3663692
(S.D. Fla. Nov. 14, 2006)...........................................................2, 8, 16

*Obuzor v. Sabena Belgian World Airlines*, No. 98 CIV 0224 (JSM), 1999 WL
223162 (S.D.N.Y. Apr. 16, 1999)..............................................................8, 9

*Olympic Airways v. Husain*, 540 U.S. 644 (2004), *reh'g denied*, 541 U.S. 1007 (2004).....7

*Ortiz v. Rosner*, 817 F. Supp. 348 (S.D.N.Y. 1993)..........................................19

*Pflug v. Egyptair Corp.*, 961 F.2d 26 (2d Cir. 1992)..........................................7

*Starkey v. Capstone Enter. of Portchester, Inc.*, 237 F.R.D. 46 (S.D.N.Y. 2006)...........5

*Sysco Food Services of Hampton Roads, Inc. v. Maersk Logistics, Inc.*,
No. 03 Civ. 7384 (JGK) 2006 WL 2506437 (S.D.N.Y. Aug. 29, 2006)....................24

*Titan Sports, Inc. v. Turner Broad. Sys.*, 151 F.3d 125 (3d Cir. 1998)......................20

*Townes Ex. Rel. Townes v. Core Haven, Inc.*, No. 00 CV 5603,
2003 WL 22861921, at *2 (S.D.N.Y. Dec. 2, 2003)..........................................19

*Verdesca v. Am. Airlines, Inc.*, No. 3-99-CV-2022-BD, 2000 WL 1538704
(N.D. Tex. Oct. 17, 2000)...................................................................8, 9, 10, 16

*Vildex, S.A.I.C. v. United Airlines, Inc.*, No. CV-94-4304 CPS, 1996 WL
733081 (E.D.N.Y. Dec. 10, 1996)..............................................................5, 8, 9

*Zicherman v. Korean Air Lines Co., Ltd.*, 516 U.S. 217 (1996)...............................25

## CONSTITUTIONS, STATUTES & RULES:

U.S. Const. art. VI, cl. 2.........................................................................7

49 U.S.C. § 49903 (amended 2001)............................................................17

49 U.S.C. § 49904 (amended 2001)............................................................17

Federal Rule of Civil Procedure Rule 56(f)....................................4, 5, 6, 9, 21

Virginia Code Annotated § 8.01-52.............................................................25

## TREATIES & REGULATIONS:

Convention for Certain Rules Relating to International Transportation by Air,
concluded at Warsaw, Poland, October 12, 1929, 49 Stat. 3000, T.S. No. 876,
137 L.N.T.S. 11 (1934), *reprinted in note following* 49 U.S.C. 40105
("Warsaw Convention") Article 17.........................................................1, 6, 7

The Convention for the Unification of Certain Rules Relating to
International Carriage by Air Signed at Warsaw on 12 October 1929 as
Amended by the Protocol Done at The Hague on 28 September 1955,
478 U.N.T.S. 371 ("The Hague Protocol").....................................................25

Montreal Protocol No. 4 to Amend the Convention for the Unification
of Certain Rules Relating to International Carriage by Air Signed at
Warsaw on 12 October 1929 as Amended by the Protocol Done at The
Hague on 28 September 1955, 2145 U.N.T.S. 36 ("Montreal Protocol No. 4")............23, 24

14 C.F.R. § 108.7.................................................................18

14 C.F.R. § 108.25...........................................................17, 18

**MISCELLANEOUS:**

Final Report of the National Commission on Terrorist Attacks Upon the
United States ("The 9/11 Commission Report").........................................1, 3, 11, 13,
                                                                              14, 16, 20

Nat'l Comm'n on Terrorist Attacks Upon the U.S., *Staff Monograph on the
"Four Flights and Civil Aviation Security"* 72 (2005) ("Aviation Monograph").........3, 11, 12, 13,
                                                                              14, 21

8 C.J.S. *Treaties, Construction and Operation, Rules of Construction* § 7................15

Thomas J. Whalen & Michelle L. Carey, *Changes in the Warsaw Convention and
its Effects on Aviation Liability, in Litigating the Aviation Case: From Pre-Trial
to Closing Argument* 107, 116 (Desmond T. Barry, Jr. ed., 1998)..........................15

*Special Drawing Rights – A Factsheet*, http://www.imf.org...........................................8

## PRELIMINARY STATEMENT

Defendant American Airlines, Inc. ("American") respectfully submits this Memorandum of Law in opposition to plaintiffs' Motion for Summary Judgment in these two wrongful death actions governed by the Warsaw Convention.[1]

Plaintiffs seek summary judgment eliminating a Warsaw Convention defense that American took "all necessary measures" to prevent the hijacking of Flight 77 on September 11, 2001 and subjecting American to unlimited presumptive liability.  Plaintiffs' motion ignores the unique circumstances of these cases and attempts to treat the terrorists' deliberate crash of Flight 77 into the Pentagon as if it were an ordinary commercial aviation disaster resulting from a mechanical failure or pilot error.  As the 9/11 Commission Report reflects, owing to the implacable determination of the enemy who launched the September 11 attacks, and the vulnerabilities inherent in the federally-designed blueprint for aviation security, this is exactly a case where American may have taken "all necessary measures" but those measures were not sufficient to prevent the terrorists from carrying out their well-planned plot. *See* Final Report of the National Commission on Terrorist Attacks Upon the United States, xv-xvi ("9/11 Commission Report") ("September 11, 2001 was a day of unprecedented shock and suffering in the history of the United States. . . . We learned about an enemy who was sophisticated, patient, disciplined, and lethal . . . its hostility towards us and our values is limitless.")

Plaintiffs' motion should be denied, for multiple reasons.  First, Plaintiffs argue essentially that because Flight 77 was hijacked, *ipso facto*, all necessary measures must not have

---

[1] Official title:  Convention for Certain Rules Relating to International Transportation by Air, concluded at Warsaw, Poland, October 12, 1929, 49 Stat. 3000, T.S. No. 876, 137 L.N.T.S. 11 (1934), *reprinted in note following* 49 U.S.C. 40105 ("Warsaw Convention").

been taken to prevent the hijacking. Plaintiffs want to raise the bar on the "all necessary measures" defense to the point that it becomes an impossible hurdle, even in these extraordinary circumstances. The actual law is not nearly as draconian nor the defense as meaningless as Plaintiffs would like the Court to believe. Under case law interpreting Article 20(1) of the Warsaw Convention, as modified by the IATA Intercarrier Agreement, American can prevail on the "all necessary measures" defense simply by showing that it complied with all applicable federal regulations and thereby took all precautions that, in sum, were appropriate to the risk that was known or knowable on September 11, 2001. *See Mfrs. Hanover Trust Co. v. Alitalia Airlines*, 429 F. Supp. 964, 967 (S.D.N.Y.) (emphasis added), *aff'd*, 573 F.2d 1292 (2d Cir. 1977), *cert. denied*, 435 U.S. 971 (1978); *see Medina v. Am. Airlines, Inc.*, No. 02-22133 CIV, 2006 WL 3663692, at *2 (S.D. Fla. Nov. 14, 2006) ("It is not necessary for the carrier to take every precaution that might have prevented the loss . . . .").

