Ronald L. Motley, Esquire
Joseph F. Rice, Esquire
Mary F. Schiavo, Esquire
MOTLEY RICE LLC
Attorneys for Plaintiffs
28 Bridgeside Boulevard
Post Office Box 1792
Mount Pleasant, SC 29465
(843) 216- 9000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
                                                                 :
IN RE SEPTEMBER 11, 2001 LITIGATION          :          21 MC 97 (AKH)
                                                                 :
-----------------------------------------------------------------x

This document relates only to:

*Falkenberg v. AMR Corp., et al.*          02 CV 7145 (AKH)
*Teague v. AMR Corp., et al.*          03 CV 6800 (AKH)

**PLAINTIFFS' REPLY TO DEFENDANT AMERICAN AIRLINES' OPPOSITION TO**

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. 4

I.    SUMMARY OF PLAINTIFFS' LEGAL GROUNDS FOR SUMMARY
      JUDGMENT ..................................................................... 6

II.   SUMMARY OF DEFENDANT'S CLAIMS ................................ 7

III.  RESPONSE TO DEFENDANT'S ARGUMENT ........................ 8
   A. Not an "Ordinary Commercial Aviation Disaster" But Similar Events Have
      Happened Before ............................................................ 8
   B. Defendant Admits The Crash of Flight 77 Is An "Accident" Under Article 17 ......... 9
   C. Ipso Facto .................................................................. 10
   D. A More Practical Analysis ............................................. 12
   E. The Defendant Seeks to Put Its Burden of Proof Upon the Court ............. 12
   F. The Cases Cited by Defendant Support Plaintiffs' Contentions ............... 13
      1. The Ultimate Burden is on Defendant ....................... 13
      2. Some Factual Dispute Does Not Defeat Summary Judgment ........ 13
      3. There is Presumptive Liability Against American Airlines Which Is Not
         Overcome by Compliance With Federal Regulations or Industry Standards ..... 14
      4. "It Never Happened Before" Even If It Were True, Is Not A Defense to Full
         Liability ............................................................. 15

IV.   PLAINTIFFS' ARE ENTITLED TO SUMMARY JUDGMENT AS A MATTER
      OF LAW ........................................................................ 17
   A. Defendant May Not Under Any Circumstances Escape Liability ............. 17
   B. "Cherry Picking" The 9/11 Commission Report ........................ 18
      1. The Divest Container ........................................... 18
      2. Contraband on Their Bodies ................................... 19
      3. Undetectable Weapons .......................................... 19
      4. CAPPS ............................................................. 20
      5. Common Strategy ................................................ 20
      6. Disputed Facts Do Not Lead to the Conclusion American Took All Reasonable
         Measures .......................................................... 21
      7. Defendant's Dogged Dodging of its Burden .................... 22
      8. Ongoing Discovery  Does Not Defeat the Motion .............. 22

V.    SUMMARY JUDGMENT CAN BE APPROPRIATELY GRANTED ON
      DEFENDANT'S OWN BRIEF AND EXHIBITS, AND DULLES DEPOSITIONS TO
      DATE .......................................................................... 22

VI.   SUMMARY JUDGMENT IS APPROPRIATE IN THESE TWO WARSAW
      CONVENTION ACTIONS ................................................... 33

**VII.    NOT ONLY SHOULD PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
BE GRANTED AS A MATTER OF LAW, BUT PLAINTIFFS, AS REPRESENTATIVES
OF PASSENGERS KILLED DURING THE COURSE OF INTERNATIONAL TRAVEL
FROM THE UNITED STATES TO AUSTRALIA ON SEPTEMBER 11, 2001, ARE
ENTITLED TO RECOVER ATTORNEYS' FEES & LITIGATION EXPENSES UNDER
THE HAGUE PROTOCOL** ................................................................................. 34

   A.    **As Both The United States & Australia Were Parties To Montreal Protocol No. 4
(To Amend The Warsaw Convention As Amended By The Hague Protocol)    On
September 11, 2001, The  United States Was Bound To The Provisions    Of The Hague
Protocol Vis-à-Vis Australia on September 11, 2001.** ........................................... 34

   B.    **The Plain Text Of The Hague Convention Authorizing This Court to Award
Plaintiffs' Court Costs & Litigation Expenses, Including Attorney's Fees, Should    Be
Enforced** ........................................................................................................... 36

**VII. CONCLUSION** .................................................................................................. 38

**Attachment: Plaintiff Exhibit 5**
List of prior hijackings, murders of pilots, deliberate destruction of plane and loss of life, other
sabotage and terrorism.

## <u>TABLE OF AUTHORITIES</u>

### Cases

*Air France v. Saks*, 470 U.S. 392, 405 (1985) ........................................................................9

*Allen Oil Co. v. Comm'r of Internal Revenue*, 614 336, 339 (2d Cir. 1980) ............................37

*Avero Belgium Ins. v. American Airlines, Inc.*, 423 F.3d 73, 83-89 (2d Cir. 2005)....................8, 34, 36, 38

*Celotex Corp. v. Catreet* 477 U.S. 317,325 (1986) ..................................................................13

*Cities Service*, supra, 391 U.S., at 289, 88 S.Ct., at 1592 ........................................................14

*Connecticut v. United States Dep't of the Interior*, 228 F.3d 82, 88 (2d Cir. 2000)....................37

*Continental Ins. Co. v. Federal Express Corp.*, 454 F.3d 951, 955-957 (9th Cir. 2006)..............35

*Cortez v. American Airlines*, 177 F.3d 1272, 1282 Note 5(11th Circuit 1999) cert. denied 528 U.S. 1136 ................12

*Day v. Trans World Airlines, Inc.*, 528 F.2d 31 (2d Cir, 1975) ..................................................9

*DeVera v. Japan Airlines*, 1994 WL 698330 (S.D.N.Y.) ...........................................................12

*Domangue v. Eastern Air Lines, Inc.*, 722 F.2d 256, 261 (5th Cir. 1984) ..................................37

*Enwerenuzor v. Iberia Airlines of Spain*, No. CV 92-3275, 1994 WL 3407 at *3 (E.D.N.Y. Jan. 5. 1994)..................6

*Evangelinos v. Trans World Airlines, Inc.*, 550 F.2d 152 (3rd Cir. 1977) ...................................9

*Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 431 (2d Cir. 2001)...................................35

*Grey v. American Airlines*, 227 Fed. 2d 282, 285 (2nd Circuit 1955), cert. denied 350 U.S. 989 (1956) ....................14

*In re Air Crash Off Long Island*, 209 F.3d 200, 207 (2d Cir. 2000)...........................................37

*In re Air Disaster at Lockerbie, Scotland on December 21, 1988*. 928 F.2d 1267 (2d Cir.), cert. denied, 502 U.S. 920 (1991) ........................................................................................................10, 18

*Krystal v. British Overseas Airways Corp.*, 403 F. Supp. 1322 (C.D. Cal. 1975).......................9

*Matshushita Electric Industries Company Limited v. Zennith Radio Corp.*, 475 U.S. 574, 587 (1986).....................14

*Medina v. Am. Airlines, Inc.*, No. 98 CIV, 2006 WL 3663692 (S.D. Fla. Nov. 14, 2006))........................12

*Mfrs. Hanover Trust Co. v. Alitalia Airlines*, 429 F. Supp. 964, 967 (S.D.N.Y.), *affd*. 573 F.2d 1292 (2d Cir. 1977),

cert. denied, 435 U.S. 971 (1978)....................................................................................14, 15, 16, 17

*Motorola, Inc. v. Kuehne & Nagel, Inc.*, 208 F. Supp.2d 910, 912 n.3 (N.D. Ill. 2002)................................37

*Obuzur v. Sabena Belgian World Airlines*, (LEXIS 5317, S.D.N.Y. 1999) ........................................11, 12

*Pflug v. Egyptair Corp.*, 961 F.2d 26, 29 (2d Cir. 1992)......................................................................9

*Piamba Cortes v. American Airlines, Inc.*, 177 F3d 1272 (11th Cir. (Fla) 1999).).........................................14

*Tishman & Lipp, Inc. v. Delta Air Lines*, 413 F.2d 1401, 1403 (2d Cir. 1969) ..............................6

*United States v. Blasius*, 397 F.2d 203, 207 n. 9 (2d Cir. 1968)..............................................38

*Vildex S.A.I.C.  v. United Airlines, Inc.*,  No. CV-94-4304 CPS, 1996 WL 733081 (E.D.N.Y.)....................13, 14, 15

*Zicherman v. Korean Lines Co. Ltc.,* 516 U.S. 217, 229 (1996), cited at Def. Brief at 25...................................36, 37

## Treatises

Convention for the Unification of Certain Rules Relating to International Carriage by Air, Oct. 12, 1929, 49 Stat.