Moreover, Plaintiffs' interpretation of the factual record is as insupportably one-sided as their interpretation of the law. Plaintiffs rely primarily on statements (taken entirely out of context, including in one instance from the wrong flight) contained in the 9/11 Commission Report and the underlying Aviation Monograph prepared by the Commission Staff for their assertions that American failed to take all necessary measures to prevent the hijacking of Flight 77, despite the fact that the Court has not yet determined whether and to what extent the 9/11 Commission Report is admissible in these cases.

The 9/11 Commission Report itself, however, is replete with findings that preclude summary judgment here. For example, the 9/11 Commission determined that:

- The terrorists were instructed to use weapons that were undetectable or permissible under the Federal Aviation Administration ("FAA") rules and equipment, *see* 9/11 Commission Report at 84;

- The FAA-ordered Computer Assisted Passenger Prescreening ("CAPPS") program was correctly applied to the hijackers, *see* Nat'l Comm'n on Terrorist Attacks Upon the U.S., *Staff Monograph on the "Four Flights and Civil Aviation Security"* 72 (2005) ("Aviation Monograph");

- The FAA-mandated security system was aimed primarily at nonsuicidal explosives attacks, *see* 9/11 Commission Report at 82-83; Aviation Monograph at 2-3, 55; and

- The FAA-required Common Strategy compelled the airlines to cooperate with, rather than confront, hijackers, *see* 9/11 Commission Report at 85; Aviation Monograph at 48, 81-82.

Consequently, even if Plaintiffs are entitled to rely on the 9/11 Commission Report, it provides ample basis to conclude that, at a minimum, disputed issues of material fact exist whether American took all necessary measures to prevent the hijacking of Flight 77.

The Court, however, need not even reach that question to deny Plaintiffs' motion because this motion is premature in two critical respects. First, the Court cannot determine whether Plaintiffs have demonstrated, as a matter of law, that American did not take "all necessary measures" to prevent the hijacking and crash of Flight 77 when the Court has not yet determined what "all necessary measures" would have been on September 11, 2001. Currently pending before the Court is the Aviation Defendants' Motion for a Determination of Applicable Law Regarding the Standard of Care, which argues that the comprehensive system of FAA aviation security regulations supply the exclusive standard of care in these actions. A decision on that motion – which is not yet fully briefed and which will be argued on June 14, 2007 – is a necessary precursor to any determination that there are no genuine issues of material fact, because the governing law is determinative of which facts are material.

3

Second, the factual record is far from complete and discovery is ongoing into many issues that are crucial to American's opposition to this motion. For example, American has sought discovery from the FBI that has the potential to shed light on what weapons the terrorists might have used and what weapons the terrorists elected not to use precisely because they recognized that those weapons were not permissible under the FAA regulations. American has also sought discovery from the Government regarding the its assessment of the terrorist threat in September 2001 and its communications to the airlines regarding the countermeasures appropriate to meet that threat. American should be permitted to develop a full factual record in support of its argument that it did take all necessary measures to prevent a terrorist hijacking, rather than being precluded at the outset from even exploring these core questions.

That portion of Plaintiffs' motion seeking recovery of attorneys' fees also should be denied because the United States was not a party to the Hague Protocol in 2001 and because attorneys' fees are not recoverable in a case governed by the Warsaw Convention.

## ARGUMENT

### I.

### SUMMARY JUDGMENT IN FAVOR OF PLAINTIFFS IS NOT APPROPRIATE IN THESE TWO WARSAW CONVENTION ACTIONS

A movant is entitled to summary judgment as a matter of law only when there are no genuine issues of material fact in dispute. Fed.R.Civ.P. 56(c). The trial court's task at the summary judgment stage is to discern if there are any genuine issues of material fact to be tried; the trial court is not charged with deciding the factual issues. *Gallo v. Prudential Residential Servs. Ltd.*, 22 F.3d 1219, 1224 (2d Cir. 1994) (explaining that a trial court's duty is "issue-finding" not "issue resolution"). A genuine issue for trial exists if, *based on the record as a*

4

*whole*, a reasonable jury could find in favor of the non-movant. *D&N Prop. Mgmt. & Dev. Corp. v. Copeland Co.*, 127 F. Supp. 2d 456, 461 (S.D.N.Y. 2001) (emphasis added).

In making its determination, the trial court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the non-moving party. *Id.* The party seeking summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *EUA Cogenex v. N. Rockland Cent. School Dist.*, 124 F. Supp. 2d 861, 867 (S.D.N.Y. 2001).

Summary judgment is never appropriate when essential discovery still must be undertaken. Rule 56(f) of the Federal Rules of Civil Procedure provides:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed.R.Civ.P. 56(f).[2]

Summary judgment in favor of Plaintiffs is inappropriate in these two Warsaw Convention actions because the issue of whether American took "all necessary measures" to prevent Plaintiffs' damages is a fact-based determination that must be made on a complete record. *See Vildex, S.A.I.C. v. United Airlines, Inc.*, No. CV-94-4304 CPS, 1996 WL 733081, at _ *6 (E.D.N.Y. Dec. 10, 1996) ("Because the parties have presented a dispute as to what security

---

[2]  A party opposing summary judgment pursuant to Rule 56(f) must file an affidavit "'explaining: 1) the nature of the uncompleted discovery, i.e., what facts are sought and how they are to be obtained; [ ] 2) how those facts are reasonably expected to create a genuine issue of material fact; [ ] 3) what efforts the affiant has made to obtain those facts; and 4) why those efforts were unsuccessful.'" *Starkey v. Capstone Enter. of Portchester, Inc.*, 237 F.R.D. 46, 49 (S.D.N.Y. 2006) (*quoting Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,*

measures were taken, which measures were available, and which measures were appropriate, summary judgment . . . is inappropriate."); Fed.R.Civ.P. 56(f). Additionally, the Court has not determined the applicable law and standard of care by which American's conduct on September 11, 2001 will be judged. *See* Aviation Defs.' Motion for a Determination of Applicable Law Regarding the Standard of Care (Docket No. 1034), filed April 30, 2007.