3000 (1934), T.S. No. 876, 137 L.N.T.S. 11 (1934), *reprinted in note following* 49 U.S.C.A. § 40105

(1997)(original Warsaw Convention);................................................................................6

Montreal Protocol No. 4 To Amend the Convention for the Unification of Certain Rules Relating to International

Carriage by Air Signed at Warsaw on 12 October 1929 as Amended by the Protocol Done at The Hague on 28

September 1955, 2145 U.N.T.S. 36 ("Montreal Protocol No. 4"). ..........................................6

The Convention for the Unification of Certain Rules Relating to International Carriage by Air Signed at Warsaw on

12 October 1929 as Amended by the Protocol Done at The Hague on 28 September 1955, 478 U.N.T.S. 371

("The Hague Protocol");................................................................................6

## Materials Produced By Defendants as Exhibits to its Response to Plaintiffs' Motion for Summary Judgment

Exhibit A – Redacted Checkpoint Operations Guide (COG), Bates No. AALTSA009504-AALTSA009619

Exhibit B – Redacted Air Carrier Standard Security Program, Bates No. AALTSA011164-AAL011420

I.    **SUMMARY OF PLAINTIFFS' LEGAL GROUNDS FOR SUMMARY JUDGMENT**

Plaintiffs' respectfully submit this Reply in Response to Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment in these two wrongful death actions governed by the Warsaw Convention and related agreements and tariffs. This Honorable Court should grant the motion for summary judgment by Plaintiff Ruth Falkenberg, as Personal Representative of the Estate of Leslie Ann Whittington, deceased, and Plaintiff Elaine Teague, as Personal Representative of the Estate of Sandra D. Teague, deceased, (collectively, Plaintiffs herein) against defendant American Airlines, Inc. (American) because it cannot be credibly disputed by the defendant that defendant is strictly liable under Article 17 of the Warsaw Convention[1] as supplemented by the IATA Intercarrier Agreement[2] incorporated in American's tariff[3] for the wrongful deaths of plaintiffs' decedents who were killed on board American

---

[1] The Warsaw Convention is a multilateral treaty that, *inter alia*, governs liability of international carriage of persons by aircraft. Originally adopted in 1929, the Warsaw Convention was amended at The Hague in 1955 and again in Montreal in 1975. *See* Convention for the Unification of Certain Rules Relating to International Carriage by Air, Oct. 12, 1929, 49 Stat. 3000 (1934), T.S. No. 876, 137 L.N.T.S. 11 (1934), *reprinted in note following* 49 U.S.C.A. § 40105 (1997)(original Warsaw Convention); The Convention for the Unification of Certain Rules Relating to International Carriage by Air Signed at Warsaw on 12 October 1929 as Amended by the Protocol Done at The Hague on 28 September 1955, 478 U.N.T.S. 371 ("The Hague Protocol"); Montreal Protocol No. 4 To Amend the Convention for the Unification of Certain Rules Relating to International Carriage by Air Signed at Warsaw on 12 October 1929 as Amended by the Protocol Done at The Hague on 28 September 1955, 2145 U.N.T.S. 36 ("Montreal Protocol No. 4").

[2] The Agreements are:  the International Air Transport Association ("IATA") Intercarrier Agreement on Passenger Liability ("IIA"), available at http://www.iata.org/nr/contentconnector/cs2000/siteinterface/sites/legal/file/iia.pdf, Attached to Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment as Exhibit 1; (2) the Agreement on Measures to Implement the IATA Intercarrier Agreement ("MIA"), available at http://www.iata.org/nr/contentconnector/cs2000/siteinterface/sites/legal/file/mia.pdf, Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment as Exhibit 2; and (3) the Air Transport Association of America Provisions Implementing the IATA Intercarrier Agreement to be Included in Conditions of Carriage and Tariffs ("IPA"), attached Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment as Exhibit 3.

[3] The rights and liabilities between an airline and its passenger are determined by the carrier's tariffs. *See Tishman & Lipp, Inc. v. Delta Air Lines*, 413 F.2d 1401, 1403 (2d Cir. 1969); *Enwerenuzor v. Iberia Airlines of Spain*, No. CV 92-3275, 1994 WL 3407 at *3 (E.D.N.Y. Jan. 5. 1994).  American's tariff incorporating the terms of the IPA was attached to Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment as Exhibit 4.

Airlines Flight 77 (Flight 77) during the course of international carriage to be performed by successive air carriers on September 11, 2001.[4]

## II.    SUMMARY OF DEFENDANT'S CLAIMS

Defendant (at different places in its Response) argues it can (1) either escape liability entirely or (2) escape liability for unlimited plaintiffs' damages.   Defendant is wrong on both counts.    Defendant also argued summary judgment was not appropriate because Defendant believes there are disputed issues of fact relating to whether the defendant took all necessary measures to avoid the injury and death of plaintiffs' decedents and whether it was impossible for Defendant to take such measures.  Therefore, defendant failed to meet or even attempt to meet its burden and instead asserted the alleged issues of disputed fact prevent entry of summary judgment.  Defendant is mistaken.

The most basic reason the burden is insurmountable for defendant American Airlines is as pointed out in Plaintiffs' initial filing that American Airlines failed to meet even the regulatory minimum standards required by Federal Aviation Regulations (such as 14 C.F.R § 108)[5] and the Air Carrier Standard Security Program (ACSSP) and the Checkpoint Operations Guide (COG) (Defendant's Exhibits A and B), as well as the many additional measures it could have taken.  Such failing has been documented not only in the 9/11 Commission Report, but in the deposition testimony in this litigation of Defendant's employees and agents.

Plaintiffs need only allege the failure of Defendant to take all reasonable measures.  It is Defendant which bears the burden of showing it took all reasonable measures.   Instead of

---

[4] Plaintiffs note for the record and for reasons discussed herein below that there is absolutely no allegation or evidence that plaintiffs in any way caused or contributed to their injuries and deaths (such as by spilling hot liquids or suffering a heart attack), and weather or other force majeure acts of God such as volcanic eruptions caused or contributed to crash at issue herein.

[5] Defendant at various locations in its brief referred to Title 18 of the Code of Federal Regulations, asserting it pertained to Aviation Security Regulation.  Title 18 is Conservation of Power and Water Resources.  Plaintiffs will assume Defendant intended to refer to Title 14, Aeronautics and Space, which includes Part 108, Aircraft Operator Security.

meeting its burden, Defendant attempted to advance other liability thresholds and a preponderance of the evidence standard. Defendant argued that if others were also negligent and failed to take all reasonable measures, somehow defendant can find immunity from liability in the failures of others. The standard is not one of a preponderance of the evidence, nor is there comparative fault. The standard is very clear. The defendant must show it took all reasonable measures to prevent the harm to plaintiffs. Defendant cannot and did not take all such reasonable measures.

Furthermore, defendant is liable under Article 22 under the Warsaw Convention as amended by the Hague Protocol, for attorney fees and litigation expenses of plaintiffs.[6] Defendant in its response either misstates or fails to understand the international laws and treaties as applied in this case.

## III.    RESPONSE TO DEFENDANT'S ARGUMENT

### A.    Not an "Ordinary Commercial Aviation Disaster" But Similar Events Have Happened Before

Defendant inexplicably argued that plaintiffs' ignore the unique circumstances of September 11 cases and treat the crash of Flight 77 into the Pentagon as if it were an "ordinary

---

[6]Art. XI of The Hague Protocol amends Warsaw Convention Article 22(4) to authorize the Court to award "the court costs and . . . the other expenses of the litigation incurred by the plaintiff." Under recent Second Circuit precedent, the United States was bound by The Hague Protocol vis-à-vis Australia on September 11, 2001. *Avero Belgium Ins. v. American Airlines, Inc.*, 423 F.3d 73, 83-89 (2d Cir. 2005). *Avero's* reasoning teaches that because the United States and Australia on September 11, 2001 were both parties to Montreal Protocol No. 4, which by its express terms adopts The Hague Protocol, the United States was thus bound to The Hague Protocol vis-à-vis Australia (a party to Montreal Protocol No. 4). *Id.* at 89 ("All parties agree that, from the perspective *of a State that is also a party to Montreal Protocol No. 4,* the United States was 'bound by the provisions of The Hague Protocol' as amended by Montreal Protocol No. 4")(emphasis added). Hence, The Hague Protocol entitles Plaintiffs, whose decedents were killed during international carriage from the U.S. to Australia, to attorneys' fees and litigation expenses. Moreover, Article 22(4) as amended by The Hague Protocol, authorizing attorneys' fees and expenses, was *not* modified by Montreal Protocol No 4 (which amended other provisions of The Hague Protocol, *see* fn. 1 above), nor by the IATA intercarrier agreement, nor by American's tariff – and hence remained in force on September 11, 2001.

commercial aviation disaster evolving from mechanical failure or pilot error."  That criticism would be more appropriately leveled at defendant American Airlines with dozens of prior crashes and hijackings on its record.  Plaintiffs do not treat anything about the deaths of their loved ones as "ordinary".  The parents of Dr. Leslie Whittington lost not only their successful, loving and talented daughter who was a Georgetown University professor, but they also lost their son-in-law and young granddaughters who died with their mother on the plane.  Elaine Teague lost her successful, loving and talented daughter who was a medical professional at Georgetown University Hospital.  Plaintiffs certainly do not treat their losses and this crash as if it were "an ordinary commercial aviation disaster."  On the other hand, despite repeated warnings and myriad prior hijackings, onboard murder of pilots, and deliberate crashing of planes, defendant continued to operate as though ignorant of the heightened security risk in 2001.  Defendant continued to act "ordinary."  A partial list of prior similar events is attached hereto as Plaintiffs' Exhibit 5.

## B. Defendant Admits The Crash of Flight 77 Is An "Accident" Under Article 17

It is well settled law, and defendant admits, that a terrorist hijacking of a plane is an accident triggering Article 17 strict liability.  *Air France v. Saks*, 470 U.S. 392, 405 (1985); *Pflug v. Egyptair Corp.*, 961 F.2d 26, 29 (2d Cir. 1992) (recognizing terrorist hijacking of a plane as "accident" under Warsaw Convention).  And *Air France v. Saks* itself cited with approval lower court cases holding that terrorist attacks or hijacking were "accidents" triggering Article 17 strict liability.  *See Air France v. Saks*, 470 U.S. at 405 (citing *Evangelinos v. Trans World Airlines, Inc.*, 550 F.2d 152 (3rd Cir. 1977) (*en banc*) (terrorist attack); *Day v. Trans World Airlines, Inc.*, 528 F.2d 31 (2d Cir, 1975) (same); *Krystal v. British Overseas Airways Corp.*, 403 F. Supp. 1322 (C.D. Cal. 1975) (hijacking)).  Thus, the risk of terrorists, hijackings, deliberate murder of pilot and co-pilot, deliberate crashing, or other destruction of the plane, and religious, political or state-approved aviation terrorism as in *In re Air Disaster at Lockerbie, Scotland on December*

*21, 1988.* 928 F.2d 1267 (2d Cir.), cert. denied, 502 U.S. 920 (1991), have all sadly happened before, including to American Airlines. Once the harm to international passengers is determined to have been as a result of an accident, it is the airline, Defendant American Airlines, which has the burden to show it took <u>all</u> reasonable measures to protect passengers Falkenberg and Teague. It was American Airlines which treated flight 77, operating in the 2001 threat-rich environment as "ordinary commercial aviation" to its peril, and to the peril of its passengers, including Dr. Leslie Whittington and Sandra Teague.