Both plaintiffs and American also continue to seek discovery from the Government and each other on a myriad of topics. *See* Barry Aff. at ¶¶ 5-9. Therefore, deciding Plaintiffs' motion now would be contrary to this Court's stated preference for deciding dispositive motions on a complete record. *See In re World Trade Ctr. Disaster Site Litig.*, 456 F. Supp. 2d 520, 554-56 (S.D.N.Y. 2006); *In re Sept. 11 Litig.*, 280 F. Supp. 2d 279, 302, 305, 312 (S.D.N.Y. 2003), *denying leave to appeal*, 2003 WL 22251325, at *1, *5 (S.D.N.Y. Oct. 1, 2003) ("Defendants will have ample opportunity, after discovery, to renew their motions."); *Mayore Estates, LLC v. Port Auth. of N.Y. & N.J.*, No. 02 Civ. 7198 (AKH), 2003 WL 22232918, at *2 (S.D.N.Y. Sept. 26, 2003).

## II.

### AMERICAN CAN AVAIL ITSELF OF THE "ALL NECESSARY MEASURES" DEFENSE BY SHOWING THAT IT TOOK ALL REASONABLE MEASURES TO PREVENT PLAINTIFFS' LOSSES

It is undisputed that Plaintiffs' decedents were engaged in "international transportation" while passengers aboard American Flight 77 on September 11, 2001. Accordingly, the rights and liabilities of the parties are subject to the terms of the Warsaw Convention and all state law claims are preempted. *See* Warsaw Convention art. 1(2); *El Al Israel Airlines, Ltd. v. Tseng*, 525 U.S. 155,

---

769 F.2d 919, 926 (2d Cir. 1985)). A party must also show that the material sought is germane

176 (1999); *King v. Am. Airlines, Inc.*, 284 F.3d 352, 356-57 (2d Cir. 2002); *In re Air Disaster at Lockerbie, Scotland on Dec. 21, 1988*, 928 F.2d 1267, 1273, 1278 (2d Cir.), *cert. denied*, 502 U.S. 920 (1991); *Fishman v. Delta Air Lines, Inc.*, 938 F. Supp. 228, 229 (S.D.N.Y. 1996), *aff'd*, 132 F.3d 138, 141-42 (2d Cir. 1998); *see also* U.S. Const. art. VI, cl. 2.  When the Warsaw Convention applies, a passenger is entitled to recover only what the Convention permits.  *Magan v. Lufthansa German Airlines*, 339 F.3d 158, 161 (2d Cir. 2003).

Article 17 of the Warsaw Convention sets forth the cause of action for the wrongful death of a passenger in the course of international transportation.  Article 17 provides that the carrier is presumptively liable for damages sustained if the "accident" which caused the death took place on board the aircraft or during the course of any of the operations of embarking or disembarking.  *See* Warsaw Convention art. 17; *see Air France v. Saks*, 470 U.S. 392, 397 (1985); *Eastern Airlines, Inc. v. Floyd*, 499 U.S. 530, 535 (1991).  Courts interpreting Article 17 define "accident" as "an unexpected or unusual event or happening that is external to the passenger." *See Pflug v. Egyptair Corp.*, 961 F.2d 26, 29 (2d Cir. 1992); *Day v. Trans World Airlines, Inc.*, 528 F.2d 31, 33 (2d Cir. 1975).  Injuries sustained during a terrorist hijacking fall within the Article 17 definition of "accident."  *See Pflug*, 961 F.2d at 29; *Day*, 528 F.2d at 33.

The finding of an "accident," however, does not end the inquiry into the airline's presumptive liability for damages under Article 17.  The airline may rebut a plaintiff's *prima facie* showing and avoid liability altogether by proving under Article 20(1) of the Warsaw Convention that it took "'all necessary measures' to avoid the damage or that it was impossible for [the airline] to take such measures." *See* Warsaw Convention art. 20(1); *Olympic Airways v. Husain*, 540 U.S.

---

and not cumulative or speculative. *Id.* at 50.

644, 649 n.5 (2004), *reh'g denied*, 541 U.S. 1007 (2004); *Mfrs. Hanover Trust Co.*, 429 F. Supp. at

967.  American has preserved its right to assert the "all necessary measures" defense for damages

above 100,000 SDRs[3].  *See* American Airlines' Int'l Passenger Rules Tariff Rule 55(B), Ex. 4 to

Pls.' Statement of Material Facts Under Local Rule 56.1 In Support of Mot. for Summ. J. Against

Def. Am. Airlines, Inc. (Docket No. 952).

Contrary to Plaintiffs' assertion, courts have construed the phrase "all necessary measures"

to mean "*all reasonable measures*." *Mfrs. Hanover Trust Co.*, 429 F. Supp. at 967 (emphasis

added).  Indeed,

> Article 20 requires of defendant proof, not of a surfeit of preventatives, but rather, of
> *an undertaking embracing all precautions that in sum are appropriate to the risk*,
> i.e., measures reasonably available to defendant and reasonably calculated, in
> cumulation, to prevent the subject loss.

*Id.* (emphasis added); *see also Obuzor v. Sabena Belgian World Airlines*, No. 98 CIV 0224 (JSM),

1999 WL 223162, at *1 (S.D.N.Y. Apr. 16, 1999); *Medina v. Am. Airlines, Inc.*, 2006 WL 3663692,

at *2; *Lee v. Am. Airlines, Inc.*, No. CIVA3:01-CV-1179-P, 2004 WL 2624647, at *1 (N.D. Tex.

Nov. 17, 2004); *Jang Sool Kwon v. Sing. Airlines*, 356 F. Supp. 2d 1041, 1046-47 (N.D. Cal. 2003);

*Verdesca v. Am. Airlines, Inc.*, No. 3-99-CV-2022-BD, 2000 WL 1538704, at *3 (N.D. Tex. Oct.

17, 2000); *Vildex*, 1996 WL 733081, at *4; *CPH Int'l v. Phoenix Assurance Co.*, No. 92 Civ.