### C. Ipso Facto

Defendant complains that plaintiffs seem to be arguing that because Flight 77 was hijacked, that ipso facto all necessary measures must not have been taken to prevent the hijacking. While plaintiffs did not argue that proposition in the summary judgment motion, plaintiffs very well could have. The fact of the hijacking certainly does lead to the conclusion ipso facto that all necessary measures must not have been taken. For example, the Federal Aviation Regulations required American Airlines to, "provide for the safety of persons and property traveling in air transportation and intrastate air transportation against acts of criminal violence and air piracy." 14 C.F.R. § 108.7 (2001). Whatever American did do, it was not enough to prevent or deter the hijackers.

For example, it is indisputable that the carrier did not do all that it could to keep the hijackers out of the cockpit. Immediately following 9/11 changes were made to the cockpit doors, including adding stronger locks – in many cases locks purchased off the shelf at hardware stores. Defendant cannot show it took all such measures or that they were impossible. There have been ample statements including the 9/11 Commission Report that such measures were readily available.

Another clear example with which defendant takes issue is the fact that a passenger reported box cutters on Flight 77. Although the defendant seems to argue, with not one shred of

evidence, that the wife of the Solicitor General of the United States, herself a trained lawyer, was somehow mistaken about viewing a box cutter and merely instead saw a knife that was less than three and a half inches long and which could not be used as a weapon and which was not menacing and which would therefore be allowed by the COG. The clearly admissible statement from this very credible woman is evidence that American and its agents allowed impermissible items to enter the sterile area and the plane, as expressly prohibited by both the ACSSP (Defendant's Exhibit A) and the COG (Defendant's Exhibit B). It was the airline's responsibility to detect such items and keep them out of the sterile area and off planes, and to prevent and deter hijackers, terrorists and saboteurs.

Thus, while the plaintiffs did not in its motion argue ipso facto that since the hijacking took place, that the defendants failed to take all reasonable measures, that is the inescapable and only logical conclusion. Measures put in place by American Airlines immediately after 9/11 were available before 9/11. No technical advances whatsoever were necessary to do more thorough screening, secure doors, remove keys from flight attendants, ban knives, train screeners, find qualified supervisors, etc., as further discussed herein below. Such means were clearly not impossible; implementation was commenced immediately after 9/11/01.

Only force majeure events, or acts of God, such as weather, or causes which were caused by or internal to the passenger (such as suffering a heart attack), have allowed the defendant carrier to escape liability to its passengers on international flights. The only reported cases where the defendant airline prevailed on the all necessary measures defense once an Article 17 "accident" is established, are those in which the cause was weather or events such as volcanic eruption or something internal to the passenger. See Kreindler, Aviation Accident Law treatise at Section 10.05 [5][c], citing, e.g. *Obuzur v. Sabena Belgian World Airlines*, (LEXIS 5317, S.D.N.Y. 1999)(no evidence in record that airline failed to take "all reasonable measures" to

avoid five-day delay due to weather); *DeVera v. Japan Airlines*, 1994 WL 698330 (S.D.N.Y.) (eight day delay due to volcanic eruption satisfied by all necessary measures defense).

### D.  A More Practical Analysis

A more practical analysis might be to examine the issue in a two step process.  American is strictly liable for the first 100,000 SDRs (Special Drawing Rights International Monetary Fund Currency Unit which takes inflation into account and calculated according to the currencies of France, United States, Germany, England and Japan).  But beyond the first SDRs, passengers can recover unlimited damages unless the carrier can prove it took all measures to avoid the damages.  *Cortez v. American Airlines*, 177 F.3d 1272, 1282 Note 5(11th Circuit 1999) cert. denied 528 U.S. 1136.  The standard described as nearly insurmountable by American's defense counsel, Desmond Barry, Jr., as discussed in plaintiffs' initial motions.  Defendant has cited no cases in which any carrier in any court in the United States has not been liable, except for weather, volcanoes, or where the plaintiff bears the fault (such as spilling boiling coffee in his own lap in the absence of turbulence from a cup held in his own hands. See *Medina v. Am. Airlines, Inc.,* No. 98 CIV, 2006 WL 3663692 (S.D. Fla. Nov. 14, 2006)).

### E.  The Defendant Seeks to Put Its Burden of Proof Upon the Court

The defendant argued the court must first determine what "all necessary measures" would have been on September 11, 2001.  The defendant's suggested threshold is not grounded in any caselaw or treaty language or interpretations.  It is the defendant that must prove it took all necessary measures.  The burden is not on the Court to first develop a list of everything the Court can envision American Airlines might have done on September 11, 2001.  Any failure by the airline to take even so much as one reasonable and necessary measure which was not impossible establishes that the defendant cannot meet its burden.   Neither plaintiffs nor the Court have the duty or obligation to first develop for the defendant an exhaustive,  finite list of all the various and possible actions which American could have taken to the harm to plaintiffs.

**F.  The Cases Cited by Defendant Support Plaintiffs' Contentions**

Defendant cited the Vildex case (among others) which concerned United Airlines (which was also the airline responsible for running the Dulles checkpoints for American Airlines on September 11, 2001).  *Vildex S.A.I.C.  v. United Airlines, Inc.*, No. CV-94-4304 CPS, 1996 WL 733081 (E.D.N.Y.).  The plaintiffs therein sued United Airlines to recover the value of cargo lost while being shipped by United Airlines.  The shipment was gold.  Far less valuable than the human lives lost on September 11, 2001, the declared value of the gold was $476,840.00.  United was responsible for transporting the gold to United's aircraft once the goods cleared customs.  While United's employees were transporting the gold to United's airplane, two masked gunman robbed the United Airlines employees.

**1.  The Ultimate Burden is on Defendant**

The United Airlines employees in the above referenced case were unarmed and the van was unlocked, consistent with airline practices at the time.  United demanded and examined credentials of persons in the sterile area of the airport, not unlike the practices in effect on September 11th.  The court noted that the burden of proof in the underlying action was on the defendants.  The court considered the actual quantum and quality of proof demanded by the underlying cause of action and which party must present such proof.  When the ultimate burden of proof is on the nonmoving party (as is the case here; the ultimate burden is on the defendant airline) to show that it took all reasonable and necessary measures, the moving party meets its initial burden pointing out to the district court that there is an absence of evidence to support the nonmoving party's case.  *Vildex* at 3; *Celotex Corp. v. Catreet* 477 U.S. 317,325 (1986).

**2.  Some Factual Dispute Does Not Defeat Summary Judgment**

To survive the motion the nonmoving party must then make a showing sufficient to establish the existence of the challenged element necessary to that party's case.  The mere existence of some alleged factual dispute does not defeat an otherwise properly supported motion

for summary judgment. *Id* at 3. "Where the record taken as a whole could not lead <u>a rational trier of fact to find for to the nonmoving party, there is no 'genuine issue for trial."</u> *Matshushita Electric Industries Company Limited v. Zennith Radio Corp.*, 475 U.S. 574, 587 (1986), 106 S.Ct. 1348 citing *Cities Service*, supra, 391 U.S., at 289, 88 S.Ct., at 1592. Therefore, the existence of some alleged factual dispute between the parties is immaterial.

### 3. There is Presumptive Liability Against American Airlines Which Is Not Overcome by Compliance With Federal Regulations or Industry Standards

In the *Vildex* case, United Airlines attempted to argue that its agents took all necessary measures to avoid the damage or that it was impossible for them to take such measures. However, the court noted that the burden rests on the carrier to prove that "it has taken all necessary measures to avoid the damage or that it was impossible for it to take such measures." The Court noted that "in most, if not all, serious accidents…the difficulties in avoiding this presumptive liability would seem to be almost if not quite insurmountable." (See *Grey v. American Airlines*, 227 Fed. 2d 282, 285 (2nd Circuit 1955), cert. denied 350 U.S. 989 (1956): Superceded by statute as stated in *Piamba Cortes v. American Airlines, Inc.*, 177 F3d 1272 (11th Cir. (Fla) 1999).) The *Vildex* court explained that it has been recognized that all necessary measures cannot be read too strictly but of necessity is construed to mean all reasonable measures. *Vildex* at 5; *Mfrs. Hanover Trust Co. v. Alitalia Airlines*, 429 F. Supp. 964, 967 (S.D.N.Y.), *affd.* 573 F.2d 1292 (2d Cir. 1977), *cert. denied*, 435 U.S. 971 (1978). Under that reasonable measure standard, "the defendant must provide proof of an undertaking embracing all precautions that in sum are appropriate to the risk, i.e. measures reasonably available to defendant and reasonable calculated, in cumulation, to prevent the subject loss. *Mfrs. Hanover Trust Co.*, 429 F.Supp. 967. United in *Vildex* claimed that its level of security met Federal Aviation Regulation standards required by the United States Department of Transportation. United also attempted to rely upon the fact that previous shipments of goods arrived without

theft to support its contentions that security was adequate. That court stated that the fact that armed robbers had so far spared such facilities could hardly have insulated the reasonably prudent airline carrier from the knowledge that an armed robbery was a likely future contingency. Id.