2729(SS) (NRB), 1994 WL 259810, at *14 (S.D.N.Y. June 9, 1994).  "The failure to take any

particular precaution that might have prevented the loss does not necessarily prevent the carrier

---

[3] SDR (Special Drawing Right) is an international basket of currencies established by the
International Monetary Fund.  *Special Drawing Rights – A Factsheet*,
http://www.imf.org/external/x10/changecss/changestyle.aspx.  The dollar equivalent of the SDR
fluctuates daily, and the daily conversion rate can be obtained from the International Monetary
Fund Website at http://www.imf.org.  *Id.*  The conversion rate on September 11, 2001 was

from relying on this defense." *Verdesca*, 2000 WL 1538704, at *3 (*citing Mfrs. Hanover Trust Co.*, 429 F. Supp. at 967); *Lee*, 2004 WL 2624647, at *1.

Whether an airline took all reasonable measures to avoid the damage is a fact-based determination that should be based on the applicable federal aviation security regulations and the risks perceived before the September 11 terrorist attacks. Summary judgment denying an airline the opportunity to prove its Article 20(1) "all necessary measures" defense is inappropriate if the parties present a dispute as to what federal security measures were mandated, what measures were available, what measures were appropriate, what measures were implemented by the airline and whether the failure of any measures was a proximate cause of the losses at issue. *See Vildex*, 1996 WL 733081, at *6 (denying summary judgment to plaintiff in a Warsaw Convention case when there was a dispute as to the appropriate security measures and when defendant asserted that its security procedures met FAA and U.S. Department of Transportation standards); *Verdesca*, 2000 WL 1538704, at *3 ("whether . . . precautions were 'reasonable' is for a jury to decide"); *see also Obuzor*, 1999 WL 223162, at *1 ("Summary judgment is infrequently granted [in Warsaw cases] because the determination of reasonableness is a question to be answered by the fact finder after trial.").

Summary judgment is also inappropriate when the standard of care governing American's conduct has yet to be determined and vital discovery is far from complete. *See* Fed.R.Civ.P. 56(f); *Vildex*, 1996 WL 733081, at *6; *see also* Aviation Defs.' Mot. for Determination of Applicable Law Regarding the Standard of Care. Based on the abundant case law addressing Article 20(1), summary judgment finding unlimited liability in a Warsaw Convention case is not

---

1 SDR = U.S. $1.27436. *See* http://imf.org/external/np/fin/data/rms_mth.aspx?SelectDate=2001-

the "slam dunk" that Plaintiffs portray. American's preservation of its right to assert the "all necessary measures" defense entitles it to conduct necessary discovery to prove that it took measures "reasonably available" to it and "reasonably calculated, in cumulation, to prevent the subject loss." *See* Barry Aff. at ¶3; *Mfrs. Hanover Trust Co.*, 429 F. Supp. at 967; *Lee*, 2004 WL 2624647, at *1; *Verdesca*, 2000 WL 1538704, at *3.

## III.

### ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT

Plaintiffs rely primarily, if not exclusively, on the 9/11 Commission Report and Aviation Monograph to argue that American failed to take "all necessary measures" to prevent the hijacking of Flight 77. They resort to tautology, stating that "[a]t a minimum, if Defendant had taken all necessary and reasonable measures to prevent the terrorists from hijacking and crashing Flight 77 into the Pentagon, the hijackers would have been properly screened and dangerous items, such as box cutters, would not have permitted on board the aircraft." This Court, however, has yet to address the admissibility of any portion of the 9/11 Commission Report or Aviation Monograph and has, in fact, explicitly determined to reserve that question for another day. Tr. of March 22, 2007 Conf. at 37-38, 39-40. But even if the Plaintiffs are entitled to rely on the 9/11 Commission Report and Aviation Monograph, those documents contain ample evidence that, contrary to Plaintiffs' highly selective references, even if American took all necessary measures imposed by the FAA's aviation security regulations, the terrorists would have been able to carry out their plot. These core issues of material fact preclude summary judgment.

---

09-30&reportType=CVSDR.

Much of Plaintiffs' argument is bottomed on a view that American permitted the
Flight 77 hijackers to take box cutters through the security checkpoints. But in fact, there is
virtually no evidence that box cutters were aboard Flight 77. Although Plaintiffs assert that box
cutters were found in the wreckage of Flight 77, that is simply incorrect. The 9/11 Commission
found that 14 knives, or portions of knives (including a "boxcutter type implement") were found
at the *Flight 93* crash site, but the 9/11 Commission Report says nothing about box cutters being
found in the wreckage of *Flight 77. See* 9/11 Commission Report at 457, n.82; *see also* Aviation
Monograph at 113, n.566.

The only hint of box cutters aboard Flight 77 consists of the 9/11 Commission Report's
account of an unrecorded telephone conversation, lasting only about one minute, between former
Solicitor General Theodore Olson and his wife, Barbara Olson, a passenger aboard Flight 77.
9/11 Commission Report at 9; Aviation Monograph at 32; *see also* Aviation Monograph at 48
("Box cutters were specifically indicated *only in one report* from Flight 77.") (emphasis added).
According to the Report, Mrs. Olson referred to the hijackers as having "knives and box cutters."
9/11 Commission Report at 9; Aviation Monograph at 32. But even if Mrs. Olson referenced
box cutters (a point on which there is no primary evidence, since the call was unrecorded), there
is no evidence in the record indicating the source of her knowledge or whether she knew the
difference between a box cutter and a utility knife or other type of small knife. She may well
have used the term loosely.

Under the Checkpoint Operations Guide, pocket utility knives and trade tools were
expressly permitted to enter the sterile area, although box cutters were not. Checkpoint
Operations Guide ("COG") at 5-11, attached to Barry Aff. as Ex. A; *see also* 9/11 Commission

11

Report at 476, n.57; Aviation Monograph at 73-74. At the time of her call, Mrs. Olson would have been unlikely to focus on that distinction; the point she was trying to convey was the generic type of weapons the hijackers had. *See Herman v. United Air Lines, Inc.*, 157 F. Supp. 65 (D. Colo. 1957) (holding that United cannot be found negligent for failing to detect and confiscate alleged "weapons" unless there is proof as to what the weapons were and how they got on board the aircraft).

Plaintiffs also assert that the 9/11 Commission's account of the reaction of an unnamed "expert" to a videotape of the Dulles checkpoint that shows the handwanding of one of the hijackers demonstrates that, as a matter of law, American cannot show that it took all necessary measures for Flight 77. Plaintiffs' claim, however, is without merit. First, what the video shows, and the interpretation to be placed upon it, are issues of fact precluding summary judgment. In the video, the visual quality of which is very poor, the screener operating the handwand has his back to the camera and obscures the view of the passenger being screened. There is no audio. The viewer of the video therefore cannot see what the screener could see, or hear what the screener could hear, when he cleared the passenger to proceed.