Even with factual disagreements, summary judgment for the plaintiffs is appropriate when the record taken as a whole cannot lead a rational trier of fact to find for the nonmoving party. Furthermore, the defendant may not merely raise factual disagreements in order to withstand the motion for summary judgment, as the burden is on the defendant. For the reasons discussed in plaintiffs' original motion and hereinbelow, defendant cannot meet its burden.

### 4. "It Never Happened Before" Even If It Were True, Is Not A Defense to Full Liability

In *Mfrs. Hanover Trust Co.*, 429 F.Supp. 967, also cited by the defendants but for a different proposition, a bank brought an action against Alitalia Airlines seeking to recover the value of bank notes after they were stolen during the robbery of the airline's office. The district court held that the airline was responsible for the loss because it failed to take reasonable precautions to guard against robberies. In that case a Wells Fargo truck delivered a parcel to the cargo building at JFK airport in Jamaica, New York. An armed security guard, employed by a protective service, was dispatched to guard the cargo but nonetheless the cargo was stolen by robbers at gunpoint. The case was subject to determination under the provisions of the Warsaw Convention. The court noted that the Warsaw Convention provided that the carrier would not be liable if the carrier proved that the carrier and its agents had taken all necessary measures to avoid the damage or that it was impossible for them to take such measures. *Mfrs. Hanover Trust Co.*, 429 F.Supp. 967. The court noted that the applicable articles of the Warsaw Convention operated to establish a presumption of carrier liability which may only be rebutted by the defendant carrier's persuasive proof that it took all necessary measures to prevent the loss. **The**

**court also noted that the carrier cannot escape liability by demonstrating its recourse to some, as opposed to all, reasonable measures.**  The Court concluded that Article 20 required the defendants prove not a surfeit of preventatives but of an undertaking of embracing all precautions that in sum are appropriate to the risk, i.e. measures reasonably available to the defendant and reasonable calculated in cumulation to prevent the subject loss.  The court made quick work of the issue of liability.  "The question of Alitalia's liability in the present case need not detain us long."  See *Mfrs. Hanover Trust Co.*, 429 F.Supp. 967.  Even though the carrier undertook a number of measures each intrinsically reasonable to secure the high value cargo held in its custody, and the court included a laundry list of things that Alitalia did do (hired an armed guard, had a valuables room, restricted access to the Alitalia valuable's room, conscientiously maintained a logbook, refused to accept high value cargo until armed guards were present, and prevented undue circulation of documents regarding shipments) the court still could imagine a number of other things that might have been done, and that might have, or might not have, actually prevented the loss from occurring.  **The court stated, "We cannot say of course such precautions would have necessarily averted the loss upon which the instant suit is based. Nor, for that matter can we say that Alitalia's employees, under the circumstances in which they found themselves on January 4, 1974, could and should have acted otherwise for the sake of thwarting their assailants' purposes.  We conclude only but nonetheless fatally for the defense that Alitalia did not take all reasonable measures that prudent foresight would have envisioned for the securing of high-value cargo."** *Mfrs. Hanover Trust Co.*, 429 F.Supp. 967 (emphasis added).  The airline also argued it was the first instance of an armed robbery involving an airline cargo warehouse at the Kennedy airport.  The court also concluded, **"That armed robbers had so far spared such facilities could hardly have insulated the reasonably prudent airline carrier from the knowledge"** that such a crime and such an occurrence was a likely future contingency, the court was also not swayed by the defense observation that

the plaintiff had made 16 previous shipments with no incident. The fact that there had been operations without such a loss in the past was no insulation against the defendant airline's liability in the future. **"Equally unavailing to the defense is Alitalia's insistence that it necessarily be held to a standard of care no more rigorous than that observed by majority of airlines at Kennedy Airport in 1974."** *Mfrs. Hanover Trust Co.*, 429 F.Supp. 967 (emphasis added). The Southern District of New York quoted from Judge Learned Hand: "There are, no doubt, cases where courts seem to make the general practice of the calling the standard of proper diligence; we have indeed given some currency to the notion ourselves. Indeed in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices." The court concluded, "Other airlines at Kennedy Airport, at least until January 1974, may well have been less security conscious than was Alitalia; few, if any, may have been more so. Nevertheless, if other airline cargo facilities might have been as, or more awkwardly situated in the face of an armed robbery than was Building 86, that fact cannot confer added grace to Alitalia's posture herein." *Mfrs. Hanover Trust Co.*, 429 F.Supp. 967. Judgment was ordered against the airline in favor of the plaintiff for the full amount of the loss plus interest at the rate of 6% per annum computed from the date of the loss plus costs.

## IV.    PLAINTIFFS' ARE ENTITLED TO SUMMARY JUDGMENT AS A MATTER OF LAW

### A. Defendant May Not Under Any Circumstances Escape Liability

Defendant very erroneously and misleadingly stated in its brief at page 7, "The airline may rebut a plaintiff's prima facie showing and avoid liability all together by proving under Article 20(l) of the Warsaw Convention that it took all necessary measures to avoid the damage and that it was impossible for [the airline] to take such measures." For that proposition they cite Warsaw Convention Article 20(1). Defendant is absolutely wrong; they have mistakenly applied

old cargo law to passengers.  Defendant absolutely may not avoid its liability for the first 100,000 SDRs, and thereafter it is the airline's burden to show that it took all necessary measures.  Compliance with regulations, meeting standards comparable to other carriers, or that a carrier did many things that others might or might not have done, does not excuse the carrier from liability.  Even though there are disputed issues of fact, if it is irrational to conclude otherwise, the plaintiffs are entitled to their summary judgment.

### B.  "Cherry Picking" The 9/11 Commission Report

The defendant complained that the plaintiffs used selected excerpts from the 9/11 Commission Report to demonstrate that American failed to take all necessary measures to prevent the events on Flight 77.  The defendant instead argued that elsewhere in the 9/11 Commission Report there are reported failings by other entities and parties in addition to American Airlines. Granted, there is no shortage of finger-pointing in the 9/11 Report, but it is irrelevant in consideration of this motion.  Even more misguided is defendant's preposterous argument that because of the magnitude of the loss or the organization and financial resources of the hijackers, obligations placed on the carrier by the Federal Aviation Regulations would somehow be excused.  There is no citation to any authority for that preposterous supposition. There is no regulation that excused or reduced the airline's duty because the terrorists were dangerous or the hijacking deadly.  To the contrary, airlines were to be even more vigilant.  Not even state-sponsored terrorism has excused a carrier's duty under the Federal Aviation Regulations.  *In re Air Disaster at Lockerbie, Scotland on December 21, 1988*. 928 F.2d 1267 (2d Cir.), cert. denied, 502 U.S. 920 (1991).  Nonetheless, plaintiffs will address some of defendant's excuses for the 9/11 Commission Report findings.

### 1.  The Divest Container

One of the defendant's excuses for what the 9/11 Commission concluded from the Dulles checkpoint video, is the hijackers might have put prohibited items in the divest container and

then picked them up after they were screened.  The defendant makes an excellent point.  Indeed the hijackers could have done just that activity and that is why the defendant's own COG and ACSSP require the screener to examine the divest container contents.  The divest container were not examined.  Not only could American have done so, it was required to do so.  The checkpoint video, the 9/11 Commission Report and defendant's own brief do not contradict that the divest container was not examined.  Examining the divest container is a reasonable and not impossible measure that the defendants could have undertaken.

### 2.  Contraband on Their Bodies

The defendant claimed the hijackers would not have jeopardized their plot by doing something as suspicious as taping something to their ankles or concealing something in their shoes.  This suggested excuse brings to light yet another measure that American Airline could have taken, reasonably should have taken, and which was not impossible on September 11, 2001.  The screeners could have looked.  In particular American Airlines screeners could have inspected the legs and pants of the hijackers; and such procedure is specifically included in the COG and is required if needed to resolve all metal detector alarms.  Measures could have included a pat down or other special screening methods.  American did not do so and these measures were not impossible.  Indeed, under the circumstances, it was likely required.

### 3.  Undetectable Weapons

On page 13 of its brief, defendant reports the Commission theorized that terrorists may have been instructed to use weapons that were undetectable by airport checkpoints.  That supposition does not excuse the fact that knives of any length (and no boxcutters) that could be used as weapons or that were menacing were not allowed past security.  American Airlines could hand search for, and eliminate, all weapons.  This hand search was something they could have done and it was not impossible.  Such procedures are discussed in the COG and ACSSP.  American Airlines claims they knew the x-ray equipment and metal detectors would not pick up

all forbidden items, yet the protocol was not changed, nor requested by American to be changed. Defendant noted that Swiss army knives, trade tools, pocket utility knives, letter openers and darts were as lethal as box cutters and were permitted into the sterile area under the COG. American's own standards specified that knives of any size, if a weapon or menacing, could not be allowed into the sterile area. American could have undertaken an examination of each and every such knife to determine if it could be used as a weapon or if it was menacing. In fact, this was reasonable and envisioned by the COG and the ACSSP. The fact that American knew of such a problem but declined to examine knives other than for length and never defined or issued training or guidelines on "menacing" or "could be used as a weapon," is further evidence of additional actions that American could have done, but did not, and which actions were possible. The 9/11 Commission Report concluded something was visible inside the back of a hijacker's waistband and not inspected.