Second, even if one assumes that the handwanding was performed improperly, there is no evidence that the two hijackers depicted in the video even carried a prohibited item on their persons through the check point. While Plaintiffs make the self-contradictory assertion that "clearly visible" in the video was an item or item "concealed in the pants" of one of the hijackers, they do not and cannot assert that the item was a prohibited weapon. The video simply does not reveal what the item is. Indeed, the item may not even have been on the hijacker's

12

person at the time of screening; for all the video reveals, the hijacker may have placed the item in the divest container and then recovered it after he was screened.

Moreover, the plaintiffs' principal complaint about the handwanding is that it was inadequate because the screener failed to move the handwand down to the floor more than two times. But handwanding to the floor more times could only have had any effect on the hijacking if: (a) the later passes somehow revealed something the earlier passes did not; (b) the hijacker had something metallic concealed around his ankle or in his shoe; and (c) the item was a prohibited weapon. All of the evidence, however, strongly suggests – particularly at this early stage, when all inferences are to be drawn in American's favor – that the hijackers would never have jeopardized their plot by doing something so suspicious as taping something to their ankles or concealing something in their shoes. To the contrary, all of the evidence shows that the terrorists carefully studied the aviation security system to learn ways that the system permitted them to carry out their plans (by using, e.g., undetectable or permissible items as weapons) *without* arousing any suspicion.

More fundamentally, the Plaintiffs' cherry-picked handful of references to the 9/11 Commission Report and the Aviation Monograph omit to mention a multiplicity of statements in both documents that, far from precluding the "all necessary measures" defense, offer substantial support for one. For example, the Commission reported that:

- The terrorists were instructed to use weapons that were permitted or were undetectable by airport checkpoints, *see* 9/11 Commission Report at 84; *see also* Aviation Monograph at 101, n. 408 (none of the blades or knife housings recovered from the crash sites were longer than 3.5 inches);

- Multiple items, such as Swiss army knives, trade tools, pocket utility knives, letter openers and darts, that were at least as lethal as box cutters were permitted into

13

the sterile area under the COG, *see* 9/11 Commission Report at 84, 476, n.57; Aviation Monograph at 73-74;

- Many deadly or dangerous items would not set off a magnetometer calibrated to the FAA-mandated specifications or be visible on the FAA-required X-ray equipment, *see id.* at 84; 9/11 Commission Report at 84. For example, magnetometers were calibrated to detect items with the metallic content of a small caliber handgun. 9/11 Commission Report at 2; Aviation Monograph at 5. A box cutter or utility knife, especially one with a plastic sheath, would have far less metallic content and would likely have been undetectable. Moreover, a typical box cutter comes with a replaceable blade and is easily disassembled and reassembled. A disassembled box cutter would have been particularly difficult to detect;

- The CAPPS program was applied correctly on September 11 and correctly selected passengers, including some of the hijackers, for additional scrutiny, *see* Aviation Monograph at 72;

- The additional screening applied to a CAPPS selectee was limited to the selected passenger's checked bags, not his or her carry-on bags or person, and was aimed at detecting explosives, not small knives, *see* 9/11 Commission Report at 84; Aviation Monograph at 2;

- The FAA had made a considered policy decision not to ban all small knives, *see* 9/11 Commission Report at 83; Aviation Monograph at 74;

- The FAA-mandated Common Strategy required crews to cooperate with hijackers on the assumption that hijackers were nonsuicidal and would present negotiable demands, *see* 9/11 Commission Report at 85; Aviation Monograph at 49, 81; and

- In the years before 9/11, the Government considered nonsuicidal sabotage as the greatest threat of a lethal terrorist attack on civil aviation, *see* 9/11 Commission Report at 82, 457, n.91; Aviation Monograph at 57-58.

Any one of these statements would be sufficient to create a disputed issue of material fact because each shows that American may well have taken all reasonable measures mandated by the FAA and reasonably calculated to meet the terrorist threat the Government anticipated. Cumulatively, they render summary judgment not just inappropriate, but inconceivable.

14

## IV.

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
## SHOULD BE DENIED AS PREMATURE

Moreover, the Court need not even reach the question of whether the 9/11 Commission Report and Aviation Monograph highlight disputed issues of fact because Plaintiffs' motion suffers from a further deficiency. The motion is premature, coming as it does before the Court has ruled on a key legal premise and in the middle of ongoing discovery into some of the core issues that Plaintiffs represent are undisputed or indisputable.

Plaintiffs' motion should be denied because the Court has not ruled on the Aviation Defendants' Motion for a Determination of Applicable Law Regarding the Standard of Care and because essential discovery relating to the "all necessary measures" defense is really just beginning. Undoubtedly, this is the "rarest of cases" where an airline can sustain its burden of proving it took "all necessary measures" to avoid the loss. *See* Thomas J. Whalen & Michelle L. Carey, "Changes in the Warsaw Convention and its Effects on Aviation Liability" in *Litigating the Aviation Case: From Pre-Trial to Closing Argument* 107, 116 (Desmond T. Barry, Jr. ed., 1998). Indeed, if the Article 20(1) "all necessary measures" defense were unavailable as a matter of law in this case, it is difficult to imagine *any* case in which it could provide a colorable defense. If that were true, the defense would become nothing more than excess verbiage within the Warsaw Convention. *See* 8 C.J.S. *Treaties, Construction and Operation, Rules of Construction* § 7 (court must give the specific words of a treaty meaning, consistent with the shared expectations of the contracting parties).

As the 9/11 Commission recognized, the September 11 attacks were a far cry from an ordinary commercial aviation crash. The Commission emphasized the unprecedented and

15

historic nature of the attacks, as well as the paramount role played by the terrorists who launched them:

> September 11, 2001, was a day of unprecedented shock and suffering in the history of the United States. . . . We learned about an enemy who was sophisticated, patient, disciplined, and lethal. The enemy rallies broad support in the Arab and Muslim world by demanding redress of political grievances, but its hostility toward us and our values is limitless. Its purpose is to rid the world of religious and political pluralism, the plebiscite, and equal rights for woman. It makes no distinction between military and civilian targets. *Collateral damages* are not in its lexicon.

9/11 Commission Report at xv – xvi (emphasis in the original).

In the face of Plaintiffs' assertions, American is entitled to develop a factual record in support of its "all necessary measures" defense. American need only show that it took "'all precautions that in sum are appropriate to the risk, *i.e.* measures reasonably available to defendant and reasonably calculated, in cumulation, to prevent the subject loss[ ]'" to prevail on the defense. *Verdesca*, 2000 WL 1538704, at *3 (*quoting Mfrs. Hanover Trust Co.*, 429 F. Supp. at 967); *see also Medina*, 2006 WL 3663692, at *2 ("It is not necessary for the carrier to take every precaution that might have prevented the loss in order for it to rely on the ['all necessary measures'] defense."); *Lee*, 2004 WL 2624647, at *1.