### 4. CAPPS

On page 14 of its brief, defendant argued it correctly applied the Computer Assisted Passenger Prescreening Program (CAPPS) and selected passengers, including some of the hijackers, for additional scrutiny. By this argument, defendant pointed out an excellent example of additional measures which the airline could have undertaken, which were not impossible, but which it did not undertake. In depositions we learned American Airlines had passenger service representatives who could have escorted profiled passengers from the ticket counter to the screening checkpoint for special security screening, including hand searches. This is discussed hereinbelow in section V.

### 5. Common Strategy

Defendant noted on page 14 of its brief that the FAA Common Strategy required crews to cooperate with hijackers. That is not all the ACSSP says. The ACSSP at Appendix XIII, page 8.b.3 states, "Attempt to keep hijacker(s) out of cockpit." This statement alone clearly

demonstrates defendant's knowledge of the vulnerability of the flight crew and of souls on board once the flight deck is breached.  While the ACSSP does not say exactly how that is to be done, clearly a flimsy door with common keys available to all Boeing pilots and all flight attendants was not the best way, and certainly not the only way, to go about implementing the strategy which is in American's ACSSP.  Obviously there are additional measures that could have been taken.  Within days after 9/11/01 the cockpit doors were strengthened, in some cases with nothing more than common latches purchased at hardware stores.

### 6.  Disputed Facts Do Not Lead to the Conclusion American Took All Reasonable Measures

At the bottom of page 14, defendant inexplicably concluded that any one of its statements is sufficient to create an issue of disputed material fact, and defendant inexplicably argued that therefore it shows that American may well have taken all reasonable measures mandated by the FAA and reasonably calculated to meet the anticipated terrorist threat.  Defendant American Airlines completely misstated the law as discussed herein.  The plaintiffs do not need to show that there are no issues of material fact; the plaintiffs need only raise the issue that the airline did not take all reasonable measures that were not impossible.  The defendant has the burden.  The defendant's brief included many examples of other measures that could have been taken.  The standard as explained in caselaw cited by defendant is not that the airline took the measures mandated by the FAA and reasonably calculated to meet the government anticipated threat.  The airline is not excused by following the government regulations or performing at that same level or even slightly better than its colleagues in the airline business.  Not only does the defendant's own pleading render summary judgment appropriate, but it renders inconceivable any other conclusion.

### 7.  Defendant's Dogged Dodging of its Burden

In section IV at page 17 of its brief, defendant seeks to require this Court to first establish a standard of care and an exhaustive list of what defendant should have done to prevent the harm to plaintiffs.  There is no such requirement.  The standard is whether the defendants took all reasonable, and not impossible, measures.  In support, defendant cited articles written by their own defense team and argued, "This is the rarest of cases where an airline can sustain its burden by showing that it took all necessary measures to avoid the loss."   But, Defendant cited no cases despite hundreds of prior hijackings, murders of pilots, deliberate crashing of planes, sabotage, bombings, etc.

### 8.  Ongoing Discovery  Does Not Defeat the Motion

In section IV, at page 20-21 of defendant's brief, it argued that it is still seeking discovery from others such as the FBI, the FAA and the CIA, but this summary judgment motion pertains only to the two international passengers, and their airline.  No entity other than the airline has the advantage of treaty law (and it is of advantage to the carrier).   American Airlines is illogical when it claims, "If, as that evidence tends to demonstrate, the terrorists restricted themselves to weapons that were either undetectable or permissible under the FAA regulations, then American did not fail to take all necessary measures."   The statement lacks any treaty, regulatory or case law support.  Not surprisingly, no case is cited in support of that illogical contention.    The fact that dozens of other plaintiffs are desirous of completing liability discovery has no bearing on the timeliness of these two international passengers' motions for summary judgment.

## V.    SUMMARY JUDGMENT CAN BE APPROPRIATELY GRANTED ON DEFENDANT'S OWN BRIEF AND EXHIBITS, AND DULLES DEPOSITIONS TO DATE

Defendant's complaints about the 9/11 Commission Investigation and Report and the 9/11 Staff Monograph are not without merit.  There was less than rigorous cross-examination

(and almost no cross-examination of airline personnel), and there will be undoubtedly be challenges to admissibility of all or parts of the 9/11 Commission Report. However, plaintiffs do not need the 9/11 Commission Report to demonstrate myriad examples of measures which the defendant could have undertaken, which were reasonable, and were not impossible, and for which there can be no debate. The requirements for those measures are contained in the very exhibits attached to Defendant's Response to Plaintiffs' Motion for Summary Judgment and in the depositions of those responsible for Dulles screening of American's passengers.

In reviewing even a sampling of the persons responsible for the security of Flight 77 (and depositions are indeed ongoing) it is illogical to conclude that American took all reasonable measures that were not impossible, as clearly demonstrated by American's own testimony and documents, as follows:

| Timothy J. Ahern – American Airlines Vice President of Safety, Security and Environment | |
|---|---|
| 86:07-11 | Q: Did Mr. Wansley tell you in June of 2000 that there were long-standing problems that impair airport screeners' performance?<br>A: No, not that I recall. |
| 91:15-21 | Q: Were you aware of screener problems detecting dangerous weapons in June of 2000?<br>A: I was aware that we had received notification from the FAA about test items that were not detected. |
| 94:02-10 | Q: Did you know about the problems that reduced screeners' effectiveness at airports that American Airlines served, yes or no?<br>A: Sure. And I think as you look at the document, the second issue is that the human factors issue is one that certainly played into it as well, significantly played into it. |
| 144:06-13 | Q: Were you aware of the fact that in March and May of 2001 the FAA's office of civil aviation and intelligence conducted a series of classified briefings for security officials at 19 of the nation's largest airports?<br>A: No. |
| 145:15-20 | Q: Were you informed by anyone in the summer of 2001 that the threat against American airplanes on domestic soil was increasing?<br>A: No. |
| 346:22-347:02 | Q: While you were vice president in charge of security, was American Airlines fined for security lapses?<br>A: We were fined, yes, sir. |
| 451:16-452:21 | Q: Mr. Ahern, are you aware that the FAA had described their aviation security procedures as minimal standards?<br>…<br>A: No, sir.<br>…<br>Q: Are you aware that American Airlines has described the FAA standards as being minimal standards, which they can exceed?<br>A: No, sir. Actually to the contrary, I would say the FAA has described in some cases their standards to be optimal.<br>Q: Well, you are unfamiliar then with Mr. James Padgett of the FAA presentation in 1997, the FAA sets minimum standards but cedes to the airlines the right to exceed these standards?<br>…<br>Q: You're not aware? |

| A: No, sir. |
| --- |

Mr. Ahern was mistaken.  He could have, and indeed it would have been reasonable and not impossible to take additional measures to prevent damage to the plaintiffs.

American Airline's Air Carrier Standard Screening Program (ACSSP), Defendant's Exhibit B

**Pages 132-33, C.1.b.**

"The training program's described below in C.2, 3., and 4.  The air carrier may include additional related security material for screening employees with notification to the FAA."

**Pages 139m, J.4.f and Page 139n.5.d**

"Current Threat.  Threat information as provided by the FAA.  The carrier, in conjunction with its PSI [Principal Security Inspector], may develop additional training material."

Mr. Ahern did not take all reasonable measures and they were not impossible as they are provided for in Defendant's own ACSSP.

| Larry Wansley – American Airlines Managing Director of Corporate Security | |
| --- | --- |
| 91:02-10 | Q: In fact are you aware that in March or May of '01 the FAA Office of Civil Aviation Intelligence conducted a number of briefings with the nation's 19 largest airports?<br>A: I am now.<br>Q:  Would it be accurate to say as of September 11th, 2001 you had no idea that that had occurred?<br>A:  That's right. |
| 99:11-100:07 | Q: You would anticipate and expect that screeners on the front line be knowledgeable of the threat of, to civil aviation by Islamic extremists?<br>…<br>A: I would expect them to be will knowledgeable about threat information that was provided to them.  Yes.<br>Q: That certainly would include just the identity and general knowledge that Osama bin Laden intended to kill Americans and was a threat to civil aviation?<br>….<br>A: I think that is rather a general statement, but I will give you a general answer, that's yes. |
| 116:03-07 | Q:  Prior to 9/11 you were aware of various reports by the GAO of vulnerabilities for checkpoint screening?<br>A: I was not aware of GAO reports regarding checkpoint screening. |
| 174:20-22 | Q: You were aware that groups were training for hijackings in January '01?<br>A: Yes. |

This lack of knowledge is contrary to the very requirements set for in the COG (Checkpoint Operations Guide, Defendant's Exhibit A)

Page 3-4 requires as follows:

"Pre-shift screener Briefing:

- Are all screeners aware of current security directives and information circulars?