But to do that effectively, American needs to know what law applies to the question of what measures are necessary. Are the "necessary measures" of Article 20(1) defined in the comprehensive aviation security regulations issued by the FAA or by some state common law standard at variance with those regulations?

16

**A.    The Applicable Standard of Care Must be Determined by the Court Before This Motion Can Be Decided.**

It is difficult to imagine how Plaintiffs can assert that there is no material issue of fact as to whether American took all reasonable measures to prevent the hijacking of Flight 77 when the Court has not yet ruled on what law determines what those necessary measures are. Plaintiffs' motion should be denied because the Court has not ruled on the Aviation Defendants' Motion for a Determination of Applicable Law Regarding the Standard of Care. As fully explained in the Memorandum of Law in support of that motion, the Aviation Defendants seek a declaration from the Court that the standard of care for American's conduct on September 11 was set by the FAA's detailed regulations pertaining to aviation security.

Before the September 11 terrorist attacks, the Federal Aviation Act specifically authorized the FAA to promulgate "regulations to protect passengers and property on an aircraft" from "acts of criminal violence or aircraft piracy." 49 U.S.C. § 49903(b) (amended 2001); *see also* 49 U.S.C. § 44904(c) (amended 2001) ("The Administrator shall take necessary actions to improve domestic air transportation security by correcting any deficiencies in that security discovered in the assessments, analyses, and monitoring carried out under this section."). In furtherance of this goal, the FAA was directed to establish "to the maximum extent practicable," "a uniform procedure for searching and detaining passengers and property." 49 U.S.C. § 49903(b)(3) (amended 2001).

The FAA responded to the directive by creating a comprehensive, uniform system of aviation security that the airlines were required to follow on September 11. Among the regulations, the FAA required each airline to adopt a mandatory Air Carrier Standard Security Program ("ACSSP"), which the airline was then legally bound to follow. *See* 14 C.F.R. § 108.25

17

(2001). Each airline's ACSSP had to contain a number of specified procedures, including procedures for checking in passengers for their flights, for the screening of passengers and their belongings and for the crew members to follow in the face of a hijacking. *See* 14 C.F.R. § 108.7 (2001); *see, e.g.*, American's Air Carrier Standard Security Program at 20-29j, 70-79d, attached to Barry Aff. as Ex. B, (hereinafter "ACSSP") (establishing procedures for checking-in passengers on domestic flights); *id.* at App. III (detailing screening the procedures for passengers and carry-on items); *id.* at App. XIII (describing the "Common Strategy"). Every ACSSP had to be submitted for approval to the FAA, and the agency also had (and routinely exercised) the power to amend previously approved programs. 14 C.F.R. § 108.25 (2001).

In addition to the ACSSP, the FAA approved the development and use of the COG. The COG was (and is) a more user-friendly version of the ACSSP that served as a handbook for checkpoint screeners by providing examples of the security procedures found in the ACSSP. *Compare* ACSSP at App. I *with* COG at 5-6 through 5-7. The FAA further responded to the directive to establish a uniform system by issuing Security Directives to modify or supplement security procedures set forth in the ACSSP and the COG. *See, e.g.*, Security Directive SD 97-01, attached to Barry Aff. as Ex. C.

Despite the FAA's comprehensive, uniform aviation security system, Plaintiffs have asserted American failed to take all reasonable measures on September 11, 2001 because it omitted to take certain steps that the FAA did not require (and in some cases prohibited), such as:

- Searching for and confiscating all small knives, *compare* Falkenberg Third Am. Compl. (Falkenberg Docket No. 48), filed March 31, 2004, at ¶¶33, 39 *with* COG *at 6-7*;

- Engaging in behavioral profiling, *compare* Falkenberg Third Am. Compl. at ¶39 *with* ACSSP *at 70-79d*;

18

- Subjecting Middle Eastern or Islamic passengers to heightened scrutiny, *compare* Falkenberg Third Am. Compl. at ¶39 *with* Information Circular IC-99-13, attached to Barry Aff. as Ex. D; and

- Resisting, rather than accommodating, hijackers and preventing hijackers from entering the cockpit at all costs, *compare* Falkenberg Third Am. Compl. at ¶¶41, 42 *with* ACSSP at App. XIII (discussing the Common Strategy).

Given the stark contrast between Plaintiffs' allegations and the federal requirements that American argues defined its obligations on September 11, 2001, Plaintiffs' assertion that there is no dispute of material fact as to whether American took all necessary measures seems not only incorrect, but untimely. The Court has not yet ruled on the question of what law would determine what facts are material. *See, e.g., Townes Ex. Rel. Townes v. Core Haven, Inc.*, No. 00 CV 5603 (RCC), 2003 WL 22861921, at *2 (S.D.N.Y. Dec. 2, 2003) (denying motion for summary judgment and holding that substantive law governing case determines which facts are material for summary judgment purposes); *Ortiz v. Rosner*, 817 F. Supp. 348, 350 (S.D.N.Y. 1993) ("[O]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.") (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

### B.    Plaintiffs' Motion Is Premature Because Discovery is Incomplete.

As discussed above, the only sources that Plaintiffs rely on to establish a factual record in support of their motion -- the 9/11 Commission Report and the Aviation Monograph -- themselves contain numerous statements that support American's "all necessary measures" defense and preclude summary judgment. American, however, is not limited to relying on the 9/11 Commission Report and the Aviation Monograph. American is entitled to conduct discovery to demonstrate that in fact it did take all reasonable measures in light of the threats assessed by

19

government agencies and the countermeasures ordered by those agencies. *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986) (vacating grant of summary judgment and noting that summary judgment must "be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition."); *see also Berger v. United States*, 87 F.3d 60, 65 (2d Cir. 1996); *Hellstrom v. U.S. Dep't of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000); *see also Titan Sports, Inc. v. Turner Broad. Sys.*, 151 F.3d 125, 128 (3d Cir. 1998) (holding that a non-party can be compelled to produce evidence regarding any matter "relevant to the subject matter involved in the pending action" or "reasonably calculated to lead to the discovery of admissible evidence"). To that end, American has served multiple outstanding discovery requests seeking documents and witnesses from the FBI, the FAA, and the CIA.