- Are all screeners aware of special events that could effect screening operations?"

| 198:06 -15 | Q: This PowerPoint presentation states, "let's take a look at FAA reported alleged security violations for AA and AE in the year 2000." Do you see that on that page?<br>A: I do.<br>Q: There is a total given without the fourth quarter for the year 200; is there not?<br>A: Yes, it is.<br>Q: What is that total?<br>A: That total is $5,649,348. |
|---|---|

American Airlines did not take all reasonable measures before 9/11/01 as they were fined millions of dollars for security violations.

| 211:20 - 214:04 | Q: In light of being fined some $5 million in 2000, did you at any point in time in light of these threats direct security personnel below you that they should increase the number of passengers that were subjected to pad down searches prior to 9/11?<br>…..<br>A: I may have, if it was in accordance with FAA directives.<br>Q: Well, I'm asking if you directed it yourself?<br>A: I didn't have the authority to go beyond the FAA requirements<br>….<br>Q: It would also be true at no time prior to 9/11 after receiving threat information into 2001 did you ever instruct American personnel to ensure that there were more searches of baggage of passengers traveling on American flights?<br>…<br>A: Again, if it was as the result of an FAA directive or instruction, we would do it. I independently did not have the authority to change that.<br>Q: At no time prior to 9/11 did you yourself ever instruct security personnel to increase the number of passengers who were selected to and subject to hand wanding?<br>…<br>A: I did not do that unless it was within the confines of a FAA order, directive or instruction. I did not have independent authority to order those kind of activities. |
|---|---|

Mr. Wansley made a deadly incorrect assumption. The Checkpoint Operations Guide (COG) states at page 6-1, "The airline GSC may direct the use of intensified security procedures." American Airlines did not, but reasonably could have.

| Beulah Hayat – Dulles Screener | |
|---|---|
| 29:12-30:10 | Q: After September 11th and before you began work at Globe, did you receive a salary increase? |
| | A: Yes, we did. |
| | Q: And what was that amount? |
| | A: That was $14 with Globe. |
| | Q: Okay.  So when you went to work for Globe, you began making $14 an hour but ….. while you were working for Argenbright, you were making $7.35 an hour; is that right? |
| | A: Yes. |
| | Q. All right.   Were your responsibilities as a pre-departure screener substantially different while working for Globe as opposed to working for Argenbright? |
| | A: No, they were the same. |
| | …. |
| | Q: But they paid you nearly double? |
| | A: Yes.  After 9/11 Argenbright also started paying u s $12. |

Clearly nothing prevented payment of better wages to screeners to attract and keep good employees.  Better

wages are another example of a very reasonable measure Defendant failed to implement before 9/11.

| 52:16-24 | Q: All right.  And were you given any specific instruction on how to determine whether a knife was a permissible knife and not a permissible knife through the checkpoint? |
|---|---|
| | …. |
| | A: The – the knife that was allowed should be of this length (indicating).  We used to measure it with our ID.  Simple, plain knife. |

This was not the standard to determine a permissible knife.  Clearly additional reasonable measures could

have been taken by defendant as set forth in its own documents.

 The Checkpoint Operations Guide (COG) states at page 5-7, "However some knives with blades under 4

inches could be considered by a reasonable person to be a 'menacing knife' and/or may be illegal under local

law and should not be allowed to enter the sterile area.  ANY QUESTIONABLE ITEM SHOULD BE

REFFERED TO A GSC."

The ACSSP, Appendix I states, "DEADLY OR DANGEROUS WEAPON GUIDELINES: The following

guidelines are furnished to assist in making a reasonable determination of what property in the possession of a

person should be considered a deadly or dangerous weapon.  They are only guidelines, however, and common

sense should always prevail.…**Knives** – Including sabers, swords, hunting knives, souvenir knives, martial

arts devices, and such other knives with blades 4 inches long or longer and/or knives considered illegal by

local law…**Disabling or Incapacitating Items** – All tear gas, mace and similar chemicals and gases whether

in pistol, canister, or other container, and other disabling devices such as electronic stunning/shocking

devices. **Other Articles** – Such items as ice picks, straight razors, and elongated scissors, even though not commonly thought of as a deadly or dangerous weapon, but could be used as a weapon, including toy or 'dummy' weapons or grenades."

No such analyses were made or even required by American Airlines at Dulles.

| 81:16-82:04 | Q: Is it the responsibility of the person working the handheld device to go all the way down… to the floor?<br>A: To the legs. Yeah.<br>Q: All the way to the floor?<br>A: To the shoes.<br>…<br>Q: To the shoes… and the floor?<br>A: Yeah. Not to the floor but to the – to the body where he – to the shoes, up to the shoes. |
|---|---|

The Dulles videotape clearly showed they did not screen down to the floor. The COG, page 4-8, clearly required screening to almost touching the floor.

| 83:24-84:10 | Q: So before every shift you would check the handheld device to see if it was operating correctly is that right?<br>A: Yeah, the person who's using it checks it.<br>Q: I understand, but I'm trying to -- I'm trying to be precise about when it's checked. Is it checked at the beginning of every shift? Is it checked with every passenger that goes through the checkpoint? Is – how often is it checked?<br>A: You know, once if you see it's working, then you don't need to check it again. |
|---|---|

The COG, at page 4-5 and at page 7-3, required the hand-wand to be tested before each and every person wanded. This was especially important because Dulles in the summer of 2001 was having a problem with malfunctioning handwands.

| 98:24-99:03 | Q: Were you able to determine, in reviewing the video (Dulles screening video day of 9/11) a second time, whether the screener actually went down to the floor eight times?<br>A: No, not eight times. |
|---|---|
| 101:02-102:12 | Q: Ms. Hayat, were you able to determine how many passes down the front or the back of the body the screener did on – on that particular passenger, Mr. Moqed?<br>A: Two times.<br>Q: Two times. And is it true that – that in your training with Argenbright and the COG, that it actually required more passes down the passenger's body than just two?<br>A: Yes.<br>Q: Yes. And so that screening wasn't consistent with the way that the COG said that you were to do the passing up and down the body if you were properly conducting hand-wand screening is that right?<br>….<br>A: Again, I'm – if he had found the source, then he wouldn't have do that again and again.<br>…..<br>Q: So I just want to make sure I understand. Your testimony is, is that because the magnetometer was so strong, you didn't actually need to pass down the body of the passenger more than twice?<br>A: If he had found the source and it – the body's no more alarming, then it's fine. |
| 105:22-106:16 | Q: Okay. In you review of – of the screening done on this passenger, Mr. Nawaf, could you determine did in fact the screener operate the handheld device up and down the body of the passenger eight times? |

|  | A: No. |
|---|---|
|  | … |
|  | Q: Okay.  And could you determine whether in fact, when operating the handheld device, whether he checked to determine whether the handheld device was working before screening the passenger? |
|  | A: Yes, he must have. |
|  | Q: He must have? |
|  | A: Yeah.  When this start – start – when he started screening. |
|  | Q. When he started the screening of that particular passenger, or when he started the screening in the beginning of the shift? |
|  | A: In the beginning of the shift. |

The COG, at page 4-8, required the screener to pass to the floor eight times, and test the hand-wand before

each person was wanded.

| 152:05-08 | Q: All right.  Ma'am, were you aware that – when was – when did you first hear the name Osama bin Laden?<br>A: After 9/11. |
|---|---|
| 153:25-154:14 | Q: Before your shift would begin in the morning when you first came into work, what was – what did you do when you first came to work in the morning as a pre-departure screener for Argenbright?<br>A: A small briefing if there was something new.<br>Q: Okay.  So if there was something new to say, they would hold a small meeting and they would inform you of what that is?<br>A: Yes. Yes.<br>Q: And how often did that happen?  Was it once a month?  Once a week?  Once every two weeks?  How often?<br>A:  Whenever there is need, if can be every other day or it can by -- |
| 158:13 | Q: Did anyone ever tell you from American Airlines or United Airlines or Argenbright that – that information indicated that a terrorist group or other hostile entity with the known capability of attacking civil aviation is likely to carry out attacks against U.S. targets or civil disturbances with a direct impact on civil aviation prior to September 11th, 2001?<br>A: No. |

The COG, at page 3-4, required at the daily "Pre-Shift Screener Briefing" that all screeners be aware of

current security directives and information circulars, as well as special events that could effect screening

operations.  Osama Bin Laden was mentioned by name in several such urgent communiqués.  These security

briefings were reasonable measures that should have been taken…and were required.

| **Samuel Huluka – Dulles Screener** | |
|---|---|
| 34:19-22 | Q: How about did they test you on your English skills?  I mean you no offense/<br>A: No one give me an English test. |

ACSSP, page 137.3 – Recurrent Training, requires an annual written test in English, without translator

assistance, to test comprehension.

| 37:14-16 | Q: Before you went to the checkpoint was there any sort of a meeting that was held?<br>A: We don't have any meeting |
|---|---|
| 61:19-62:09 | Q: Do you know what the threat level was on the morning of September 11th, 2001, the security threat level?<br>A: There is no threat level before 9/11/ |

| | Q: Okay. |
| | A: Just like now it's orange, something.  Before 9/11. |
| | Q: Had you ever heard of not a color coded system, but a numbered system of threats before 9/11? |
| | A: No.  Before, no. |
| | Q: Did you have the sense that there was any increased threat? |
| | A: No. |
| 63:02-09 | Q: Do you know what a security directive is? |
| | … |
| | A: I don't know. |
| | Q: Do you know what an information circular is? |
| | A: I don't know. |

A daily briefing was required, as discussed above, to review current security directives and information circulars and other important information.

| **Stephen Kar-Hung Chu – Dulles Checkpoint Security Supervisor** | |
| 54:02-16 | Q: Do you recall the name of the guide? |
| | A: I believe we call it the COG book. |
| | …. |
| | Q: How often as a screener would you look at that guide? |
| | A:  At the beginning – I believe at the beginning when they start they are given time to go in there and read the book.  At the time when I started I believe only the CSS were allowed to do that. |

The COG must be available at <u>every</u> checkpoint. COG page 3-4. While in training a screener must go through a period of on the job training and review the COG every day. ACSSP page 134.d.3.

| 90:19-91:07 | A: When we started back in 1992 there wasn't, you know, that big about mace. |
| | Q: So you were not tested on you ability to detect mace? |
| | A: No.  I'm not saying we were tested with it.  We – other than the  -- anything other than the FAA approved test object, if it's on the list we can get familiar with how it looks, but we never really, you know, used that to test people. |

As discussed above, the airline with its PSI, was permitted to develop additional training material.

| 98:08-20 | Q: How long could a knife be? |
| | … |
| | A: If I remember correctly, straight edge 4 inches limit. |
| | Q: How would you measure that? |
| | A:  We don't have a tape at the checkpoint, but we usually have airport I.D., and roughly from one corner to another corner on your airport I.D. is roughly about four inches, so.  So it may not be exactly, but it gives you the guideline you can go with. |

The Checkpoint Operations Guide (COG) stated at page 5-7, "However some knives with blades under 4 inches could be considered by a reasonable person to be a 'menacing knife' and/or may be illegal under local law and should not be allowed to enter the sterile area.  ANY QUESTIONABLE ITEM SHOULD BE

REFFERED TO A GSC."