American seeks discovery from the Government that focuses on the sophistication of planning that went into the September 11 terrorist attacks – discovery that relates directly to American's Article 20(1) "all necessary measures" defense. *See* Aviation Defs.' Mem. of Law in Support of Mot. for Focused Disc. from the Gov't. The hijackers learned checkpoint screening procedures and planned around the multilayered aviation security system in place on September 11 to make their plot impossible to detect and prevent. *See* 9/11 Commission Report at 158-59, 245.

For example, American has requested from the FBI's Boston field office documents relating to items the FBI seized from luggage, rental cars and hotel rooms and apartments left behind by the hijackers. The 9/11 Commission reported that a suitcase that failed to make the connection when Mohammad Atta connected from his flight from Portland, Maine contained a

20

large knife and a ruler. Aviation Monograph at 85-86, n.25. If, as that evidence tends to demonstrate, the terrorists restricted themselves to weapons that were either undetectable or permissible under the FAA regulations, then American did not fail to take all necessary measures; the attacks resulted because the FAA-mandated measures were not well-designed for the threat that materialized on September 11.

Indeed, Plaintiffs seem to agree that discovery from the Government is critical to understanding how the terrorists carried out their attacks. Plaintiffs have themselves served discovery upon the Government to learn "what happened on 9/11 and leading up to 9/11" and have sought to inspect the security equipment used to screen the terrorists. *See* Pls.' Joint Master Discovery – Screening Equipment (Newark and Dulles), dated February 26, 2007, attached to the Barry Aff. as Ex. E. American also is entitled to discover evidence from the Government demonstrating that the terrorists exploited limitations in the FAA designed and mandated system that existed on the morning of September 11.

Rule 56(f) of the Federal Rules of Civil Procedure allows American to obtain "facts essential to justify the party's opposition" before having to respond to plaintiffs' broad brush allegations in a summary judgment motion. Fed.R.Civ.P. 56(f). Some of the facts that American seeks from the Government that have obvious relevance to this motion include:

- The information and analysis that led the FAA, the FBI, and other government agencies responsible for protecting the nation against terrorist attacks on civil aviation before September 11 to establish the security procedures followed by American on September 11;

- The information and analysis that led the FAA, the FBI, and other government agencies responsible for protecting the nation against terrorist attacks on civil aviation before September 11 to not adopt different or additional procedures that Plaintiffs now claim should have been implemented by American;

21

- All communications among government agencies and American leading up to September 11 regarding terrorist threats to civil aviation;

- How the FAA determined who should be on "no fly" lists;

- The creation of the prohibited and restricted items list, including the 1993 proposal to ban all knives, which the FAA ultimately rejected;

- Whether the various government agencies considered changing the "Common Strategy" before the September 11 terrorist attacks; and

- How the terrorists made test runs to determine what items they could get through the screening checkpoints.

Discovery from the Government is in its very early stages: the Government has produced a small number of documents and has thus far agreed to produce one witness (a Rule 30(b)(6) witness from the FAA). Moreover, as the Court is aware, the scope of discovery available from the Government as to intelligence that the Government elected not to share with American before September 11 is the subject of another pending motion, one that is again not yet fully briefed. Summary judgment on this incomplete record would be entirely contrary to Rule 56(f).

## V.

## THE HAGUE PROTOCOL DOES NOT APPLY BECAUSE THE UNITED STATES WAS NOT A PARTY TO THE HAGUE PROTOCOL IN 2001

Plaintiffs also assert that they are entitled to recover attorneys' fees and litigation expenses in these two actions pursuant to Article 22(4) of The The Hague Protocol of 1955 ("Hague Protocol").[4] Pls.' Mem. of Law at 14. Plaintiffs argue that Article 22(4) of the Hague Protocol

---

[4] The Hague Protocol is an amendment to the Warsaw Convention. *Avero Belgium Ins. v. Am. Airlines, Inc.*, 423 F.3d 73, 75 n.2 (2d Cir. 2005). The Warsaw Convention was originally adopted in 1929 and was amended at The Hague in 1955 and in Montreal in 1975. *Id.* The Hague Protocol was signed on behalf of the United States on June 28, 1956 and was submitted to the United States Senate for advice and consent to ratification in 1959. *See id.* at 82 n.12. But

22

applies because the United States consented to be bound by the Hague Protocol by virtue of its

ratification of Montreal Protocol No. 4.[5]  *Id.*  Plaintiffs' argument, however, fails entirely

because "the United States did not consent to be bound to the Hague Protocol . . . by virtue of its

ratification of Montreal Protocol No. 4. Indeed, it expressed an intention to the contrary." *Avero*

*Belgium Ins. v. Am. Airlines, Inc.*, 423 F.3d 73, 86 (2d Cir. 2005).  Plaintiffs' argument also fails

because Article 22(4) of the Hague Protocol does not provide for the recovery of attorneys' fees

and costs.

Plaintiffs' argument that the United States became bound by the Hague Protocol when it

ratified Montreal Protocol No. 4 is based erroneously on Article XVII(2)[6] of Montreal Protocol

---

ratification was never forthcoming, mainly because the Senate would not agree to the low limit of liability on passenger death and injuries contained in the Hague Protocol. *Id.*  The Hague Protocol was returned to the President in 1967. *Id.* (citing Letter of Submittal from Secretary of State Colin Powell to President George W. Bush dated June 15, 2002, *reprinted in* Treaty Document 107-14 107th Congress, Second Session (July 31, 2002)).  Ultimately the Senate consented to the Hague Protocol and the United States ratified the Hague Protocol. *Id.* at 83 n.13.  The Hague Protocol entered into force and effect on December 14, 2003 and since that date the Hague Protocol has been a treaty obligation of the United States. *Id.*  It was not so on September 11, 2001.

[5]  Montreal Protocol No. 4 is an amendment to the original Warsaw Convention and the Hague Protocol of 1955 that eliminated the need for many of the particulars contained in cargo air waybills and adopted the Special Drawing Right ("SDR") as the unit of conversion for cargo liability limits. *See generally* Montreal Protocol No. 4 to Amend the Convention for the Unification of Certain Rules Relating to International Carriage by Air Signed at Warsaw on 12 October 1929 as Amended by the Protocol Done at The Hague on 28 September 1955, 2145 U.N.T.S. 36 ("Montreal Protocol No. 4").  The United States ratified Montreal Protocol No. 4 in 1998 and it became effective in the United States on March 4, 1999. *Avero*, 423 F.3d at 83.