The ACSSP, Appendix I stated, "DEADLY OR DANGEROUS WEAPON GUIDELINES: The following guidelines are furnished to assist in making a reasonable determination of what property in the possession of a person should be considered a deadly or dangerous weapon.  They are only guidelines, however, and common sense should always prevail.…**Knives** – Including sabers, swords, hunting knives, souvenir knives, martial arts devices, and such other knives with blades 4 inches long or longer and/or knives considered illegal by local law…"

| 147:17-148:05 | Q: Sir are you aware whether Dulles Airport was fined for screening irregularities while you were there? <br> A: I didn't know anything about it. <br> Q:  You're not aware of any fines that were issued against Argenbright for inadequate screening at Dulles while you were there during your 10 year tenure? <br> A:  Even that would be the office, the people and there's no need for them to tell me, I believe. |
|---|---|

The job of the CSS included applying corrective action. COG, p. 3-1.

| **Nabil Nashid Abadir – Dulles Screener** | |
|---|---|
| 24:18-20 | Q: Were given an English proficiency test by Argenbright? <br> A: No. |

As discussed above, it was required annually.

| 44:23-45:04 | Q: It is also states a few bullet points down part of your initial training was to review the Checkpoint Operations Guide or the COG.  Do you recall being trained on the COG in the initial classroom? <br> A:  The COG, I don't know what they mean by that name. |
|---|---|

This knowledge was required by both the COG and the ACSSP.

| 74:23-75:02 | Q: When did you first hear the name Osama bin Laden? <br> A:   After September 11th I heard about that guy, but before I don't hear about him. |
|---|---|
| 75:24-76:06 | Q: Do you know what the threat level was on the morning of September 11th at Dulles Airport? <br> … <br> Q: The threat level? Do you know what a threat level is? <br> A: No |
| 78:13-20 | Q:  Do you know what a security directive is? <br> …. <br> A: No. <br> Q: Do you know what an information circular is? <br> A: I don't know. |
| 79:07-10 | Q: Were you ever given or did you – were you ever read from or told about increased threats contained in security directives? <br> A: No. |

If there had been daily briefings as required, he would have known these things.  There were no daily

briefings as required by the COG.

| Susan Simmons – American Airlines Ticket Counter Agent at Dulles and Ground Security Coordinator | |
| --- | --- |
| 81:10-23 | Q: Did you have any trouble, did you ask them an profiling questions?<br>A: I did.  I asked them both.<br>Q: How did they respond?<br>A: I first asked al Mihdhar, and he answered the questions correctly, he answered yes to both of them.  And when I questioned Moqed, he looked at me like he couldn't understand my English.  And al Mihdhar turned to him and said something I couldn't understand what he was saying,.  And then he said oh, yes, yes. |
| 103:04-09 | Q: Did you have any discretion in making, without giving me the criteria, any discretion in September of 2001, in deciding whether or not to make a passenger a selectee?<br>A: Yes. |
| 103:21-106:15 | Q: For the record, 103 on its cover page , first of all has bates numbers AAL 006411 through 6442.  It's a, appears to be some kind of electronic or PowerPoint slide presentation.  And the first slide on the first page simply says "security, basic indoctrination."  1/5/01.  Again, produced in this litigation by American airlines.<br>….. (106:10)<br>Q: And then on the bottom, it says language barrier.  And the subbullet is "if no translator available, hand search all baggage."  Do you see that?<br>A: Yes. |
| 137:23-139:05 | Q: Was there any procedure at Dulles on or before 9/11 where a passenger's boarding pass was stamped with an S, or some other designation that required additional screening of that passenger?<br><br>A: I can't remember if that was – when that was done.  I remember something – I'm not clear about it.  I can't recall when that was done, if it was pre-9/11, post-9/11.<br>Q: What was the consequence of stamping an S on a boarding pass?<br>….<br>A: I can't even recall if we put an S on there.  They kept changing the rules all the time. So I can't – I really can't recall. |

American Airlines did not do what its own ACSSP required, and employees were unsure.

| Chandresh Patel – Argenbright Senior Duty Manager at Dulles | |
| --- | --- |
| 74:14-22 | Q: Did you ever have regular meetings with the CSSs?<br>A: If something has to address, yes.<br>Q: Roughly how regular would you have those meetings><br>A: It's not regular, if something change come up or something happen, we just brief the CSS. |

As discussed above, the daily briefing was required.

| 133:07-17 | Q: Prior to September 11th, how would a screener at the checkpoint know that someone had been designated a selectee?<br>…<br>A: The airlines come to the checkpoint and let the supervisor know.  Customer service agent come to the checkpoint and let the supervisor know this bags need dump search. |
| --- | --- |

Obviously American did not do this on September 11, 2001.  No selectee was given such a search.

| 147:12-19 | Q: Did you know prior to September 11th that terrorists who posed threats to civil aviation were present in the United States?<br>A:  I don't remember.  I don't think so. |
| --- | --- |

This information should have been covered at the daily briefing as required by the COG and ACSSP.

| John T. Evans – American Airlines Passenger Safety Agent at Dulles, Ground Security Coordinator on 9/11/2001 | |
|---|---|
| 51:07-52:06 | Q: As you watched the video, what was your impression of the screening that was being done that was depicted in the video?<br>…<br>A: I think it was very poorly, you can't really see that, it's not that technical.<br>Q: What do you mean?<br>A: It should have been clearer.  I think they need to have better TV screens at the security points. |

The American employee suggests yet another reasonable measure that should have been taken.

| 139:16-20 | Q: Was there a COG at the checkpoint that the passengers who boarded Flight 77 went through, was there a COG at that checkpoint?<br>A: I have no idea. |

Per the COG, page 3-4, not only required a COG at each checkpoint, but required him to check for it at the

start of each and every shift.

| 193:13-21 | Q: I'm asking you whether or not it was part of your responsibilities pre-9/11 to ensure that the hand wanding procedures were done right.<br>A: That the wanding was done, I reckon it was done, you say do properly, I wasn't properly trained to handwand. |

The COG, page 3-5, required supervisors to ensure the screeners were using proper hand-wanding procedure.

That would be hard to accomplish if you don't know how to do it.

| 227:18-228:06 | Q: Sir, during your work with American Airlines, did you notice that any of the screeners had difficulty speaking English?<br>A: Yes.<br>Q: Was that a problem?<br>A: Was that problem, yes.  I felt it was a problem.<br>Q: In what way was it a problem?<br>A: They couldn't really talk to the pass – the passengers coming through. |

Annual English comprehension tests were required.

| 236:08-16 | Q: Do you believe you didn't have enough information to indicate that Islamic terrorists might attack commercial aviation?<br>A: No, we had information.<br>Q: Why did it come as a surprise then?<br>A: I didn't think it would really happen. |

This "head in the sand" state of denial speaks for itself.

| 251:19-21 | Q: Do you know the term exceptional screening?<br>A: No. |

That was catastrophically unfortunate, as it is the GSC who had the authority to direct exceptional screening – the use of intensified screening procedures. COG, page 6-1.

| 256:14-17 | Q: Can you name anyone at American Airlines corporate security department? <br> A: No, sir. |

Security supervisors were required by the COG to know these contacts.

| **Dana G. Turner – AA GSC at Dulles on 9/11** | |
|---|---|
| 106:09-107:21 | Q: 170 alleged violations first quarter, 175 alleged violations second quarter, 170 alleged violations in the third quarter. That's three quarters, total of $5.649 million in fine, I'm asking you if as a GSC for American Airlines prior to September 11, 2001, you though that was a lot of fines. <br> … <br> A: So any fine would be more than any of us would like to see, so. <br> Q: An certainly $5.6 million in fines is significant, in three quarters, is significantly more than you would like to see, correct? <br> … <br> A: I would certainly like to see a smaller dollar figure; yes. |

FAA fines refer to fines for security violations, and security violations means American Airlines was not doing what it was supposed to be doing to secure its passengers

| 132:24-366:14 | Q: If someone presented a knife to you on September 11, 2001 and asked you to look at it and determine whether or not it was menacing, what criteria would you use? <br> … <br> A: Extremely jagged is what comes to mind. |

There are no such criteria in the COG or ACSSP and American to date has produced no criteria. Plaintiffs suggest they had none, but they should have. Furthermore, they clearly needed to implement training so supervisors and employees knew what items to keep off airplanes.

## VI.    SUMMARY JUDGMENT IS APPROPRIATE IN THESE TWO WARSAW CONVENTION ACTIONS

Summary judgment in favor of plaintiffs Falkenberg and Teague is appropriate in these two Warsaw Convention actions. Defendant's response admits they are absolutely liable for the first $300,000.00. Defendant elected to avail of itself of the all reasonable measures defense for amounts in excess, but the burden is on defendant to prove it took all reasonable measures. Defendant made absolutely no effort to meet its burden. It is legally impossible for defendant to show it took all necessary measures because they failed to take all those actions required by the

Federal Aviation Regulations, the Checkpoint Operations Guide ("COG") or the Air Carrier Standard Security Program, ("ACSSP").    Having failed to meet or exceed even the legal minimums, it is impossible for them to show that they took all reasonable measures to prevent the plaintiffs' losses.  Arguing that others may have also failed to take reasonable measures does not excuse defendant's failure to meet its mandatory minimums.