[6]  Article XVII of Montreal Protocol No. 4 provides in relevant part:

2.      Ratification of this Protocol by any State which is not a Party to the Warsaw Convention or by any State which is not a Party to the Warsaw Convention as amended at The Hague, 1955, shall have the effect of accession to

23

No. 4 and a June 23, 2000 letter by Deputy Secretary of State Strobe Talbott. Pls.' Mem. of Law at 16-17. Inexplicably, Plaintiffs totally ignore the Second Circuit's holding in *Avero* that "the United States did not consent to be bound to the Hague Protocol (as a separate treaty) by virtue of its ratification of Montreal Protocol No. 4." *Avero*, 423 F.3d at 86 (noting that it is doubtful that courts would hold that "anything other than a clearly stated intention to accede to a treaty would bind the United States in the absence of formal ratification."); *see also Sysco Food Servs. of Hampton Roads, Inc. v. Maersk Logistics, Inc.*, No. 03 Civ. 7384 (JGK), 2006 WL 2506437, at *5 (S.D.N.Y. Aug. 29, 2006); *but see Continental Ins. Co. v. Federal Express Corp.*, 454 F.3d 951 (9th Cir. 2006). Indeed, the United States did not ratify the Hague Protocol until 2003. *Avero*, 423 F.3d. at 83 n.13; *see id.* at 87 (citing a 2002 publication by the United States State Department that unequivocally stated that the United States is *not* a party to the Hague Protocol).

Because the United States courts are vested with the power to interpret the treaty obligations of the United States, *El Al Israel Airlines v. Tseng*, 525 U.S. at 167 (*citing Air France*, 470 U.S. at 399), and the United States did not ratify the Hague Protocol until 2003, *Avero*, 423 F.3d at 86, Plaintiffs' reliance on Article 22(4) of the Hague Protocol has no support whatsoever.

Even assuming that Article 22(4) of the Hague Protocol did apply, the provision still does not allow Plaintiffs to recover attorneys' fees or expenses. Article 22(4) of the Hague Protocol provides:

---

the Warsaw Convention as amended at The Hague, 1955 and by Protocol No. 4 of Montreal, 1975.

*See* Montreal Protocol No. 4.

24

4.    The limits prescribed in this article shall not prevent the court from awarding, *in accordance with its own law*, in addition, the whole or part of the court costs and of the other expenses of the litigation incurred by the plaintiff. The foregoing provision shall not apply if the amount of the damages awarded, excluding court costs and other expenses of the litigation, does not exceed the sum which the carrier has offered in writing to the plaintiff within a period of six months from the date of the occurrence causing the damage, or before the commencement of the action, if that is later.

The Convention for the Unification of Certain Rules Relating to International Carriage by Air

Signed at Warsaw on 12 October 1929 as Amended by the Protocol Done at The Hague on

28 September 1955 ("The Hague Protocol"), 478 U.N.T.S. 371 (emphasis added).

As with the Warsaw Convention, the Hague Protocol merely provides a framework for the particular damages and expenses to be awarded. *See Zicherman v. Korean Air Lines Co. Ltd.*, 516 U.S. 217, 229 (1996); *Brink's Ltd. v. S. Af. Airways*, 93 F.3d 1022, 1029 (2d Cir. 1996) ("[T]he participants in the Convention recognized that uniformity was not always possible, and thus, envisioned application of local law to certain questions"); *see also Lahey v. Singapore Airlines, Inc.*, 115 F. Supp. 2d 464, 468 (S.D.N.Y. 2000). By its plain language, Article 22(4) merely acts as a "pass-through," directing courts to apply the law that would govern in the absence of the Warsaw Convention. *Zicherman*, 516 U.S. at 229; *Brink's Ltd.*, 93 F.3d at 1029. Because neither Virginia nor New York law allows for the separate recovery of attorneys' fees in a wrongful death action, *see* Va. Code Ann. § 8.01-52; *In re Stanton's Will*, 236 N.Y.S.2d 358, 359 (N.Y. Sur. 1963) (noting attorneys' fees are chargeable against a recovery in a wrongful death action), Plaintiffs could not recover attorneys' fees even if the Hague Protocol were applicable in these actions.

## CONCLUSION

Plaintiffs' Motion for Summary Judgment should be denied in all respects.

Dated: New York, New York
      May 7, 2007

               Respectfully submitted,

               CONDON & FORSYTH LLP
               7 Times Square
               New York, New York  10036
               Tel.:  (212) 490-9100
               Fax:  (212) 370-4453

               By:_____
                   Desmond T. Barry, Jr. (DB 8066)

               -and-

               DEBEVOISE & PLIMPTON LLP
               919 Third Avenue
               New York, New York 10022
               Tel.: (212) 909-6000
               Fax: (212) 909-6836

               By:_____
                   Roger E. Podesta (RP 1749)

               Attorneys for Defendant
               AMERICAN AIRLINES, INC.

*Of Counsel:*

CONDON & FORSYTH LLP
Eric C. McNamar

DEBEVOISE & PLIMPTON LLP
Maura K. Monaghan
Alison Mikkor

**AFFIDAVIT OF SERVICE**

STATE OF NEW YORK        )
                              ) ss.:

COUNTY OF NEW YORK      )

        Eric C. McNamar, being duly sworn, deposes and says that deponent is not a party to the action, is over 18 years of age and resides in New York, New York and that on the 7th day of May 2007, deponent served the within **MEMORANDUM OF LAW OF DEFENDANT AMERICAN AIRLINES, INC. IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; DEFENDANT AMERICAN AIRLINES, INC.'S RESPONSE TO PLAINTIFFS' STATEMENT OF MATERIAL FACTS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT PURSUANT TO LOCAL RULE 56.1; and FED.R.CIV.P. 56(f) AFFIDAVIT OF DESMOND T. BARRY, JR. IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

upon:

1. Mary Schiavo – Counsel for Plaintiffs Ruth Falkenberg and Elaine Teague;
2. Marc S. Moller – Wrongful Death and Personal Injury Plaintiffs' Liaison Counsel;
3. Robert A. Clifford – Property Damage and Business Loss Plaintiffs' Liaison Counsel;
4. Richard Williamson – Ground Defendants' Liaison Counsel;
5. Beth Jacob – WTC 7 Ground Defendants' Liaison Counsel;
6. Beth Goldman – U.S. Attorneys' Office;
7. Sarah Normand – U.S. Attorneys' Office; and
8. All Aviation Defendants

by emailing a copy of the papers to the attorneys in accordance with the Court's March 10, 2005

Order.

_____
Eric C. McNamar

Sworn to before me this
7th day of May 2007

_____
Notary Public

TINA M. ZOCCALI
Notary Public, State of New York
No. 01ZO6059025
Qualified in Rockland County
Commission Expires May 21, 20 07