**VII.    NOT ONLY SHOULD PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT BE GRANTED AS A MATTER OF LAW, BUT PLAINTIFFS, AS REPRESENTATIVES OF PASSENGERS KILLED DURING THE COURSE OF INTERNATIONAL TRAVEL FROM THE UNITED STATES TO AUSTRALIA ON SEPTEMBER 11, 2001, ARE ENTITLED TO RECOVER ATTORNEYS' FEES & LITIGATION EXPENSES UNDER THE HAGUE PROTOCOL**

**A.    As Both The United States & Australia Were Parties To Montreal Protocol No. 4 (To Amend The Warsaw Convention As Amended By The Hague Protocol) On September 11, 2001, The  United States Was Bound To The Provisions Of The Hague Protocol Vis-à-Vis Australia on September 11, 2001.**

American Airlines misrepresents the Second Circuit's holding in *Avero Belgium Ins. v. Am. Airlines, Inc.*, 423 F.3d 73 (2d Cir. 2005).  Despite what defendant asserts, *Avero* did <u>not</u> hold that the United States by ratifying Montreal Protocol No. 4 in 1999 was not bound by the Hague Protocol's provisions vis-à-vis *any country*.  Rather, *Avero* clearly explained:

> All parties agree that, from the perspective of a State that is also a party to Montreal Protocol No. 4, the United States <u>was "bound</u> by the provisions of The Hague Protocol" (as amended by Montreal Protocol No. 4) by virtue of having ratified Montreal Protocol No. 4.  That is the sum and substance of the Talbott Letter.

*Avero*, 423 F.3d at 88.

The "Talbott Letter" was the June 23, 2000 Letter of U.S. Deputy Secretary of State Strobe Talbott accompanying President Clinton's transmission to the Senate of the Montreal Convention, which explained the effect of the earlier ratification of Montreal Protocol No. 4:

"In accordance with the provisions of Montreal Protocol No. 4, the United States also became bound by the provisions of The Hague Protocol when it ratified Montreal Protocol No. 4." *See also, Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 431 (2d Cir. 2001)(explaining that the U.S. was not governed by The Hague Protocol "until another international agreement, Montreal Protocol No. 4, was ratified by the Senate on September 28, 1998, and became effective on March 4, 1999.")  So Second Circuit law is clear that vis-à-vis a State – like Australia – that was "also a party to Montreal Protocol No. 4" in 2001, the United States was bound by the provisions of the Hague Protocol.  *Avero*, 423 F.3d at 88; *Fujitsu*, 247 F.3d at 431; *see also*, *Continental Ins. Co. v. Federal Express Corp.*, 454 F.3d 951, 955-957 (9th Cir. 2006)(by becoming a party to Montreal Protocol No. 4 on March 4, 1999, the United States bound itself to the provisions of The Hague Protocol vis-à-vis States that were parties to the Montreal Protocol No. 4 *as well as* vis-à-vis States that were parties to The Hague Protocol but not Montreal Protocol No. 4).

*Avero* expressly did not overrule "the sum and substance" of the Talbott letter that the United States was bound to the Hague Protocol vis-à-vis States that were parties to Montreal Protocol No. 4 like Australia.  Rather, *Avero* was quite clear that

> [t]he ***narrow question*** raised in this case is not directly addressed in the Talbott Letter – namely, whether the United States became bound in this manner ***vis-à-vis States that are <u>not</u> parties to the Montreal Protocol No. 4***, but are parties Hague Protocol.  On that score, the Talbott Letter is silent.

*Avero*, 423 F.3d at 88 (emphasis added).  So the narrow question in *Avero* was whether the United States in 2001 was bound to the Hague Protocol vis-à-vis Belgium, which was ***not*** a party Montreal Protocol No. 4.  Answering *that* narrow question, *Avero* held that when the United States ratified Montreal Protocol No. 4 in 1998 (effective March 4, 1999), "it expressed an intention *not* to be bound by the Hague Protocol ***against States that, like Belgium, were <u>not</u> parties to the Montreal Protocol No. 4.***"  *Avero,* 423 F.3d  at 77 (emphasis added).  Defense counsel obscures that narrow holding by stating that *Avero* held that the United States "expressed

an intention to the contrary," Def. Brief at 23, while leaving out the rest of the quote that the United States expressed an intention not to be bound by the Hague Protocol "against States that, like Belgium, were _not_ parties to the Montreal Protocol No. 4." *Avero,* 423 F.3d at 77. Hence, *Avero's* narrow holding only applies to states that were not parties to Montreal Protocol No. 4.

As Australia **was** a party to Montreal Protocol No. 4 on September 11, 2001, *Avero*'s narrow holding does not apply. *See* Def.'s Rule 56.1 Statement ¶ 18 ("American admits that Montreal Protocol No. 4 (to amend the Warsaw Convention as amended by the Hague Protocol) entered into force in Australia on June 14, 1998."). Hence, by the plain text of *Avero* – "All parties agree that, from the perspective of a State **that is also a party to Montreal Protocol No. 4**, the United States was 'bound by the provisions of The Hague Protocol' (as amended by Montreal Protocol No. 4) by virtue of having ratified Montreal Protocol No. 4" – the United States was bound vis-à-vis Australia by the Hague Protocol on September 11, 2001. *Avero,* 423 F.3d at 88.

**B**.    **The Plain Text Of The Hague Convention Authorizing This Court to Award Plaintiffs' Court Costs & Litigation Expenses, Including Attorney's Fees, Should Be Enforced**

American's last erroneous argument is to insist that this Court read the plain text of Article 22(4) authorizing this Court to award "court costs and . . . the other expenses of the litigation incurred by the plaintiff" as superfluous, as "nothing more than a pass-through" already provided by Warsaw Convention Articles 17 and 24(2). *Zicherman v. Korean Lines Co. Ltc.,* 516 U.S. 217, 229 (1996), cited at Def. Brief at 25. While the aviation defense bar may wish that "[a]s with the Warsaw Convention . . . Article 22(4) merely acts as a 'pass-through,' directing courts to apply the law that would govern in the absence of the Warsaw Convention," Def. Brief at 25, such a reading would render Article 22(4) redundant and ignore the expressed intent of its

framers, specifically that of NYU School of Law Professor Andreas Lowenfeld who represented

the position of the United States to the Hague Convention on this precise point:

> [T]he United States proposed that Article 22 of the Warsaw Convention be
> amended to allow the award of litigation expenses, including attorney's fees, in
> addition to the primary award.

*Motorola, Inc. v. Kuehne & Nagel, Inc.*, 208 F. Supp.2d 910, 912 n.3 (N.D. Ill. 2002)(quoting A.

Lowenfeld & A. Mendelsohn, *The United States and the Warsaw Convention*, 80 Harv. L. Rev.

497, 507 (1967); *Domangue v. Eastern Air Lines, Inc.*, 722 F.2d 256, 261 (5th Cir. 1984) (same).

By asking this Court to read Article 22(4) as superfluous, as "nothing more" than a pass-

through" already provided by Warsaw Convention Articles 17 and 24(2), American Airlines

would have this Court violate the canon of statutory construction whereby courts are enjoined to

give force and effect to all of a statute or treaty's provisions and avoid rendering any of them

superfluous. *See In re Air Crash Off Long Island*, 209 F.3d 200, 207 (2d Cir. 2000)("[T] he

Court will avoid a reading which renders some words altogether redundant")(rejecting aviation

"defendants' definition [that] violates this canon of statutory construction because it renders

"high seas' [under DOHSA] superfluous"); *see also*, *Connecticut v. United States Dep't of the

Interior*, 228 F.3d 82, 88 (2d Cir. 2000)(explaining that the court is required to disfavor an

interpretation of a statute that renders language superfluous); *Allen Oil Co. v. Comm'r of Internal

Revenue*, 614 336, 339 (2d Cir. 1980)(stating that "a statute must, if reasonably possibly, be

construed in a way that will give force and effect to each of its provisions rather than render

some of them meaningless"); *United States v. Blasius*, 397 F.2d 203, 207 n. 9 (2d Cir. 1968).

Hence, this Court should give force and effect to the plain text of Article 22(4) by

awarding Plaintiffs, as Representatives of passengers killed during the course of international

travel between the United States and Australia on September 11, 2001, their attorneys' fees and

litigation expenses.    Defense counsel's reading that would reader Article 22(4) superfluous should be emphatically rejected, along with their misleading reading of *Avero*.  *Supra.*

## VII. CONCLUSION

This Court should enter its order granting Summary Judgment on liability against American Airlines to Plaintiffs, Teague and Falkenberg, and further order that American's liability is not limited to 100,000 SDRs, and that costs, litigation expenses and attorneys fees may be recovered.[7]  Summary Judgment should be granted as a matter law to plaintiffs Teague and Falkenberg.

Dated:  May 23, 2007                          Respectfully submitted,
                                              **MOTLEY RICE LLC**


                                  **By:**    __s/_ Mary Schiavo_____
                                             Ronald L. Motley, Esquire
                                             Joseph F. Rice, Esquire
                                             Mary Schiavo, Esquire
                                             Jodi Westbrook Flowers, Esquire
                                             Don Migliori, Esquire
                                             Michael E. Elsner, Esquire (ME-8337)
                                             Elizabeth Smith, Esquire
                                             Justin Kaplan, Esquire
                                             Vincent I. Parrett, Esquire (VP-5092)
                                             Motley Rice LLC
                                             28 Bridgeside Boulevard
                                             Post Office Box 1792
                                             Mount Pleasant, SC 29465
                                             Telephone:  (843) 216-9000

---

[7] At that point a damages trial could then be ordered to determine the amount of damages.