Ronald L. Motley, Esquire
Joseph F. Rice, Esquire
Mary F. Schiavo, Esquire
MOTLEY RICE LLC
Attorneys for Plaintiffs
28 Bridgeside Boulevard
Post Office Box 1792
Mount Pleasant, SC 29465
(843) 216- 9000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
                                                                 :
IN RE SEPTEMBER 11, 2001 LITIGATION          :          21 MC 97 (AKH)
                                                                 :
-----------------------------------------------------------------x

This document relates only to:

*Falkenberg v. AMR Corp., et al.*          02 CV 7145 (AKH)
*Teague v. AMR Corp., et al.*             03 CV 6800 (AKH)

**PLAINTIFFS' REPLY TO DEFENDANT AMERICAN AIRLINES' OPPOSITION TO**

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................ 4

I.    SUMMARY OF PLAINTIFFS' LEGAL GROUNDS FOR SUMMARY
      JUDGMENT ......................................................................................... 6

II.   SUMMARY OF DEFENDANT'S CLAIMS ......................................... 7

III.  RESPONSE TO DEFENDANT'S ARGUMENT ................................. 8
      A.   Not an "Ordinary Commercial Aviation Disaster" But Similar Events Have
           Happened Before .......................................................................... 8
      B.   Defendant Admits The Crash of Flight 77 Is An "Accident" Under Article 17 ......... 9
      C.   Ipso Facto .................................................................................. 10
      D.   A More Practical Analysis ........................................................... 12
      E.   The Defendant Seeks to Put Its Burden of Proof Upon the Court ............ 12
      F.   The Cases Cited by Defendant Support Plaintiffs' Contentions ............... 13
           1.   The Ultimate Burden is on Defendant ................................... 13
           2.   Some Factual Dispute Does Not Defeat Summary Judgment .......... 13
           3.   There is Presumptive Liability Against American Airlines Which Is Not
                Overcome by Compliance With Federal Regulations or Industry Standards ..... 14
           4.   "It Never Happened Before" Even If It Were True, Is Not A Defense to Full
                Liability .......................................................................... 15

IV.   PLAINTIFFS' ARE ENTITLED TO SUMMARY JUDGMENT AS A MATTER
      OF LAW ............................................................................................ 17
      A.   Defendant May Not Under Any Circumstances Escape Liability ............. 17
      B.   "Cherry Picking" The 9/11 Commission Report ................................ 18
           1.   The Divest Container ........................................................ 18
           2.   Contraband on Their Bodies ............................................... 19
           3.   Undetectable Weapons ...................................................... 19
           4.   CAPPS ........................................................................... 20
           5.   Common Strategy .............................................................. 20
           6.   Disputed Facts Do Not Lead to the Conclusion American Took All Reasonable
                Measures ........................................................................ 21
           7.   Defendant's Dogged Dodging of its Burden .............................. 22
           8.   Ongoing Discovery Does Not Defeat the Motion ........................ 22

V.    SUMMARY JUDGMENT CAN BE APPROPRIATELY GRANTED ON
      DEFENDANT'S OWN BRIEF AND EXHIBITS, AND DULLES DEPOSITIONS TO
      DATE ................................................................................................ 22

VI.   SUMMARY JUDGMENT IS APPROPRIATE IN THESE TWO WARSAW
      CONVENTION ACTIONS ................................................................. 33

**VII.    NOT ONLY SHOULD PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT BE GRANTED AS A MATTER OF LAW, BUT PLAINTIFFS, AS REPRESENTATIVES OF PASSENGERS KILLED DURING THE COURSE OF INTERNATIONAL TRAVEL FROM THE UNITED STATES TO AUSTRALIA ON SEPTEMBER 11, 2001, ARE ENTITLED TO RECOVER ATTORNEYS' FEES & LITIGATION EXPENSES UNDER THE HAGUE PROTOCOL** ................................................................................ 34

A.    **As Both The United States & Australia Were Parties To Montreal Protocol No. 4 (To Amend The Warsaw Convention As Amended By The Hague Protocol)    On September 11, 2001, The  United States Was Bound To The Provisions    Of The Hague Protocol Vis-à-Vis Australia on September 11, 2001.** ........................................... 34

B.    **The Plain Text Of The Hague Convention Authorizing This Court to Award Plaintiffs' Court Costs & Litigation Expenses, Including Attorney's Fees, Should    Be Enforced** ............................................................................................ 36

**VII. CONCLUSION** ........................................................................................................ 38

**Attachment: Plaintiff Exhibit 5**
List of prior hijackings, murders of pilots, deliberate destruction of plane and loss of life, other sabotage and terrorism.

# TABLE OF AUTHORITIES

## Cases

*Air France v. Saks*, 470 U.S. 392, 405 (1985) ........................................................................9

*Allen Oil Co. v. Comm'r of Internal Revenue*, 614 336, 339 (2d Cir. 1980) ........................37

*Avero Belgium Ins. v. American Airlines, Inc.*, 423 F.3d 73, 83-89 (2d Cir. 2005)..........8, 34, 36, 38

*Celotex Corp. v. Catreet* 477 U.S. 317,325 (1986)..............................................................13

*Cities Service*, supra, 391 U.S., at 289, 88 S.Ct., at 1592 ......................................................14

*Connecticut v. United States Dep't of the Interior*, 228 F.3d 82, 88 (2d Cir. 2000).............37

*Continental Ins. Co. v. Federal Express Corp.*, 454 F.3d 951, 955-957 (9th Cir. 2006)..........35

*Cortez v. American Airlines*, 177 F.3d 1272, 1282 Note 5(11th Circuit 1999) cert. denied 528 U.S. 1136 ...............12

*Day v. Trans World Airlines, Inc.*, 528 F.2d 31 (2d Cir, 1975) ..............................................9

*DeVera v. Japan Airlines*, 1994 WL 698330 (S.D.N.Y.) .......................................................12

*Domangue v. Eastern Air Lines, Inc.*, 722 F.2d 256, 261 (5th Cir. 1984) ............................37

*Enwerenuzor v. Iberia Airlines of Spain*, No. CV 92-3275, 1994 WL 3407 at *3 (E.D.N.Y. Jan. 5. 1994)................6

*Evangelinos v. Trans World Airlines, Inc.*, 550 F.2d 152 (3rd Cir. 1977) ............................9

*Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 431 (2d Cir. 2001)............................35

*Grey v. American Airlines*, 227 Fed. 2d 282, 285 (2nd Circuit 1955), cert. denied 350 U.S. 989 (1956) ..................14

*In re Air Crash Off Long Island*, 209 F.3d 200, 207 (2d Cir. 2000)......................................37

*In re Air Disaster at Lockerbie, Scotland on December 21, 1988*. 928 F.2d 1267 (2d Cir.), cert. denied, 502 U.S. 920 (1991) ...........................................................................................................10, 18

*Krystal v. British Overseas Airways Corp.*, 403 F. Supp. 1322 (C.D. Cal. 1975).................9

*Matshushita Electric Industries Company Limited v. Zennith Radio Corp.*, 475 U.S. 574, 587 (1986)..............14

*Medina v. Am. Airlines, Inc.,* No. 98 CIV, 2006 WL 3663692 (S.D. Fla. Nov. 14, 2006))..........12

*Mfrs. Hanover Trust Co. v. Alitalia Airlines*, 429 F. Supp. 964, 967 (S.D.N.Y.), *affd.* 573 F.2d 1292 (2d Cir. 1977), *cert. denied*, 435 U.S. 971 (1978)....................................................................................14, 15, 16, 17

*Motorola, Inc. v. Kuehne & Nagel, Inc.*, 208 F. Supp.2d 910, 912 n.3 (N.D. Ill. 2002)................................37

*Obuzur v. Sabena Belgian World Airlines*, (LEXIS 5317, S.D.N.Y. 1999) ........................................11, 12

*Pflug v. Egyptair Corp.*, 961 F.2d 26, 29 (2d Cir. 1992) ........................................................................9

*Piamba Cortes v. American Airlines, Inc.*, 177 F3d 1272 (11th Cir. (Fla) 1999).)........................................14

*Tishman & Lipp, Inc. v. Delta Air Lines*, 413 F.2d 1401, 1403 (2d Cir. 1969) .............................................6

*United States v. Blasius*, 397 F.2d 203, 207 n. 9 (2d Cir. 1968)................................................................38

*Vildex S.A.I.C.  v. United Airlines, Inc.*,  No. CV-94-4304 CPS, 1996 WL 733081 (E.D.N.Y.)....................13, 14, 15

*Zicherman v. Korean Lines Co. Ltc.,* 516 U.S. 217, 229 (1996), cited at Def. Brief at 25.....................................36, 37

## Treatises

Convention for the Unification of Certain Rules Relating to International Carriage by Air, Oct. 12, 1929, 49 Stat.

3000 (1934), T.S. No. 876, 137 L.N.T.S. 11 (1934), *reprinted in note following* 49 U.S.C.A. § 40105

(1997)(original Warsaw Convention);........................................................................................................6

Montreal Protocol No. 4 To Amend the Convention for the Unification of Certain Rules Relating to International

Carriage by Air Signed at Warsaw on 12 October 1929 as Amended by the Protocol Done at The Hague on 28

September 1955, 2145 U.N.T.S. 36 ("Montreal Protocol No. 4"). ..........................................................6

The Convention for the Unification of Certain Rules Relating to International Carriage by Air Signed at Warsaw on

12 October 1929 as Amended by the Protocol Done at The Hague on 28 September 1955, 478 U.N.T.S. 371

("The Hague Protocol");.........................................................................................................................6

## Materials Produced By Defendants as Exhibits to its Response to Plaintiffs' Motion for Summary Judgment

Exhibit A – Redacted Checkpoint Operations Guide (COG), Bates No. AALTSA009504-AALTSA009619

Exhibit B – Redacted Air Carrier Standard Security Program, Bates No. AALTSA011164-AAL011420

## I.    SUMMARY OF PLAINTIFFS' LEGAL GROUNDS FOR SUMMARY JUDGMENT

Plaintiffs' respectfully submit this Reply in Response to Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment in these two wrongful death actions governed by the Warsaw Convention and related agreements and tariffs. This Honorable Court should grant the motion for summary judgment by Plaintiff Ruth Falkenberg, as Personal Representative of the Estate of Leslie Ann Whittington, deceased, and Plaintiff Elaine Teague, as Personal Representative of the Estate of Sandra D. Teague, deceased, (collectively, Plaintiffs herein) against defendant American Airlines, Inc. (American) because it cannot be credibly disputed by the defendant that defendant is strictly liable under Article 17 of the Warsaw Convention[1] as supplemented by the IATA Intercarrier Agreement[2] incorporated in American's tariff[3] for the wrongful deaths of plaintiffs' decedents who were killed on board American

---

[1] The Warsaw Convention is a multilateral treaty that, *inter alia*, governs liability of international carriage of persons by aircraft. Originally adopted in 1929, the Warsaw Convention was amended at The Hague in 1955 and again in Montreal in 1975. *See* Convention for the Unification of Certain Rules Relating to International Carriage by Air, Oct. 12, 1929, 49 Stat. 3000 (1934), T.S. No. 876, 137 L.N.T.S. 11 (1934), *reprinted in note following* 49 U.S.C.A. § 40105 (1997)(original Warsaw Convention); The Convention for the Unification of Certain Rules Relating to International Carriage by Air Signed at Warsaw on 12 October 1929 as Amended by the Protocol Done at The Hague on 28 September 1955, 478 U.N.T.S. 371 ("The Hague Protocol"); Montreal Protocol No. 4 To Amend the Convention for the Unification of Certain Rules Relating to International Carriage by Air Signed at Warsaw on 12 October 1929 as Amended by the Protocol Done at The Hague on 28 September 1955, 2145 U.N.T.S. 36 ("Montreal Protocol No. 4").

[2] The Agreements are: the International Air Transport Association ("IATA") Intercarrier Agreement on Passenger Liability ("IIA"), available at http://www.iata.org/nr/contentconnector/cs2000/siteinterface/sites/legal/file/iia.pdf, Attached to Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment as Exhibit 1; (2) the Agreement on Measures to Implement the IATA Intercarrier Agreement ("MIA"), available at http://www.iata.org/nr/contentconnector/cs2000/siteinterface/sites/legal/file/mia.pdf, Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment as Exhibit 2; and (3) the Air Transport Association of America Provisions Implementing the IATA Intercarrier Agreement to be Included in Conditions of Carriage and Tariffs ("IPA"), attached Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment as Exhibit 3.

[3] The rights and liabilities between an airline and its passenger are determined by the carrier's tariffs. *See Tishman & Lipp, Inc. v. Delta Air Lines*, 413 F.2d 1401, 1403 (2d Cir. 1969); *Enwerenuzor v. Iberia Airlines of Spain*, No. CV 92-3275, 1994 WL 3407 at *3 (E.D.N.Y. Jan. 5. 1994). American's tariff incorporating the terms of the IPA was attached to Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment as Exhibit 4.

Airlines Flight 77 (Flight 77) during the course of international carriage to be performed by successive air carriers on September 11, 2001.[4]

## II.    SUMMARY OF DEFENDANT'S CLAIMS

Defendant (at different places in its Response) argues it can (1) either escape liability entirely or (2) escape liability for unlimited plaintiffs' damages.   Defendant is wrong on both counts.    Defendant also argued summary judgment was not appropriate because Defendant believes there are disputed issues of fact relating to whether the defendant took all necessary measures to avoid the injury and death of plaintiffs' decedents and whether it was impossible for Defendant to take such measures.  Therefore, defendant failed to meet or even attempt to meet its burden and instead asserted the alleged issues of disputed fact prevent entry of summary judgment.  Defendant is mistaken.

The most basic reason the burden is insurmountable for defendant American Airlines is as pointed out in Plaintiffs' initial filing that American Airlines failed to meet even the regulatory minimum standards required by Federal Aviation Regulations (such as 14 C.F.R § 108)[5] and the Air Carrier Standard Security Program (ACSSP) and the Checkpoint Operations Guide (COG) (Defendant's Exhibits A and B), as well as the many additional measures it could have taken.  Such failing has been documented not only in the 9/11 Commission Report, but in the deposition testimony in this litigation of Defendant's employees and agents.

Plaintiffs need only allege the failure of Defendant to take all reasonable measures.  It is Defendant which bears the burden of showing it took all reasonable measures.   Instead of

---

[4] Plaintiffs note for the record and for reasons discussed herein below that there is absolutely no allegation or evidence that plaintiffs in any way caused or contributed to their injuries and deaths (such as by spilling hot liquids or suffering a heart attack), and weather or other force majeure acts of God such as volcanic eruptions caused or contributed to crash at issue herein.

[5] Defendant at various locations in its brief referred to Title 18 of the Code of Federal Regulations, asserting it pertained to Aviation Security Regulation.  Title 18 is Conservation of Power and Water Resources.  Plaintiffs will assume Defendant intended to refer to Title 14, Aeronautics and Space, which includes Part 108, Aircraft Operator Security.

meeting its burden, Defendant attempted to advance other liability thresholds and a preponderance of the evidence standard. Defendant argued that if others were also negligent and failed to take all reasonable measures, somehow defendant can find immunity from liability in the failures of others. The standard is not one of a preponderance of the evidence, nor is there comparative fault. The standard is very clear. The defendant must show it took all reasonable measures to prevent the harm to plaintiffs. Defendant cannot and did not take all such reasonable measures.

Furthermore, defendant is liable under Article 22 under the Warsaw Convention as amended by the Hague Protocol, for attorney fees and litigation expenses of plaintiffs.[6] Defendant in its response either misstates or fails to understand the international laws and treaties as applied in this case.

## III.    RESPONSE TO DEFENDANT'S ARGUMENT

### A.    Not an "Ordinary Commercial Aviation Disaster" But Similar Events Have Happened Before

Defendant inexplicably argued that plaintiffs' ignore the unique circumstances of September 11 cases and treat the crash of Flight 77 into the Pentagon as if it were an "ordinary

---

[6] Art. XI of The Hague Protocol amends Warsaw Convention Article 22(4) to authorize the Court to award "the court costs and . . . the other expenses of the litigation incurred by the plaintiff." Under recent Second Circuit precedent, the United States was bound by The Hague Protocol vis-à-vis Australia on September 11, 2001. *Avero Belgium Ins. v. American Airlines, Inc.*, 423 F.3d 73, 83-89 (2d Cir. 2005). *Avero's* reasoning teaches that because the United States and Australia on September 11, 2001 were both parties to Montreal Protocol No. 4, which by its express terms adopts The Hague Protocol, the United States was thus bound to The Hague Protocol vis-à-vis Australia (a party to Montreal Protocol No. 4). *Id.* at 89 ("All parties agree that, from the perspective *of a State that is also a party to Montreal Protocol No. 4*, the United States was 'bound by the provisions of The Hague Protocol' as amended by Montreal Protocol No. 4")(emphasis added). Hence, The Hague Protocol entitles Plaintiffs, whose decedents were killed during international carriage from the U.S. to Australia, to attorneys' fees and litigation expenses. Moreover, Article 22(4) as amended by The Hague Protocol, authorizing attorneys' fees and expenses, was *not* modified by Montreal Protocol No 4 (which amended other provisions of The Hague Protocol, *see* fn. 1 above), nor by the IATA intercarrier agreement, nor by American's tariff – and hence remained in force on September 11, 2001.

commercial aviation disaster evolving from mechanical failure or pilot error." That criticism would be more appropriately leveled at defendant American Airlines with dozens of prior crashes and hijackings on its record. Plaintiffs do not treat anything about the deaths of their loved ones as "ordinary". The parents of Dr. Leslie Whittington lost not only their successful, loving and talented daughter who was a Georgetown University professor, but they also lost their son-in-law and young granddaughters who died with their mother on the plane. Elaine Teague lost her successful, loving and talented daughter who was a medical professional at Georgetown University Hospital. Plaintiffs certainly do not treat their losses and this crash as if it were "an ordinary commercial aviation disaster." On the other hand, despite repeated warnings and myriad prior hijackings, onboard murder of pilots, and deliberate crashing of planes, defendant continued to operate as though ignorant of the heightened security risk in 2001. Defendant continued to act "ordinary." A partial list of prior similar events is attached hereto as Plaintiffs' Exhibit 5.

**B.  Defendant Admits The Crash of Flight 77 Is An "Accident" Under Article 17**

It is well settled law, and defendant admits, that a terrorist hijacking of a plane is an accident triggering Article 17 strict liability. *Air France v. Saks*, 470 U.S. 392, 405 (1985); *Pflug v. Egyptair Corp.*, 961 F.2d 26, 29 (2d Cir. 1992) (recognizing terrorist hijacking of a plane as "accident" under Warsaw Convention). And *Air France v. Saks* itself cited with approval lower court cases holding that terrorist attacks or hijacking were "accidents" triggering Article 17 strict liability. *See Air France v. Saks*, 470 U.S. at 405 (citing *Evangelinos v. Trans World Airlines, Inc.*, 550 F.2d 152 (3rd Cir. 1977) (*en banc*) (terrorist attack); *Day v. Trans World Airlines, Inc.*, 528 F.2d 31 (2d Cir, 1975) (same); *Krystal v. British Overseas Airways Corp.*, 403 F. Supp. 1322 (C.D. Cal. 1975) (hijacking)). Thus, the risk of terrorists, hijackings, deliberate murder of pilot and co-pilot, deliberate crashing, or other destruction of the plane, and religious, political or state-approved aviation terrorism as in *In re Air Disaster at Lockerbie, Scotland on December*

*21, 1988.* 928 F.2d 1267 (2d Cir.), cert. denied, 502 U.S. 920 (1991), have all sadly happened before, including to American Airlines. Once the harm to international passengers is determined to have been as a result of an accident, it is the airline, Defendant American Airlines, which has the burden to show it took <u>all</u> reasonable measures to protect passengers Falkenberg and Teague. It was American Airlines which treated flight 77, operating in the 2001 threat-rich environment as "ordinary commercial aviation" to its peril, and to the peril of its passengers, including Dr. Leslie Whittington and Sandra Teague.

### C. Ipso Facto

Defendant complains that plaintiffs seem to be arguing that because Flight 77 was hijacked, that ipso facto all necessary measures must not have been taken to prevent the hijacking. While plaintiffs did not argue that proposition in the summary judgment motion, plaintiffs very well could have. The fact of the hijacking certainly does lead to the conclusion ipso facto that all necessary measures must not have been taken. For example, the Federal Aviation Regulations required American Airlines to, "provide for the safety of persons and property traveling in air transportation and intrastate air transportation against acts of criminal violence and air piracy." 14 C.F.R. § 108.7 (2001). Whatever American did do, it was not enough to prevent or deter the hijackers.

For example, it is indisputable that the carrier did not do all that it could to keep the hijackers out of the cockpit. Immediately following 9/11 changes were made to the cockpit doors, including adding stronger locks – in many cases locks purchased off the shelf at hardware stores. Defendant cannot show it took all such measures or that they were impossible. There have been ample statements including the 9/11 Commission Report that such measures were readily available.

Another clear example with which defendant takes issue is the fact that a passenger reported box cutters on Flight 77. Although the defendant seems to argue, with not one shred of

evidence, that the wife of the Solicitor General of the United States, herself a trained lawyer, was somehow mistaken about viewing a box cutter and merely instead saw a knife that was less than three and a half inches long and which could not be used as a weapon and which was not menacing and which would therefore be allowed by the COG. The clearly admissible statement from this very credible woman is evidence that American and its agents allowed impermissible items to enter the sterile area and the plane, as expressly prohibited by both the ACSSP (Defendant's Exhibit A) and the COG (Defendant's Exhibit B). It was the airline's responsibility to detect such items and keep them out of the sterile area and off planes, and to prevent and deter hijackers, terrorists and saboteurs.

Thus, while the plaintiffs did not in its motion argue ipso facto that since the hijacking took place, that the defendants failed to take all reasonable measures, that is the inescapable and only logical conclusion. Measures put in place by American Airlines immediately after 9/11 were available before 9/11. No technical advances whatsoever were necessary to do more thorough screening, secure doors, remove keys from flight attendants, ban knives, train screeners, find qualified supervisors, etc., as further discussed herein below. Such means were clearly not impossible; implementation was commenced immediately after 9/11/01.

Only force majeure events, or acts of God, such as weather, or causes which were caused by or internal to the passenger (such as suffering a heart attack), have allowed the defendant carrier to escape liability to its passengers on international flights. The only reported cases where the defendant airline prevailed on the all necessary measures defense once an Article 17 "accident" is established, are those in which the cause was weather or events such as volcanic eruption or something internal to the passenger. See Kreindler, Aviation Accident Law treatise at Section 10.05 [5][c], citing, e.g. *Obuzur v. Sabena Belgian World Airlines*, (LEXIS 5317, S.D.N.Y. 1999)(no evidence in record that airline failed to take "all reasonable measures" to

avoid five-day delay due to weather); *DeVera v. Japan Airlines*, 1994 WL 698330 (S.D.N.Y.) (eight day delay due to volcanic eruption satisfied by all necessary measures defense).

### D. A More Practical Analysis

A more practical analysis might be to examine the issue in a two step process. American is strictly liable for the first 100,000 SDRs (Special Drawing Rights International Monetary Fund Currency Unit which takes inflation into account and calculated according to the currencies of France, United States, Germany, England and Japan). But beyond the first SDRs, passengers can recover unlimited damages unless the carrier can prove it took all measures to avoid the damages. *Cortez v. American Airlines*, 177 F.3d 1272, 1282 Note 5(11th Circuit 1999) cert. denied 528 U.S. 1136. The standard described as nearly insurmountable by American's defense counsel, Desmond Barry, Jr., as discussed in plaintiffs' initial motions. Defendant has cited no cases in which any carrier in any court in the United States has not been liable, except for weather, volcanoes, or where the plaintiff bears the fault (such as spilling boiling coffee in his own lap in the absence of turbulence from a cup held in his own hands. See *Medina v. Am. Airlines, Inc.,* No. 98 CIV, 2006 WL 3663692 (S.D. Fla. Nov. 14, 2006)).

### E. The Defendant Seeks to Put Its Burden of Proof Upon the Court

The defendant argued the court must first determine what "all necessary measures" would have been on September 11, 2001. The defendant's suggested threshold is not grounded in any caselaw or treaty language or interpretations. It is the defendant that must prove it took all necessary measures. The burden is not on the Court to first develop a list of everything the Court can envision American Airlines might have done on September 11, 2001. Any failure by the airline to take even so much as one reasonable and necessary measure which was not impossible establishes that the defendant cannot meet its burden. Neither plaintiffs nor the Court have the duty or obligation to first develop for the defendant an exhaustive, finite list of all the various and possible actions which American could have taken to the harm to plaintiffs.

### F. The Cases Cited by Defendant Support Plaintiffs' Contentions

Defendant cited the Vildex case (among others) which concerned United Airlines (which was also the airline responsible for running the Dulles checkpoints for American Airlines on September 11, 2001). *Vildex S.A.I.C. v. United Airlines, Inc.*, No. CV-94-4304 CPS, 1996 WL 733081 (E.D.N.Y.). The plaintiffs therein sued United Airlines to recover the value of cargo lost while being shipped by United Airlines. The shipment was gold. Far less valuable than the human lives lost on September 11, 2001, the declared value of the gold was $476,840.00. United was responsible for transporting the gold to United's aircraft once the goods cleared customs. While United's employees were transporting the gold to United's airplane, two masked gunman robbed the United Airlines employees.

#### 1. The Ultimate Burden is on Defendant

The United Airlines employees in the above referenced case were unarmed and the van was unlocked, consistent with airline practices at the time. United demanded and examined credentials of persons in the sterile area of the airport, not unlike the practices in effect on September 11th. The court noted that the burden of proof in the underlying action was on the defendants. The court considered the actual quantum and quality of proof demanded by the underlying cause of action and which party must present such proof. When the ultimate burden of proof is on the nonmoving party (as is the case here; the ultimate burden is on the defendant airline) to show that it took all reasonable and necessary measures, the moving party meets its initial burden pointing out to the district court that there is an absence of evidence to support the nonmoving party's case. *Vildex* at 3; *Celotex Corp. v. Catreet* 477 U.S. 317,325 (1986).

#### 2. Some Factual Dispute Does Not Defeat Summary Judgment

To survive the motion the nonmoving party must then make a showing sufficient to establish the existence of the challenged element necessary to that party's case. The mere existence of some alleged factual dispute does not defeat an otherwise properly supported motion

for summary judgment. *Id* at 3. "Where the record taken as a whole could not lead <u>a rational trier of fact to find for to the nonmoving party, there is no 'genuine issue for trial.</u>" *Matshushita Electric Industries Company Limited v. Zennith Radio Corp.*, 475 U.S. 574, 587 (1986), 106 S.Ct. 1348 citing *Cities Service*, supra, 391 U.S., at 289, 88 S.Ct., at 1592. Therefore, the existence of some alleged factual dispute between the parties is immaterial.

### 3. There is Presumptive Liability Against American Airlines Which Is Not Overcome by Compliance With Federal Regulations or Industry Standards

In the *Vildex* case, United Airlines attempted to argue that its agents took all necessary measures to avoid the damage or that it was impossible for them to take such measures. However, the court noted that the burden rests on the carrier to prove that "it has taken all necessary measures to avoid the damage or that it was impossible for it to take such measures." The Court noted that "in most, if not all, serious accidents…the difficulties in avoiding this presumptive liability would seem to be almost if not quite insurmountable." (See *Grey v. American Airlines*, 227 Fed. 2d 282, 285 (2nd Circuit 1955), cert. denied 350 U.S. 989 (1956): Superceded by statute as stated in *Piamba Cortes v. American Airlines, Inc.*, 177 F3d 1272 (11th Cir. (Fla) 1999).) The *Vildex* court explained that it has been recognized that all necessary measures cannot be read too strictly but of necessity is construed to mean all reasonable measures. *Vildex* at 5; *Mfrs. Hanover Trust Co. v. Alitalia Airlines*, 429 F. Supp. 964, 967 (S.D.N.Y.), *affd.* 573 F.2d 1292 (2d Cir. 1977), *cert. denied*, 435 U.S. 971 (1978). Under that reasonable measure standard, "the defendant must provide proof of an undertaking embracing all precautions that in sum are appropriate to the risk, i.e. measures reasonably available to defendant and reasonable calculated, in cumulation, to prevent the subject loss. *Mfrs. Hanover Trust Co.*, 429 F.Supp. 967. United in *Vildex* claimed that its level of security met Federal Aviation Regulation standards required by the United States Department of Transportation. United also attempted to rely upon the fact that previous shipments of goods arrived without

theft to support its contentions that security was adequate. That court stated that the fact that armed robbers had so far spared such facilities could hardly have insulated the reasonably prudent airline carrier from the knowledge that an armed robbery was a likely future contingency. Id.

Even with factual disagreements, summary judgment for the plaintiffs is appropriate when the record taken as a whole cannot lead a rational trier of fact to find for the nonmoving party. Furthermore, the defendant may not merely raise factual disagreements in order to withstand the motion for summary judgment, as the burden is on the defendant. For the reasons discussed in plaintiffs' original motion and hereinbelow, defendant cannot meet its burden.

### 4. "It Never Happened Before" Even If It Were True, Is Not A Defense to Full Liability

In *Mfrs. Hanover Trust Co.*, 429 F.Supp. 967, also cited by the defendants but for a different proposition, a bank brought an action against Alitalia Airlines seeking to recover the value of bank notes after they were stolen during the robbery of the airline's office. The district court held that the airline was responsible for the loss because it failed to take reasonable precautions to guard against robberies. In that case a Wells Fargo truck delivered a parcel to the cargo building at JFK airport in Jamaica, New York. An armed security guard, employed by a protective service, was dispatched to guard the cargo but nonetheless the cargo was stolen by robbers at gunpoint. The case was subject to determination under the provisions of the Warsaw Convention. The court noted that the Warsaw Convention provided that the carrier would not be liable if the carrier proved that the carrier and its agents had taken all necessary measures to avoid the damage or that it was impossible for them to take such measures. *Mfrs. Hanover Trust Co.*, 429 F.Supp. 967. The court noted that the applicable articles of the Warsaw Convention operated to establish a presumption of carrier liability which may only be rebutted by the defendant carrier's persuasive proof that it took all necessary measures to prevent the loss. **The**

**court also noted that the carrier cannot escape liability by demonstrating its recourse to some, as opposed to all, reasonable measures.** The Court concluded that Article 20 required the defendants prove not a surfeit of preventatives but of an undertaking of embracing all precautions that in sum are appropriate to the risk, i.e. measures reasonably available to the defendant and reasonable calculated in cumulation to prevent the subject loss. The court made quick work of the issue of liability. "The question of Alitalia's liability in the present case need not detain us long." See *Mfrs. Hanover Trust Co.*, 429 F.Supp. 967. Even though the carrier undertook a number of measures each intrinsically reasonable to secure the high value cargo held in its custody, and the court included a laundry list of things that Alitalia did do (hired an armed guard, had a valuables room, restricted access to the Alitalia valuable's room, conscientiously maintained a logbook, refused to accept high value cargo until armed guards were present, and prevented undue circulation of documents regarding shipments) the court still could imagine a number of other things that might have been done, and that might have, or might not have, actually prevented the loss from occurring. **The court stated, "We cannot say of course such precautions would have necessarily averted the loss upon which the instant suit is based. Nor, for that matter can we say that Alitalia's employees, under the circumstances in which they found themselves on January 4, 1974, could and should have acted otherwise for the sake of thwarting their assailants' purposes. We conclude only but nonetheless fatally for the defense that Alitalia did not take all reasonable measures that prudent foresight would have envisioned for the securing of high-value cargo."** *Mfrs. Hanover Trust Co.*, 429 F.Supp. 967 (emphasis added). The airline also argued it was the first instance of an armed robbery involving an airline cargo warehouse at the Kennedy airport. The court also concluded, **"That armed robbers had so far spared such facilities could hardly have insulated the reasonably prudent airline carrier from the knowledge"** that such a crime and such an occurrence was **a likely future contingency, the court was also not swayed by the defense observation that**

**the plaintiff had made 16 previous shipments with no incident. The fact that there had been operations without such a loss in the past was no insulation against the defendant airline's liability in the future. "Equally unavailing to the defense is Alitalia's insistence that it necessarily be held to a standard of care no more rigorous than that observed by majority of airlines at Kennedy Airport in 1974."** *Mfrs. Hanover Trust Co.*, 429 F.Supp. 967 (emphasis added). The Southern District of New York quoted from Judge Learned Hand: "There are, no doubt, cases where courts seem to make the general practice of the calling the standard of proper diligence; we have indeed given some currency to the notion ourselves. Indeed in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices." The court concluded, "Other airlines at Kennedy Airport, at least until January 1974, may well have been less security conscious than was Alitalia; few, if any, may have been more so. Nevertheless, if other airline cargo facilities might have been as, or more awkwardly situated in the face of an armed robbery than was Building 86, that fact cannot confer added grace to Alitalia's posture herein." *Mfrs. Hanover Trust Co.*, 429 F.Supp. 967. Judgment was ordered against the airline in favor of the plaintiff for the full amount of the loss plus interest at the rate of 6% per annum computed from the date of the loss plus costs.

## IV.    PLAINTIFFS' ARE ENTITLED TO SUMMARY JUDGMENT AS A MATTER OF LAW

### A. Defendant May Not Under Any Circumstances Escape Liability

Defendant very erroneously and misleadingly stated in its brief at page 7, "The airline may rebut a plaintiff's prima facie showing and avoid liability all together by proving under Article 20(l) of the Warsaw Convention that it took all necessary measures to avoid the damage and that it was impossible for [the airline] to take such measures." For that proposition they cite Warsaw Convention Article 20(1). Defendant is absolutely wrong; they have mistakenly applied

old cargo law to passengers.  Defendant absolutely may not avoid its liability for the first 100,000 SDRs, and thereafter it is the airline's burden to show that it took all necessary measures.  Compliance with regulations, meeting standards comparable to other carriers, or that a carrier did many things that others might or might not have done, does not excuse the carrier from liability.  Even though there are disputed issues of fact, if it is irrational to conclude otherwise, the plaintiffs are entitled to their summary judgment.

### B.  "Cherry Picking" The 9/11 Commission Report

The defendant complained that the plaintiffs used selected excerpts from the 9/11 Commission Report to demonstrate that American failed to take all necessary measures to prevent the events on Flight 77.  The defendant instead argued that elsewhere in the 9/11 Commission Report there are reported failings by other entities and parties in addition to American Airlines. Granted, there is no shortage of finger-pointing in the 9/11 Report, but it is irrelevant in consideration of this motion.  Even more misguided is defendant's preposterous argument that because of the magnitude of the loss or the organization and financial resources of the hijackers, obligations placed on the carrier by the Federal Aviation Regulations would somehow be excused.  There is no citation to any authority for that preposterous supposition. There is no regulation that excused or reduced the airline's duty because the terrorists were dangerous or the hijacking deadly.  To the contrary, airlines were to be even more vigilant.  Not even state-sponsored terrorism has excused a carrier's duty under the Federal Aviation Regulations.  *In re Air Disaster at Lockerbie, Scotland on December 21, 1988*. 928 F.2d 1267 (2d Cir.), cert. denied, 502 U.S. 920 (1991).  Nonetheless, plaintiffs will address some of defendant's excuses for the 9/11 Commission Report findings.

### 1.  The Divest Container

One of the defendant's excuses for what the 9/11 Commission concluded from the Dulles checkpoint video, is the hijackers might have put prohibited items in the divest container and

then picked them up after they were screened.  The defendant makes an excellent point.  Indeed the hijackers could have done just that activity and that is why the defendant's own COG and ACSSP require the screener to examine the divest container contents.  The divest container were not examined.  Not only could American have done so, it was required to do so.  The checkpoint video, the 9/11 Commission Report and defendant's own brief do not contradict that the divest container was not examined.  Examining the divest container is a reasonable and not impossible measure that the defendants could have undertaken.

### 2.  Contraband on Their Bodies

The defendant claimed the hijackers would not have jeopardized their plot by doing something as suspicious as taping something to their ankles or concealing something in their shoes.  This suggested excuse brings to light yet another measure that American Airline could have taken, reasonably should have taken, and which was not impossible on September 11, 2001.  The screeners could have looked.   In particular American Airlines screeners could have inspected the legs and pants of the hijackers; and such procedure is specifically included in the COG and is required if needed to resolve all metal detector alarms.   Measures could have included a pat down or other special screening methods.   American did not do so and these measures were not impossible.  Indeed, under the circumstances, it was likely required.

### 3.  Undetectable Weapons

On page 13 of its brief, defendant reports the Commission theorized that terrorists may have been instructed to use weapons that were undetectable by airport checkpoints.   That supposition does not excuse the fact that knives of any length (and no boxcutters) that could be used as weapons or that were menacing were not allowed past security.  American Airlines could hand search for, and eliminate, all weapons.  This hand search was something they could have done and it was not impossible.   Such procedures are discussed in the COG and ACSSP.  American Airlines claims they knew the x-ray equipment and metal detectors would not pick up

all forbidden items, yet the protocol was not changed, nor requested by American to be changed. Defendant noted that Swiss army knives, trade tools, pocket utility knives, letter openers and darts were as lethal as box cutters and were permitted into the sterile area under the COG. American's own standards specified that knives of any size, if a weapon or menacing, could not be allowed into the sterile area. American could have undertaken an examination of each and every such knife to determine if it could be used as a weapon or if it was menacing. In fact, this was reasonable and envisioned by the COG and the ACSSP. The fact that American knew of such a problem but declined to examine knives other than for length and never defined or issued training or guidelines on "menacing" or "could be used as a weapon," is further evidence of additional actions that American could have done, but did not, and which actions were possible. The 9/11 Commission Report concluded something was visible inside the back of a hijacker's waistband and not inspected.

### 4. CAPPS

On page 14 of its brief, defendant argued it correctly applied the Computer Assisted Passenger Prescreening Program (CAPPS) and selected passengers, including some of the hijackers, for additional scrutiny. By this argument, defendant pointed out an excellent example of additional measures which the airline could have undertaken, which were not impossible, but which it did not undertake. In depositions we learned American Airlines had passenger service representatives who could have escorted profiled passengers from the ticket counter to the screening checkpoint for special security screening, including hand searches. This is discussed hereinbelow in section V.

### 5. Common Strategy

Defendant noted on page 14 of its brief that the FAA Common Strategy required crews to cooperate with hijackers. That is not all the ACSSP says. The ACSSP at Appendix XIII, page 8.b.3 states, "Attempt to keep hijacker(s) out of cockpit." This statement alone clearly

demonstrates defendant's knowledge of the vulnerability of the flight crew and of souls on board once the flight deck is breached. While the ACSSP does not say exactly how that is to be done, clearly a flimsy door with common keys available to all Boeing pilots and all flight attendants was not the best way, and certainly not the only way, to go about implementing the strategy which is in American's ACSSP. Obviously there are additional measures that could have been taken. Within days after 9/11/01 the cockpit doors were strengthened, in some cases with nothing more than common latches purchased at hardware stores.

### 6. Disputed Facts Do Not Lead to the Conclusion American Took All Reasonable Measures

At the bottom of page 14, defendant inexplicably concluded that any one of its statements is sufficient to create an issue of disputed material fact, and defendant inexplicably argued that therefore it shows that American may well have taken all reasonable measures mandated by the FAA and reasonably calculated to meet the anticipated terrorist threat. Defendant American Airlines completely misstated the law as discussed herein. The plaintiffs do not need to show that there are no issues of material fact; the plaintiffs need only raise the issue that the airline did not take all reasonable measures that were not impossible. The defendant has the burden. The defendant's brief included many examples of other measures that could have been taken. The standard as explained in caselaw cited by defendant is not that the airline took the measures mandated by the FAA and reasonably calculated to meet the government anticipated threat. The airline is not excused by following the government regulations or performing at that same level or even slightly better than its colleagues in the airline business. Not only does the defendant's own pleading render summary judgment appropriate, but it renders inconceivable any other conclusion.

### 7.  Defendant's Dogged Dodging of its Burden

In section IV at page 17 of its brief, defendant seeks to require this Court to first establish a standard of care and an exhaustive list of what defendant should have done to prevent the harm to plaintiffs.  There is no such requirement.  The standard is whether the defendants took all reasonable, and not impossible, measures.  In support, defendant cited articles written by their own defense team and argued, "This is the rarest of cases where an airline can sustain its burden by showing that it took all necessary measures to avoid the loss."   But, Defendant cited no cases despite hundreds of prior hijackings, murders of pilots, deliberate crashing of planes, sabotage, bombings, etc.

### 8.  Ongoing Discovery  Does Not Defeat the Motion

In section IV, at page 20-21 of defendant's brief, it argued that it is still seeking discovery from others such as the FBI, the FAA and the CIA, but this summary judgment motion pertains only to the two international passengers, and their airline.  No entity other than the airline has the advantage of treaty law (and it is of advantage to the carrier).   American Airlines is illogical when it claims, "If, as that evidence tends to demonstrate, the terrorists restricted themselves to weapons that were either undetectable or permissible under the FAA regulations, then American did not fail to take all necessary measures."   The statement lacks any treaty, regulatory or case law support.  Not surprisingly, no case is cited in support of that illogical contention.    The fact that dozens of other plaintiffs are desirous of completing liability discovery has no bearing on the timeliness of these two international passengers' motions for summary judgment.


## V.    SUMMARY JUDGMENT CAN BE APPROPRIATELY GRANTED ON DEFENDANT'S OWN BRIEF AND EXHIBITS, AND DULLES DEPOSITIONS TO DATE

Defendant's complaints about the 9/11 Commission Investigation and Report and the 9/11 Staff Monograph are not without merit.  There was less than rigorous cross-examination

(and almost no cross-examination of airline personnel), and there will be undoubtedly be challenges to admissibility of all or parts of the 9/11 Commission Report. However, plaintiffs do not need the 9/11 Commission Report to demonstrate myriad examples of measures which the defendant could have undertaken, which were reasonable, and were not impossible, and for which there can be no debate. The requirements for those measures are contained in the very exhibits attached to Defendant's Response to Plaintiffs' Motion for Summary Judgment and in the depositions of those responsible for Dulles screening of American's passengers.

In reviewing even a sampling of the persons responsible for the security of Flight 77 (and depositions are indeed ongoing) it is illogical to conclude that American took all reasonable measures that were not impossible, as clearly demonstrated by American's own testimony and documents, as follows:

| Timothy J. Ahern – American Airlines Vice President of Safety, Security and Environment | |
| --- | --- |
| 86:07-11 | Q: Did Mr. Wansley tell you in June of 2000 that there were long-standing problems that impair airport screeners' performance?<br>A: No, not that I recall. |
| 91:15-21 | Q: Were you aware of screener problems detecting dangerous weapons in June of 2000?<br>A: I was aware that we had received notification from the FAA about test items that were not detected. |
| 94:02-10 | Q: Did you know about the problems that reduced screeners' effectiveness at airports that American Airlines served, yes or no?<br>A: Sure. And I think as you look at the document, the second issue is that the human factors issue is one that certainly played into it as well, significantly played into it. |
| 144:06-13 | Q: Were you aware of the fact that in March and May of 2001 the FAA's office of civil aviation and intelligence conducted a series of classified briefings for security officials at 19 of the nation's largest airports?<br>A: No. |
| 145:15-20 | Q: Were you informed by anyone in the summer of 2001 that the threat against American airplanes on domestic soil was increasing?<br>A: No. |
| 346:22-347:02 | Q: While you were vice president in charge of security, was American Airlines fined for security lapses?<br>A: We were fined, yes, sir. |
| 451:16-452:21 | Q: Mr. Ahern, are you aware that the FAA had described their aviation security procedures as minimal standards?<br>…<br>A: No, sir.<br>…<br>Q: Are you aware that American Airlines has described the FAA standards as being minimal standards, which they can exceed?<br>A: No, sir. Actually to the contrary, I would say the FAA has described in some cases their standards to be optimal.<br>Q: Well, you are unfamiliar then with Mr. James Padgett of the FAA presentation in 1997, the FAA sets minimum standards but cedes to the airlines the right to exceed these standards?<br>…<br>Q: You're not aware? |

| A: No, sir. |
| --- |

Mr. Ahern was mistaken.  He could have, and indeed it would have been reasonable and not

impossible to take additional measures to prevent damage to the plaintiffs.


American Airline's Air Carrier Standard Screening Program (ACSSP), Defendant's Exhibit B

**Pages 132-33, C.1.b.**

"The training program's described below in C.2, 3., and 4.  The air carrier may include

additional related security material for screening employees with notification to the FAA."

**Pages 139m, J.4.f and Page 139n.5.d**

"Current Threat.  Threat information as provided by the FAA.  The carrier, in conjunction with

its PSI [Principal Security Inspector], may develop additional training material."


Mr. Ahern did not take all reasonable measures and they were not impossible as they are

provided for in Defendant's own ACSSP.

| Larry Wansley – American Airlines Managing Director of Corporate Security | |
| --- | --- |
| 91:02-10 | Q: In fact are you aware that in March or May of '01 the FAA Office of Civil Aviation Intelligence conducted a number of briefings with the nation's 19 largest airports?<br>A: I am now.<br>Q:  Would it be accurate to say as of September 11th, 2001 you had no idea that that had occurred?<br>A:  That's right. |
| 99:11-100:07 | Q: You would anticipate and expect that screeners on the front line be knowledgeable of the threat of, to civil aviation by Islamic extremists?<br>…<br>A: I would expect them to be will knowledgeable about threat information that was provided to them.  Yes.<br>Q: That certainly would include just the identity and general knowledge that Osama bin Laden intended to kill Americans and was a threat to civil aviation?<br>….<br>A: I think that is rather a general statement, but I will give you a general answer, that's yes. |
| 116:03-07 | Q:  Prior to 9/11 you were aware of various reports by the GAO of vulnerabilities for checkpoint screening?<br>A: I was not aware of GAO reports regarding checkpoint screening. |
| 174:20-22 | Q: You were aware that groups were training for hijackings in January '01?<br>A: Yes. |

This lack of knowledge is contrary to the very requirements set for in the COG (Checkpoint Operations Guide, Defendant's Exhibit A)

Page 3-4 requires as follows:

"Pre-shift screener Briefing:

▪ Are all screeners aware of current security directives and information circulars?

▪ Are all screeners aware of special events that could effect screening operations?"

| 198:06 -15 | Q: This PowerPoint presentation states, "let's take a look at FAA reported alleged security violations for AA and AE in the year 2000."  Do you see that on that page?<br>A: I do.<br>Q: There is a total given without the fourth quarter for the year 200; is there not?<br>A: Yes, it is.<br>Q: What is that total?<br>A: That total is $5,649,348. |
|---|---|

American Airlines did not take all reasonable measures before 9/11/01 as they were fined millions of dollars for security violations.

| 211:20 - 214:04 | Q: In light of being fined some $5 million in 2000, did you at any point in time in light of these threats direct security personnel below you that they should increase the number of passengers that were subjected to pad down searches prior to 9/11?<br>…..<br>A:  I may have, if it was in accordance with FAA directives.<br>Q:  Well, I'm asking if you directed it yourself?<br>A:  I didn't have the authority to go beyond the FAA requirements<br>….<br>Q:  It would also be true at no time prior to 9/11 after receiving threat information into 2001 did you ever instruct American personnel to ensure that there were more searches of baggage of passengers traveling on American flights?<br>…<br>A: Again, if it was as the result of an FAA directive or instruction, we would do it.  I independently did not have the authority to change that.<br>Q: At no time prior to 9/11 did you yourself ever instruct security personnel to increase the number of passengers who were selected to and subject to hand wanding?<br>…<br>A: I did not do that unless it was within the confines of a FAA order, directive or instruction.  I did not have independent authority to order those kind of activities. |
|---|---|

Mr. Wansley made a deadly incorrect assumption.  The Checkpoint Operations Guide (COG) states at page 6-1, "The airline GSC may direct the use of intensified security procedures."  American Airlines did not, but reasonably could have.

| | |
|---|---|
| **Beulah Hayat – Dulles Screener** | |
| 29:12-<br>30:10 | Q: After September 11th and before you began work at Globe, did you receive a salary increase?<br>A: Yes, we did.<br>Q: And what was that amount?<br>A: That was $14 with Globe.<br>Q: Okay.  So when you went to work for Globe, you began making $14 an hour but ….. while you were working for Argenbright, you were making $7.35 an hour; is that right?<br>A: Yes.<br>Q. All right.   Were your responsibilities as a pre-departure screener substantially different while working for Globe as opposed to working for Argenbright?<br>A: No, they were the same.<br>….<br>Q: But they paid you nearly double?<br>A: Yes.  After 9/11 Argenbright also started paying u s $12. |

Clearly nothing prevented payment of better wages to screeners to attract and keep good employees.  Better

wages are another example of a very reasonable measure Defendant failed to implement before 9/11.

| | |
|---|---|
| 52:16-<br>24 | Q: All right.  And were you given any specific instruction on how to determine whether a knife was a permissible knife and not a permissible knife through the checkpoint?<br>….<br>A: The – the knife that was allowed should be of this length (indicating).  We used to measure it with our ID.  Simple, plain knife. |

This was not the standard to determine a permissible knife.  Clearly additional reasonable measures could

have been taken by defendant as set forth in its own documents.

 The Checkpoint Operations Guide (COG) states at page 5-7, "However some knives with blades under 4

inches could be considered by a reasonable person to be a 'menacing knife' and/or may be illegal under local

law and should not be allowed to enter the sterile area.  ANY QUESTIONABLE ITEM SHOULD BE

REFFERED TO A GSC."

The ACSSP, Appendix I states, "DEADLY OR DANGEROUS WEAPON GUIDELINES: The following

guidelines are furnished to assist in making a reasonable determination of what property in the possession of a

person should be considered a deadly or dangerous weapon.  They are only guidelines, however, and common

sense should always prevail.…**Knives** – Including sabers, swords, hunting knives, souvenir knives, martial

arts devices, and such other knives with blades 4 inches long or longer and/or knives considered illegal by

local law…**Disabling or Incapacitating Items** – All tear gas, mace and similar chemicals and gases whether

in pistol, canister, or other container, and other disabling devices such as electronic stunning/shocking

devices. **Other Articles** – Such items as ice picks, straight razors, and elongated scissors, even though not commonly thought of as a deadly or dangerous weapon, but could be used as a weapon, including toy or 'dummy' weapons or grenades."

No such analyses were made or even required by American Airlines at Dulles.

| 81:16-82:04 | Q: Is it the responsibility of the person working the handheld device to go all the way down… to the floor?<br>A: To the legs.  Yeah.<br>Q: All the way to the floor?<br>A: To the shoes.<br>…<br>Q: To the shoes… and the floor?<br>A: Yeah.  Not to the floor but to the – to the body where he – to the shoes, up to the shoes. |
|---|---|

The Dulles videotape clearly showed they did not screen down to the floor.  The COG, page 4-8, clearly required screening to almost touching the floor.

| 83:24-84:10 | Q: So before every shift you would check the handheld device to see if it was operating correctly is that right?<br>A: Yeah, the person who's using it checks it.<br>Q: I understand, but I'm trying to -- I'm trying to be precise about when it's checked.  Is it checked at the beginning of every shift?  Is it checked with every passenger that goes through the checkpoint?  Is – how often is it checked?<br>A: You know, once if you see it's working, then you don't need to check it again. |
|---|---|

The COG, at page 4-5 and at page 7-3, required the hand-wand to be tested before each and every person wanded.  This was especially important because Dulles in the summer of 2001 was having a problem with malfunctioning handwands.

| 98:24-99:03 | Q: Were you able to determine, in reviewing the video (Dulles screening video day of 9/11) a second time, whether the screener actually went down to the floor eight times?<br>A: No, not eight times. |
|---|---|
| 101:02-102:12 | Q: Ms. Hayat, were you able to determine how many passes down the front or the back of the body the screener did on – on that particular passenger, Mr. Moqed?<br>A:  Two times.<br>Q: Two times.  And is it true that – that in your training with Argenbright and the COG, that it actually required more passes down the passenger's body than just two?<br>A: Yes.<br>Q: Yes.  And so that screening wasn't consistent with the way that the COG said that you were to do the passing up and down the body if you were properly conducting hand-wand screening is that right?<br>….<br>A: Again, I'm – if he had found the source, then he wouldn't have do that again and again.<br>…..<br>Q: So I just want to make sure I understand.  Your testimony is, is that because the magnetometer was so strong, you didn't actually need to pass down the body of the passenger more than twice?<br>A: If he had found the source and it – the body's no more alarming, then it's fine. |
| 105:22-106:16 | Q: Okay.  In you review of – of the screening done on this passenger, Mr. Nawaf, could you determine did in fact the screener operate the handheld device up and down the body of the passenger eight times? |

|  | A: No. |
|---|---|
|  | … |
|  | Q: Okay.  And could you determine whether in fact, when operating the handheld device, whether he checked to determine whether the handheld device was working before screening the passenger? |
|  | A: Yes, he must have. |
|  | Q: He must have? |
|  | A: Yeah.  When this start – start – when he started screening. |
|  | Q.  When he started the screening of that particular passenger, or when he started the screening in the beginning of the shift? |
|  | A: In the beginning of the shift. |

The COG, at page 4-8, required the screener to pass to the floor eight times, and test the hand-wand before each person was wanded.

| 152:05-08 | Q: All right.  Ma'am, were you aware that – when was – when did you first hear the name Osama bin Laden? |
|---|---|
|  | A: After 9/11. |
| 153:25-154:14 | Q: Before your shift would begin in the morning when you first came into work, what was – what did you do when you first came to work in the morning as a pre-departure screener for Argenbright? |
|  | A: A small briefing if there was something new. |
|  | Q: Okay.  So if there was something new to say, they would hold a small meeting and they would inform you of what that is? |
|  | A: Yes. Yes. |
|  | Q: And how often did that happen?  Was it once a month?  Once a week?  Once every two weeks?  How often? |
|  | A:  Whenever there is need, if can be every other day or it can by -- |
| 158:13 | Q: Did anyone ever tell you from American Airlines or United Airlines or Argenbright that – that information indicated that a terrorist group or other hostile entity with the known capability of attacking civil aviation is likely to carry out attacks against U.S. targets or civil disturbances with a direct impact on civil aviation prior to September 11th, 2001? |
|  | A: No. |

The COG, at page 3-4, required at the daily "Pre-Shift Screener Briefing" that all screeners be aware of current security directives and information circulars, as well as special events that could effect screening operations.  Osama Bin Laden was mentioned by name in several such urgent communiqués.  These security briefings were reasonable measures that should have been taken…and were required.

| **Samuel Huluka – Dulles Screener** | |
|---|---|
| 34:19-22 | Q: How about did they test you on your English skills?  I mean you no offense/ |
|  | A: No one give me an English test. |

ACSSP, page 137.3 – Recurrent Training, requires an annual written test in English, without translator assistance, to test comprehension.

| 37:14-16 | Q:  Before you went to the checkpoint was there any sort of a meeting that was held? |
|---|---|
|  | A:  We don't have any meeting |
| 61:19-62:09 | Q: Do you know what the threat level was on the morning of September 11th, 2001, the security threat level? |
|  | A: There is no threat level before 9/11/ |

| | Q: Okay. |
| | A: Just like now it's orange, something. Before 9/11. |
| | Q: Had you ever heard of not a color coded system, but a numbered system of threats before 9/11? |
| | A: No. Before, no. |
| | Q: Did you have the sense that there was any increased threat? |
| | A: No. |
| 63:02-09 | Q: Do you know what a security directive is? |
| | … |
| | A: I don't know. |
| | Q: Do you know what an information circular is? |
| | A: I don't know. |

A daily briefing was required, as discussed above, to review current security directives and information circulars and other important information.

| **Stephen Kar-Hung Chu – Dulles Checkpoint Security Supervisor** | |
| 54:02-16 | Q: Do you recall the name of the guide? |
| | A: I believe we call it the COG book. |
| | …. |
| | Q: How often as a screener would you look at that guide? |
| | A: At the beginning – I believe at the beginning when they start they are given time to go in there and read the book. At the time when I started I believe only the CSS were allowed to do that. |

The COG must be available at <u>every</u> checkpoint. COG page 3-4. While in training a screener must go through a period of on the job training and review the COG every day. ACSSP page 134.d.3.

| 90:19-91:07 | A: When we started back in 1992 there wasn't, you know, that big about mace. |
| | Q: So you were not tested on you ability to detect mace? |
| | A: No. I'm not saying we were tested with it. We – other than the  -- anything other than the FAA approved test object, if it's on the list we can get familiar with how it looks, but we never really, you know, used that to test people. |

As discussed above, the airline with its PSI, was permitted to develop additional training material.

| 98:08-20 | Q: How long could a knife be? |
| | … |
| | A: If I remember correctly, straight edge 4 inches limit. |
| | Q: How would you measure that? |
| | A: We don't have a tape at the checkpoint, but we usually have airport I.D., and roughly from one corner to another corner on your airport I.D. is roughly about four inches, so. So it may not be exactly, but it gives you the guideline you can go with. |

The Checkpoint Operations Guide (COG) stated at page 5-7, "However some knives with blades under 4 inches could be considered by a reasonable person to be a 'menacing knife' and/or may be illegal under local law and should not be allowed to enter the sterile area. ANY QUESTIONABLE ITEM SHOULD BE

REFFERED TO A GSC."

The ACSSP, Appendix I stated, "DEADLY OR DANGEROUS WEAPON GUIDELINES: The following guidelines are furnished to assist in making a reasonable determination of what property in the possession of a person should be considered a deadly or dangerous weapon.  They are only guidelines, however, and common sense should always prevail.…**Knives** – Including sabers, swords, hunting knives, souvenir knives, martial arts devices, and such other knives with blades 4 inches long or longer and/or knives considered illegal by local law…"

| 147:17-148:05 | Q: Sir are you aware whether Dulles Airport was fined for screening irregularities while you were there?<br>A: I didn't know anything about it.<br>Q:  You're not aware of any fines that were issued against Argenbright for inadequate screening at Dulles while you were there during your 10 year tenure?<br>A:  Even that would be the office, the people and there's no need for them to tell me, I believe. |
|---|---|

The job of the CSS included applying corrective action. COG, p. 3-1.

| Nabil Nashid Abadir – Dulles Screener | |
|---|---|
| 24:18-20 | Q: Were given an English proficiency test by Argenbright?<br>A: No. |

As discussed above, it was required annually.

| 44:23-45:04 | Q: It is also states a few bullet points down part of your initial training was to review the Checkpoint Operations Guide or the COG.  Do you recall being trained on the COG in the initial classroom?<br>A:  The COG, I don't know what they mean by that name. |
|---|---|

This knowledge was required by both the COG and the ACSSP.

| 74:23-75:02 | Q: When did you first hear the name Osama bin Laden?<br>A:  After September 11th I heard about that guy, but before I don't hear about him. |
|---|---|
| 75:24-76:06 | Q: Do you know what the threat level was on the morning of September 11th at Dulles Airport?<br>…<br>Q: The threat level? Do you know what a threat level is?<br>A: No |
| 78:13-20 | Q:  Do you know what a security directive is?<br>….<br>A: No.<br>Q: Do you know what an information circular is?<br>A: I don't know. |
| 79:07-10 | Q: Were you ever given or did you – were you ever read from or told about increased threats contained in security directives?<br>A: No. |

If there had been daily briefings as required, he would have known these things.  There were no daily

briefings as required by the COG.

| Susan Simmons – American Airlines Ticket Counter Agent at Dulles and Ground Security Coordinator | |
|---|---|
| 81:10-23 | Q: Did you have any trouble, did you ask them an profiling questions?<br>A: I did.  I asked them both.<br>Q: How did they respond?<br>A: I first asked al Mihdhar, and he answered the questions correctly, he answered yes to both of them.  And when I questioned Moqed, he looked at me like he couldn't understand my English.  And al Mihdhar turned to him and said something I couldn't understand what he was saying,.  And then he said oh, yes, yes. |
| 103:04-09 | Q: Did you have any discretion in making, without giving me the criteria, any discretion in September of 2001, in deciding whether or not to make a passenger a selectee?<br>A: Yes. |
| 103:21-106:15 | Q: For the record, 103 on its cover page , first of all has bates numbers AAL 006411 through 6442.  It's a, appears to be some kind of electronic or PowerPoint slide presentation.  And the first slide on the first page simply says "security, basic indoctrination."  1/5/01.  Again, produced in this litigation by American airlines.<br>….. (106:10)<br>Q: And then on the bottom, it says language barrier.  And the subbullet is "if no translator available, hand search all baggage."  Do you see that?<br>A: Yes. |
| 137:23-139:05 | Q: Was there any procedure at Dulles on or before 9/11 where a passenger's boarding pass was stamped with an S, or some other designation that required additional screening of that passenger?<br><br>A: I can't remember if that was – when that was done.  I remember something – I'm not clear about it.  I can't recall when that was done, if it was pre-9/11, post-9/11.<br>Q: What was the consequence of stamping an S on a boarding pass?<br>….<br>A: I can't even recall if we put an S on there.  They kept changing the rules all the time. So I can't – I really can't recall. |

American Airlines did not do what its own ACSSP required, and employees were unsure.

| Chandresh Patel – Argenbright Senior Duty Manager at Dulles | |
|---|---|
| 74:14-22 | Q: Did you ever have regular meetings with the CSSs?<br>A: If something has to address, yes.<br>Q: Roughly how regular would you have those meetings><br>A: It's not regular, if something change come up or something happen, we just brief the CSS. |

As discussed above, the daily briefing was required.

| 133:07-17 | Q: Prior to September 11th, how would a screener at the checkpoint know that someone had been designated a selectee?<br>…<br>A: The airlines come to the checkpoint and let the supervisor know.  Customer service agent come to the checkpoint and let the supervisor know this bags need dump search. |
|---|---|

Obviously American did not do this on September 11, 2001.  No selectee was given such a search.

| 147:12-19 | Q: Did you know prior to September 11th that terrorists who posed threats to civil aviation were present in the United States?<br>A:  I don't remember.  I don't think so. |
|---|---|

This information should have been covered at the daily briefing as required by the COG and ACSSP.

| John T. Evans – American Airlines Passenger Safety Agent at Dulles, Ground Security Coordinator on 9/11/2001 | |
|---|---|
| 51:07-52:06 | Q: As you watched the video, what was your impression of the screening that was being done that was depicted in the video? <br> … <br> A: I think it was very poorly, you can't really see that, it's not that technical. <br> Q: What do you mean? <br> A: It should have been clearer.  I think they need to have better TV screens at the security points. |

The American employee suggests yet another reasonable measure that should have been taken.

| 139:16-20 | Q: Was there a COG at the checkpoint that the passengers who boarded Flight 77 went through, was there a COG at that checkpoint? <br> A: I have no idea. |
|---|---|

Per the COG, page 3-4, not only required a COG at each checkpoint, but required him to check for it at the

start of each and every shift.

| 193:13-21 | Q: I'm asking you whether or not it was part of your responsibilities pre-9/11 to ensure that the hand wanding procedures were done right. <br> A: That the wanding was done, I reckon it was done, you say do properly, I wasn't properly trained to handwand. |
|---|---|

The COG, page 3-5, required supervisors to ensure the screeners were using proper hand-wanding procedure.

That would be hard to accomplish if you don't know how to do it.

| 227:18-228:06 | Q: Sir, during your work with American Airlines, did you notice that any of the screeners had difficulty speaking English? <br> A: Yes. <br> Q: Was that a problem? <br> A: Was that problem, yes.  I felt it was a problem. <br> Q: In what way was it a problem? <br> A: They couldn't really talk to the pass – the passengers coming through. |
|---|---|

Annual English comprehension tests were required.

| 236:08-16 | Q: Do you believe you didn't have enough information to indicate that Islamic terrorists might attack commercial aviation? <br> A: No, we had information. <br> Q: Why did it come as a surprise then? <br> A: I didn't think it would really happen. |
|---|---|

This "head in the sand" state of denial speaks for itself.

| 251:19-21 | Q: Do you know the term exceptional screening? <br> A: No. |
|---|---|

That was catastrophically unfortunate, as it is the GSC who had the authority to direct exceptional screening – the use of intensified screening procedures. COG, page 6-1.

| 256:14-17 | Q: Can you name anyone at American Airlines corporate security department?<br>A: No, sir. |

Security supervisors were required by the COG to know these contacts.

---

| **Dana G. Turner – AA GSC at Dulles on 9/11** | |
| 106:09-107:21 | Q: 170 alleged violations first quarter, 175 alleged violations second quarter, 170 alleged violations in the third quarter. That's three quarters, total of $5.649 million in fine, I'm asking you if as a GSC for American Airlines prior to September 11, 2001, you though that was a lot of fines.<br>…<br>A: So any fine would be more than any of us would like to see, so.<br>Q: An certainly $5.6 million in fines is significant, in three quarters, is significantly more than you would like to see, correct?<br>…<br>A: I would certainly like to see a smaller dollar figure; yes. |

FAA fines refer to fines for security violations, and security violations means American Airlines was not

doing what it was supposed to be doing to secure its passengers

| 132:24-366:14 | Q: If someone presented a knife to you on September 11, 2001 and asked you to look at it and determine whether or not it was menacing, what criteria would you use?<br>…<br>A: Extremely jagged is what comes to mind. |

There are no such criteria in the COG or ACSSP and American to date has produced no criteria.  Plaintiffs

suggest they had none, but they should have.  Furthermore, they clearly needed to implement training so

supervisors and employees knew what items to keep off airplanes.


## VI.    SUMMARY JUDGMENT IS APPROPRIATE IN THESE TWO WARSAW CONVENTION ACTIONS

Summary judgment in favor of plaintiffs Falkenberg and Teague is appropriate in these

two Warsaw Convention actions.  Defendant's response admits they are absolutely liable for the

first $300,000.00.  Defendant elected to avail of itself of the all reasonable measures defense for

amounts in excess, but the burden is on defendant to prove it took all reasonable measures.

Defendant made absolutely no effort to meet its burden.  It is legally impossible for defendant to

show it took all necessary measures because they failed to take all those actions required by the

Federal Aviation Regulations, the Checkpoint Operations Guide ("COG") or the Air Carrier Standard Security Program, ("ACSSP").    Having failed to meet or exceed even the legal minimums, it is impossible for them to show that they took all reasonable measures to prevent the plaintiffs' losses.  Arguing that others may have also failed to take reasonable measures does not excuse defendant's failure to meet its mandatory minimums.


**VII.    NOT ONLY SHOULD PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT BE GRANTED AS A MATTER OF LAW, BUT PLAINTIFFS, AS REPRESENTATIVES OF PASSENGERS KILLED DURING THE COURSE OF INTERNATIONAL TRAVEL FROM THE UNITED STATES TO AUSTRALIA ON SEPTEMBER 11, 2001, ARE ENTITLED TO RECOVER ATTORNEYS' FEES & LITIGATION EXPENSES UNDER THE HAGUE PROTOCOL**


> **A.    As Both The United States & Australia Were Parties To Montreal Protocol No. 4 (To Amend The Warsaw Convention As Amended By The Hague Protocol) On September 11, 2001, The  United States Was Bound To The Provisions Of The Hague Protocol Vis-à-Vis Australia on September 11, 2001.**


American Airlines misrepresents the Second Circuit's holding in *Avero Belgium Ins. v. Am. Airlines, Inc.*, 423 F.3d 73 (2d Cir. 2005).  Despite what defendant asserts, *Avero* did <u>not</u> hold that the United States by ratifying Montreal Protocol No. 4 in 1999 was not bound by the Hague Protocol's provisions vis-à-vis *any country*.  Rather, *Avero* clearly explained:

> All parties agree that, from the perspective of a State that is also a party to Montreal Protocol No. 4, the United States <u>was "bound</u> by the provisions of The Hague Protocol" (as amended by Montreal Protocol No. 4) by virtue of having ratified Montreal Protocol No. 4.  That is the sum and substance of the Talbott Letter.

*Avero*, 423 F.3d at 88.

The "Talbott Letter" was the June 23, 2000 Letter of U.S. Deputy Secretary of State Strobe Talbott accompanying President Clinton's transmission to the Senate of the Montreal Convention, which explained the effect of the earlier ratification of Montreal Protocol No. 4:

"In accordance with the provisions of Montreal Protocol No. 4, the United States also became bound by the provisions of The Hague Protocol when it ratified Montreal Protocol No. 4." *See also, Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 431 (2d Cir. 2001)(explaining that the U.S. was not governed by The Hague Protocol "until another international agreement, Montreal Protocol No. 4, was ratified by the Senate on September 28, 1998, and became effective on March 4, 1999.") So Second Circuit law is clear that vis-à-vis a State – like Australia – that was "also a party to Montreal Protocol No. 4" in 2001, the United States was bound by the provisions of the Hague Protocol. *Avero*, 423 F.3d at 88; *Fujitsu*, 247 F.3d at 431; *see also, Continental Ins. Co. v. Federal Express Corp.*, 454 F.3d 951, 955-957 (9th Cir. 2006)(by becoming a party to Montreal Protocol No. 4 on March 4, 1999, the United States bound itself to the provisions of The Hague Protocol vis-à-vis States that were parties to the Montreal Protocol No. 4 *as well as* vis-à-vis States that were parties to The Hague Protocol but not Montreal Protocol No. 4).

*Avero* expressly did not overrule "the sum and substance" of the Talbott letter that the United States was bound to the Hague Protocol vis-à-vis States that were parties to Montreal Protocol No. 4 like Australia. Rather, *Avero* was quite clear that

> [t]he **narrow question** raised in this case is not directly addressed in the Talbott Letter – namely, whether the United States became bound in this manner **vis-à-vis States that are <u>not</u> parties to the Montreal Protocol No. 4**, but are parties Hague Protocol. On that score, the Talbott Letter is silent.

*Avero*, 423 F.3d at 88 (emphasis added). So the narrow question in *Avero* was whether the United States in 2001 was bound to the Hague Protocol vis-à-vis Belgium, which was **not** a party Montreal Protocol No. 4. Answering *that* narrow question, *Avero* held that when the United States ratified Montreal Protocol No. 4 in 1998 (effective March 4, 1999), "it expressed an intention *not* to be bound by the Hague Protocol **against States that, like Belgium**, were <u>**not**</u> **parties to the Montreal Protocol No. 4.**" *Avero*, 423 F.3d at 77 (emphasis added). Defense counsel obscures that narrow holding by stating that *Avero* held that the United States "expressed

an intention to the contrary," Def. Brief at 23, while leaving out the rest of the quote that the United States expressed an intention not to be bound by the Hague Protocol "against States that, like Belgium, were *not* parties to the Montreal Protocol No. 4." *Avero,* 423 F.3d at 77. Hence, *Avero's* narrow holding only applies to states that were not parties to Montreal Protocol No. 4.

As Australia *was* a party to Montreal Protocol No. 4 on September 11, 2001, *Avero*'s narrow holding does not apply. *See* Def.'s Rule 56.1 Statement ¶ 18 ("American admits that Montreal Protocol No. 4 (to amend the Warsaw Convention as amended by the Hague Protocol) entered into force in Australia on June 14, 1998."). Hence, by the plain text of *Avero* – "All parties agree that, from the perspective of a State *that is also a party to Montreal Protocol No. 4*, the United States was 'bound by the provisions of The Hague Protocol' (as amended by Montreal Protocol No. 4) by virtue of having ratified Montreal Protocol No. 4" – the United States was bound vis-à-vis Australia by the Hague Protocol on September 11, 2001. *Avero*, 423 F.3d at 88.

**B**.    **The Plain Text Of The Hague Convention Authorizing This Court to Award Plaintiffs' Court Costs & Litigation Expenses, Including Attorney's Fees, Should Be Enforced**

American's last erroneous argument is to insist that this Court read the plain text of Article 22(4) authorizing this Court to award "court costs and . . . the other expenses of the litigation incurred by the plaintiff" as superfluous, as "nothing more than a pass-through" already provided by Warsaw Convention Articles 17 and 24(2). *Zicherman v. Korean Lines Co. Ltc.,* 516 U.S. 217, 229 (1996), cited at Def. Brief at 25. While the aviation defense bar may wish that "[a]s with the Warsaw Convention . . . Article 22(4) merely acts as a 'pass-through,' directing courts to apply the law that would govern in the absence of the Warsaw Convention," Def. Brief at 25, such a reading would render Article 22(4) redundant and ignore the expressed intent of its

framers, specifically that of NYU School of Law Professor Andreas Lowenfeld who represented

the position of the United States to the Hague Convention on this precise point:

> [T]he United States proposed that Article 22 of the Warsaw Convention be
> amended to allow the award of litigation expenses, including attorney's fees, in
> addition to the primary award.

*Motorola, Inc. v. Kuehne & Nagel, Inc.*, 208 F. Supp.2d 910, 912 n.3 (N.D. Ill. 2002)(quoting A.

Lowenfeld & A. Mendelsohn, *The United States and the Warsaw Convention*, 80 Harv. L. Rev.

497, 507 (1967); *Domangue v. Eastern Air Lines, Inc.*, 722 F.2d 256, 261 (5th Cir. 1984) (same).

By asking this Court to read Article 22(4) as superfluous, as "nothing more" than a pass-

through" already provided by Warsaw Convention Articles 17 and 24(2), American Airlines

would have this Court violate the canon of statutory construction whereby courts are enjoined to

give force and effect to all of a statute or treaty's provisions and avoid rendering any of them

superfluous.  *See In re Air Crash Off Long Island*, 209 F.3d 200, 207 (2d Cir. 2000)("[T] he

Court will avoid a reading which renders some words altogether redundant")(rejecting aviation

"defendants' definition [that] violates this canon of statutory construction because it renders

"high seas' [under DOHSA] superfluous"); *see also*, *Connecticut v. United States Dep't of the

Interior*, 228 F.3d 82, 88 (2d Cir. 2000)(explaining that the court is required to disfavor an

interpretation of a statute that renders language superfluous); *Allen Oil Co. v. Comm'r of Internal

Revenue*, 614 336, 339 (2d Cir. 1980)(stating that "a statute must, if reasonably possibly, be

construed in a way that will give force and effect to each of its provisions rather than render

some of them meaningless"); *United States v. Blasius*, 397 F.2d 203, 207 n. 9 (2d Cir. 1968).

Hence, this Court should give force and effect to the plain text of Article 22(4) by

awarding Plaintiffs, as Representatives of passengers killed during the course of international

travel between the United States and Australia on September 11, 2001, their attorneys' fees and

litigation expenses. Defense counsel's reading that would reader Article 22(4) superfluous should be emphatically rejected, along with their misleading reading of *Avero*. *Supra.*

## VII. CONCLUSION

This Court should enter its order granting Summary Judgment on liability against American Airlines to Plaintiffs, Teague and Falkenberg, and further order that American's liability is not limited to 100,000 SDRs, and that costs, litigation expenses and attorneys fees may be recovered.[7] Summary Judgment should be granted as a matter law to plaintiffs Teague and Falkenberg.

Dated:  May 23, 2007                    Respectfully submitted,
                                         **MOTLEY RICE LLC**


                              **By:**    __s/_ Mary Schiavo_____
                                         Ronald L. Motley, Esquire
                                         Joseph F. Rice, Esquire
                                         Mary Schiavo, Esquire
                                         Jodi Westbrook Flowers, Esquire
                                         Don Migliori, Esquire
                                         Michael E. Elsner, Esquire (ME-8337)
                                         Elizabeth Smith, Esquire
                                         Justin Kaplan, Esquire
                                         Vincent I. Parrett, Esquire (VP-5092)
                                         Motley Rice LLC
                                         28 Bridgeside Boulevard
                                         Post Office Box 1792
                                         Mount Pleasant, SC 29465
                                         Telephone:  (843) 216-9000

---

[7] At that point a damages trial could then be ordered to determine the amount of damages.

## Prior Hijackings and Other Attacks on Aviation

**May 1930**
**Hijacking**-- Peruvian revolutionaries seize a Pan American mail plane.

**1947-1958**
**Twenty-three hijackings**--The world's first fatal hijacking occurs in July 1947.

**November 1, 1955**
**Bomb** -- A bomb destroyed a United Air Lines plane after it took off from Denver, CO.

**January 6, 1960**
**Bomb**--A National Airlines crashed near Bolivia, N.C.

**April 12, 1960**
**Hijacking**--A Pilot and 2 crewmen were among the 4 hijackers.

**May 1961**
**Hijacking**

**May-August 1961**
Four **Hijacking** incidents

**May 1962**
**Bomb**-- Continental Air Lines 707 flying over southern Iowa.

**May 7, 1964**
**Suicide-Hijacker** --Captain and first officer of a Pacific Air Lines Fokker F-27 shot en route from Reno, Nev., to San Francisco, Calif.

**August 31, 1965**
**Hijacking**--Flight departing from Honolulu International Airport

**October 11, 1965**
**Hijacking**--Plane departing from Hoolehua-Molokai Airport, HI.

**1968 - 12 Hijacking of Commercial airlines, 6 general aircraft.**

**July 22 1968**
**Hijacking** --An El Al Boeing 707 flying from Rome to Tel Aviv hijacked by three members of the Popular Front for the Liberation of Palestine and flown to Algeria.

**July 19, 1968**
**Bombing**--An Air France and Japan Airlines ticket offices in Los Angeles damaged by bombs.

**August 17, 1968**
**Bombing**--A Mexican Airlines office in Miami is damaged by a bomb.

**1969-1970 87 Hijackings**
40 U.S. aircraft totals 40; 47 foreign aircraft.

**January 19, 1969**
**Hijacking**-- Ecuadorian airliner en route from Quito to Miami.

Exhibit 5

**August 9, 1969**
**Bombing**--Two American tourists injured when a bomb explodes at an Olympic Airways facility in Athens.

**August 29, 1969**
**Hijacking**--A TWA 707 bound for Israel and diverted it to Syria.

**October 31, 1969**
**Hijacking**--A U.S. Marine absent-without-leave, hijacked a TWA 707 plane bound for San Francisco and diverts the plane on 17-hour journey that ends in Rome, Italy.

**November 4, 1969**
**Hijacking**--En route from Miami to Mexico.

**January 9, 1970**
**Hijacking**--A TWA 707 airliner en route from Paris to Rome is hijacked to Beirut.

**February 16, 1970**
**Hijacking**--An Eastern Airlines plane.

**February 21, 1970**
**Sabotage**--Swissair plane en route to Tel Aviv crashed on takeoff.

**March 17, 1970**
**Hijacking and Murder of Co-pilot and wounding of Pilot -** Newark departure to Boston.  Hijacker killed the copilot on an Eastern Air Lines shuttle.

**March 31, 1970**
**Hijacking**—Televised, the plane flew into North Korea, where the attackers were granted political asylum.

**May 25, 1970**
**Hijacking** -- American Airlines, Chicago to New York flight.

**June 4, 1970**
**Hijacking** -- A TWA 727 jet with 51 passengers on Phoenix-Washington, DC, flight hijacked by an unemployed U.S. truck driver.

**June 23, 1970**
**Hijacking** -- A US citizen with an Albanian passport hijacked a Pan American World Airways jet bound from Beirut to New York.

**July 1, 1970**
**Hijacking** -- A National Airlines jet.

**August 2, 1970**
**Hijacking** -- The first hijacking of a wide-bodied airliner of a Pan American 747 from New York.

**August 20, 1970**
**Hijacking** -- A Newark to San Juan flight

**September 6, 1970**

**Hijacking** – 5 airplanes, five governments (U.S, Germany, Switzerland, Israel, and Britain), and 769 hostages.  It was carried out by the Palestinian Liberation Front.

**October 30, 1970**
**Hijacking** -- A National Airlines jet.

**November 1, 1970**
**Hijacking** -- A National Airlines jet from Miami to San Francisco hijacked.

**November 4, 1970**
**Hijacking** -- An Eastern Air Lines jet on a Richmond to Dallas hijacked.

**January 3, 1971**
**Hijacking** -- A National Airlines plane hijacked.

**January 22, 1971**
**Hijacking** -- A Northwest Orient Airlines jet on a flight from Minneapolis to Washington, DC, hijacked.

**February 4, 1971**
**Hijacking** -- A Delta Air Lines jet hijacked.

**June 12, 1971**
**Hijacking** -- Passenger killed by hijacker on a TWA aircraft bound from Albuquerque to New York.

**November 24, 1971**
**Hijacking involving Extortion** – D. B. Cooper on a flight from Portland to Seattle successfully demanded $200,000 and four parachutes, and then parachuted from the rear stairway of the Boeing 727.

**January 20, 1972**
**Hijacking** -- A hijacker parachuted from a plane into the vicinity of Denver.

**March 6, 1972**
**Bombing/Hijacking** -- TWA was warned that four of its planes would be blown up at six-hour intervals unless $2 million in ransom was paid. One bomb exploded in a plane on the ground in Las Vegas and another was sniffed out by a dog in John F. Kennedy airport.

**March 7, 1972**
**Bombings** -- A bomb was discovered and defused aboard a TWA plane at New York's Kennedy Airport. On March 9, another bomb damaged a TWA airliner parked at Las Vegas. A third bomb was found aboard a United Air Lines jet at Seattle.

**May 31, 1972**
**Rifles and Grenades in Airport Terminal** -- Three Japanese Red Army terrorists flew to Tel Aviv's Lod Airport on a flight from Rome.

**July 12, 1972**
**Hijacking** -- A Boeing 727, Philadelphia.

**July 31, 1972**
**Hijacking** -- A Delta Air Lines jet over Florida diverted to Algeria.

**September 15, 1972**

**Bombing Attempt** -- Israel-bound El Al aircraft on August 16.

**October 29, 1972**
**Hijacking** -- Four fugitives killed a ticket agent and hijacked an Eastern Air Lines Boeing 727 at Houston, Texas.

**November 10, 1972**
**Hijacking** -- Three escaped convicts hijacked a Southern Airways DC 9 flying out of Birmingham, Alabama.

**May 18, 1973**
**Hijacking** -- Four hijackers demanded the release of prisoners.

**December 17, 1973**
**Bombing and Hijacking** -- Arab terrorists used incendiaries to kill 30 passengers aboard a Pan American airliner at Rome's Leonardo Da Vinci Airport. After leaving the plane the assailants hijacked a Lufthansa jet.

**February 17, 1974**
**Hijacking** -- A soldier flew a stolen Army helicopter to the White House, guards opened fire with shotguns.

**February 22, 1974**
**Hijacking** -- At Baltimore-Washington International Airport, a former mental patient attempted to hijack a DC-9 and crash it into the White House.

**September 8, 1974**
**Bombing** -- Trans World Airlines Boeing 707 bound for Rome and then New York.

**September 10, 1974**
**Hijacking** -- TWA Flight 355 from Chicago to New York

**October 8, 1974**
**Bombing** -- A TWA airliner to Greece from Israel was blown up in flight over the Aegean Sea.

**December 29, 1975**
**Bombing** -- Exploded in a coin-operated locker at New York's La Guardia Airport.

**June 27, 1976**
**Hijacking** -- Air France

**October 1977**
**Hijacking** -- Frontier Airlines plane, commandeered in Nebraska and forced to fly to Atlanta.

**October 19, 1977**
**Hijacking** -- A Lufthansa aircraft and murder of pilot

**December 4, 1977**
**Hijacking** -- A Malaysian Airlines Boeing 737 crashed after being hijacked.

**January 28, 1978**
**Hijacking** -- Flight from Kinston to Wilmington, NC

**March 13, 1978**

**Hijacking** -- United Airlines flight from San Francisco to Seattle

**April 1, 1978**
**Hijacking** -- Piedmont Airlines flight from Richmond to Norfolk, VA

**August 27, 1978**
**Hijacking** -- United Airlines flight from Denver to Seattle

**December 14, 1978**
**Hijacking** -- National Airlines flight from New York to Miami

**December 21, 1978**
**Hijacking** -- TWA flight from St. Louis to Kansas City.

**January 27, 1979**
**Hijacking** -- A United Airlines flight from Los Angeles to New York

**March 16, 1979**
**Hijacking** -- A Continental Airlines flight from Phoenix to Tucson

**June 11, 1979**
**Hijacking** -- A hijacker on a Delta Air Lines flight from New York to Fort Lauderdale

**June 20, 1979**
**Hijacking** -- American Flight 293 from New York's LaGuardia Airport to Chicago's O'Hare International Airport

**June 30, 1979**
**Hijacking** -- An Eastern Airlines flight from San Juan to Miami

**July 20, 1979**
**Hijacking** -- A United Airlines flight from Denver to Omaha

**August 16, 1979**
**Hijacking** -- An Eastern Airlines flight from Guatemala City to Miami

**August 22, 1979**
**Hijacking** -- A United Airlines flight from Portland to Los Angeles

**October 30, 1979**
**Hijacking** -- A hijacker on a Pacific Southwest Airlines flight from Los Angeles to San Diego

**November 24, 1979**
**Hijacking** -- American Airlines flight from San Antonio to El Paso International Airport and demands to be flown to Iran.

**January 15, 1980**
**Hijacking** -- A Delta Airlines flight from Atlanta to New York

**January 25, 1980**
**Hijacking** -- Delta Airlines L-1011 to Cuba, and demand to be flown to Iran.

**April 9, 1980**
**Hijacking** -- American Airlines B-727 aircraft on the ground at Ontario, CA

**April 14, 1980**
**Hijacking** -- A Continental Airlines flight from Denver to Ontario

**May 1, 1980**
**Hijacking** -- A Pacific Southwest Airlines flight from Stockton, CA to Los Angeles, CA

**May 16, 1980**
**Hijacking** -- Pan Am jet on the ground.

**July 11, 1980**
**Hijacking** -- Northwest Airlines flight from Seattle to Portland.

**July 22, 1980**
**Hijacking** - a Delta Air Lines L-1011

**August 10, 1980**
**Hijacking** -- Air Florida flight from Miami to Key West.

**August 13, 1980**
**Hijacking** -- An Air Florida flight.

**August 14, 1980**
**Hijacking** -- National Airlines flight from Miami to San Juan

**August 16, 1980**
**Hijacking** -- Eastern Airlines flight from New York to Miami

**August 16, 1980**
**Hijacking** -- Eastern Airlines flight from Miami to Orlando

**August 16, 1980**
**Hijacking** -- Republic Airlines flight from Miami to Orlando

**August 16, 1980**
**Hijacking** -- Delta Airlines flight from San Juan to Miami

**August 18, 1980**
**Hijacking** -- A flight from Melbourne, Australia to Atlanta

**August 27, 1980**
**Hijacking** -- Eastern Airlines L-1011 bound from New York to Florida hijackers carried bottle of an unknown liquid.

**August 29, 1980**
**Hijacking** -- Braniff Airways plane in Lima, Peru and demand to be flown to the United States.

**September 8, 1980**
**Hijacking** - Hijacker with a bottle of liquid hijacked Eastern Airlines Flight 161 en route from New York to Florida.

**September 12, 1980**
**Hijacking** -- Flight from Newark to Miami.

**September 14, 1980**

**Hijacking** – Eastern Airlines flight from Tampa to Miami is hijacked.

**September 17, 1980**
**Hijacking** -- Delta Airlines flight from Atlanta to Columbia

**October 25, 1980**
**Hijacking** -- A Continental Airlines flight from Miami to Houston

**March 2, 1981**
**Hijacking** -- Three Pakistanis who hijacked a Pakistan International Airlines jet March 2 surrendered and released their 102 hostages 13 days later.

**March 6, 1981**
**Hijacking** – Airline unknown.

**April 10, 1981**
**Hijacking** -- An Eastern Airlines flight from New York to Miami.

**July 11, 1981**
**Hijacking** -- A U.S. jet by two men who lit firebombs made of baby bottles aboard the plane.

**September 30, 1981**
**Hijacking** -- An Indian Airlines plane, a Boeing 737, hijacked by five Sikh extremists was forced to fly to Pakistan.

**October 5, 1981**
**Hijacking** -- A USAir flight from Albany to Buffalo, assailant demanded to be taken to the Soviet Union.

**October 23, 1981**
**Hijacking** -- An American Airlines flight from San Juan to New York, hijacker demanded to be flown to Canada.

**December 7, 1981**
**Hijacking** -- Chanting 'Allah Akbar' ('God is Great'), three Lebanese hijackers surrendered to Syrian peacekeeping troops in Beirut after hijacking a Libyan 727.

**March 1, 1982**
**Hijacking** -- A United Airlines flight from Chicago to Miami.

**April 5, 1982**
**Hijacking** -- A Delta Airlines flight from Chicago to Miami.

**December 30, 1982**
**Hijacking** -- A United Airlines flight from Chicago to Pittsburg, hijacker demanded to be flown to Washington.

**January 7, 1983**
**Hijacking** -- Delta Airlines flight from Portland to Boston, hijacked by a man demanding to be flown to Las Vegas.

**January 20, 1983**
**Hijacking** -- Northwest Airlines from Seattle to Portland, Oregon, hijacker demanded to be flown to Afghanistan.

**May 1, 1983**
**Hijacking** -- A hijacker locked in a lavatory issued notes threatening to blow up the aircraft.

**July 17, 1983**
**Hijacking** -- Delta Airlines flight from Miami to Tampa.

**August 18, 1983**
**Hijacking** -- A Delta Airlines flight from Miami to Tampa.

**August 27, 1983**
**Hijacking** -- Air France Boeing 737 from Vienna, forced to Tehran.

**September 22, 1983**
**Hijacking** -- American Airlines flight from New York to St. Thomas.

**February 11, 1984**
**Hijacking** -- American Airlines flight from Port-au-Prince, Haiti to New York.

**March 7, 1984**
**Hijacking** -- Air France plane from Frankfurt to Paris, forced it to land in Geneva.

**March 28, 1984**
**Hijacking** -- Delta Air Lines flight from New Orleans to Dallas.

**April 5, 1984**
**Hijacking** -- Saudi Arabian Airlines flight from Jeddah, Saudi Arabia to Damascus, Syria, hijacker demanded to be taken to Sweden.

**Summer 1984**
**Hijacking Plot** -- During the Summer Olympic Games in Los Angeles, the FBI uncovered a plot to fly a crop-dusting plane into a filled Olympic stadium.

**November 5, 1984**
**Hijacking** -- A Saudi Arabian Airlines flight from Jeddah to Riyadh, Saudi Arabia forced to Tehran, Iran.

**December 4, 1984**
**Hijacking** -- Arab hijackers hijacked a Kuwait Air A-310 to Iran.

**December 31, 1984**
**Hijacking** - An American Airlines flight from St. Croix, Virgin Islands to New York hijacked by a prisoner under escort.

**1985**
**Simultaneous Bombing - 3 airports --** Jordanian Airline 727 at Beirut airport after being seized by Shi'ite Muslims. Simultaneous attacks using grenades and guns on the Rome and Vienna airports, loss of 20 lives and many injuries.

**March 17, 1985**
**Hijacking** -- A Saudi Arabian Airlines flight from Jeddah to Riyadh.

**June 14, 1985**

**Hijacking** -- TWA Flight 847 flight from Athens to Rome.


**June 11, 1985**
**Hijacking** -- Boeing 727 from Beirut to Amman by three Shi'ite Muslim Arabs

**June 23, 1985**
**2 Bombings** -- An Air India Boeing 747 from Toronto to London and New Delhi, mid-flight over the Irish Coast. Tokyo Airport, Japan a Sikh bomb exploded in an Air Canada aircraft, fatalities.

**October 7, 1985 (Not Aviation)**
**Hijacking** -- Italian cruise ship Achille Lauro in Egyptian waters.

**November 23, 1985**
**Hijacking** -- Abu Nidal Group seized control of an Egyptair 737 from Athens.

**December 27, 1985**
**Hijacking** -- A Saudi Arabian Airlines flight from Karachi, Pakistan to Riyadh.

**1986**
**Hijackings** -- 13 known hijackings of carrier aircraft worldwide, four of which are U.S. - registered aircraft.

**1986**
**Bombing** -- Two years prior to the Pam Am 103 Lockerbie bombing, Libya sponsored an attempt to blow up an American airliner over Tel Aviv. Palestinian terrorists hired to carry out the plot on a Pan Am jumbo jet seized but Pakistani troops storm the plane.

**February 5, 1986**
**Hijacking** -- Delta Airlines flight, Dallas-Forth-Worth Airport.

**February 27, 1986**
**Hijacking** -- Trans World Airlines, Miami to New York.

**March 4, 1986**
**Hijacking** -- An Olympic Airways B-737 from Athens to Santorini demanded to be taken to Libya.

**March 14, 1986**
**Hijacking** -- Delta Airlines DC-9, Dallas to Phoenix is hijacked by a man attempting to commit suicide.

**March 30, 1986**
**Bombing** -- TWA Flight 840 approaching Athens airport, by Palestinian terrorists.

**April 2, 1986**
**Bombing** -- Bomb planted under Seat 10F in a TWA Boeing 727 from the United States via Rome, Athens and Cairo. Abu Nidal's terrorist group claims credit.

**May 2, 1986**
**Hijacking** -- Horizon Airlines SA-227 plane, Eugene to Portland, Oregon

**May 3, 1986**
**Hijacking** -- China Airlines B-747, Bangkok, Thailand to Hong Kong.

**May 20, 1986**
**Hijacking** -- A Finn Air DC-9 from Oulu to Helsinki.

**May 23, 1986**
**Hijacking** -- Swiss Air DC-10 from Chicago to Zurich.

**July 5, 1986**
**Hijacking** -- Sudan Airways B-707 from Baghdad, Iraq to Khartoum, Sudan.

**August 28, 1986**
**Hijacking** -- LOT Airlines TU-134 from Wroclaw to Warsaw, Poland.

**September 5, 1986**
**Hijacking** -- Pan Am Flight 73 in Karachi.

**September 5, 1986**
**Hijacking** -- A Pan Am 747 at Karachi.

**September 20, 1986**
**Hijacking** -- Aeroflot TU-134 Kiev, to Ufa, to Nizhnevartovsk, USSR.

**October 5, 1986**
**Hijacking** -- Abu Nidal terrorists hijack a Pan Am B747 at Karachi.

**November 10, 1986**
**Hijacking** -- Iran Air A-300 from Tehran to Tabriz, Iran.

**December 25, 1986**
**Hijacking** -- Iraqi Airways flight crashed near Arar, Saudi Arabia after being hijacked by 4 assailants who tried to enter the cockpit.

**January 5, 1987**
**Hijacking** -- Delta Airlines flight.

**January 10, 1987**
**Hijacking** -- New York Air DC-9 from Newark to Washington Dulles.

**March 7, 1987**
**Hijacking** -- Alaska Airlines plane from Seattle to Anchorage.

**March 10, 1987**
**Hijacking** -- Cubana Airlines plane from Havana to Nueva Gerona, Cuba.

**March 11, 1987**
**Hijacking** -- Antonov 24RV operated by Cubana de Aviacion from Nueva Gerona.

**May 5, 1987**
**Hijacking** -- Iran Air hijacked from Shiraz to Tehran, Iran.

**June 5, 1987**
**Hijacking** -- Virgin Islands Seaplane flight from St. Croix to San Juan.

**July 3, 1987**
**Hijacking** -- Alaska Airlines flight from Seattle to Anchorage.

**July 24, 1987**

**Hijacking** -- Air Afrique DC-10-30 from Brazzaville Maya to Paris.

**September 8, 1987**
**Hijacking** -- LOT plane from Warsaw to Athens.

**October 1, 1987**
**Hijacking** -- New York Air flight from Newark to Washington.

**November 6, 1987**
**Hijacking** -- Air Canada B-767 from San Francisco to Toronto.

**November 29, 1987**
**Bombing** -- North Korean agents plant a bomb on Korean Airlines Flight 858. The plane crashed into the Indian Ocean.

**December 7, 1987**
**Pilots Shooting** - Deliberate crashing of Pacific Southwest Airlines Flight 1771, Paso Robles, CA, after a disgruntled former employee shoot pilot and co-pilot in flight.

**December 23, 1987**
**Hijacking** -- KLM B-737 from Amsterdam to Rome.

**January 4, 1988**
**Hijacking** -- Aeromexico DC-9 from Mexico City.

**February 13, 1988**
**Hijacking** -- Air Tanzania B-737 from Dar Es Salaam to Kilimanjaro.

**February 22, 1988**
**Hijacking** -- China Airlines B-737 from Taipei to Kaohsiung.

**March 8, 1988**
**Hijacking** -- Aeroflot TU-154 from Irkutsk to Leningrad.

**March 12, 1988**
**Hijacking** -- Pakistan International Airlines A-300 from Karachi to Quetta.

**April 5, 1988**
**Hijacking** -- Kuwait Airlines Flight 422 from Bangkok.

**May 12, 1988**
**Hijacking** -- Xiamen Airlines B-737 from Xiamen to Guangzhou-Baiyun.

**May 23, 1988**
**Hijacking** -- Avianca B-727 from Medellín to Bogotá, Colombia.

**October 1, 1988**
**Hijacking** -- American Airlines A-300 from Port-au-Prince, Haiti to New York, NY.

**October 22, 1988**
**Hijacking** -- Flight en route from Tehran to Vienna to Frankfurt.

**December 2, 1988**
**Hijacking** -- Aeroflot IL 76 from Mineralnyye Vody, USSR.

**December 11, 1988**
**Hijacking** -- Trans World Airlines flight from San Juan to Miami.

**December 21, 1988**
**Bombing** -- Pan Am Flight 103 over Lockerbie, Scotland by Libyan terrorist.

**January 20, 1989**
**Hijacking** -- Aeroflot TU-134 from Arkhangelsk to Odessa.

**January 21, 1989**
**Hijacking** -- Aeroflot Antonov 24 from Ivano Frankovsk to Kiev.

**January 31, 1989**
**Hijacking** -- Aerolineas Centrales de Colombia ACES B-727 from San Andreas to Medellin.

**March 29, 1989**
**Hijacking** -- Malev Hungarian Airlines TU-154 from Budapest to Prague to Amsterdam.

**March 31, 1989**
**Hijacking** -- Aeroflot Airlines TU-154 from Astrakhan to Baku.

**April 10, 1989**
**Hijacking** -- Mission Aviation Cessna 402C from Cap-Haitian, Haiti to Fort Lauderdale, Florida.

**April 24, 1989**
**Hijacking** -- China Eastern Airlines YUN-7 from Ningbo to Xiamen.

**May 18, 1989**
**Hijacking** -- Aeroflot IL-62 from Luanda, Angola and Dar Es Salaam, Tanzania.

**May 26, 1989**
**Hijacking** -- CSA Ceskoslovenske Aerolinie YAK-40 from Prague to Carlsbad, Czechoslovakia.

**May 27, 1989**
**Hijacking** -- American Airlines flight from Dallas to Miami.

**May 31, 1989**
**Hijacking** -- ALM Antillean Airlines MD-80 flight from Miami to Haiti to Curacao.

**August 23, 1989**
**Hijacking** -- Air France A-300 flight from Paris to Algiers.

**September 1989**
**Bombing** -- Terrorists explode in midair French UTA Flight 772, from Brazzaville, Congo to Paris.

**September 19, 1989**
**Hijacking** -- Royal Air Maroc ATR-42 flight from Casablanca to El Aaiun Asmara.

**October 6, 1989**
**Hijacking** -- Myanmar Airways F-28 flight from Myeik Airport to Yangon-Mingaladon Airport, Burma.

**November 1989**
**Bombing --** Columbia Avianca Flight 203 from Bogota to Cali, Columbia.

**November 12, 1988**
**Hijacking** -- Trans World Airlines flight from San Juan to Miami.

**December 11, 1989**
**Hijacking** -- Trans World Airlines flight from San Juan to Miami.

**December 16, 1989**
**Hijacking** -- CAAC B-747 flight from Beijing to Shanghai to San Francisco.

**December 31, 1989**
**Hijacking** -- Saudi Arabian Airlines flight from Jeddah to Riyadh, Saudi Arabia.

**January 3, 1990**
**Hijacking** -- LATN Cessna-402 flight from Asuncion to somewhere in Paraguay.

**January 16, 1990**
**Hijacking** -- America West Airlines B-737 flight from Houston to Las Vegas

**January 18, 1990**
**Hijacking** -- United Airlines flight from San Francisco to Seattle.

**January 26, 1990**
**Hijacking** -- Iran Air B-727 flight from Shiraz to Bandar Abbas.

**April 2, 1990**
**Hijacking** -- American Airlines flight from Port-au-Prince, Haiti to New York, NY.

**April 18, 1990**
**Hijacking** -- Aeroflot TU-134 flight from Moscow to Leningrad.

**May 29, 1990**
**Hijacking** -- Military AN-26 flight from Mogadishu to Hargessa, Somalia.

**June 8, 1990**
**Hijacking** -- Aeroflot TU-154 flight from Minsk to Murmansk, USSR.

**June 19, 1990**
**Hijacking** -- Aeroflot TU-134 flight from Riga to Murmansk, USSR.

**June 24, 1990**
**Hijacking** -- Aeroflot TU-134 flight from Tallinn to Lvov, USSR.

**June 28, 1990**
**Hijacking** -- Aeroflot TU-134 flight from Krasnodar to Krasnoyarsk, USSR.

**June 30, 1990**
**Hijacking** -- Aeroflot TU-154 flight from Lvov to Leningrad, USSR.

**July 4, 1990**
**Hijacking** -- Aeroflot TU-134 flight from Sochi to Rostov, USSR.

**July 5, 1990**

**Hijacking** -- Aeroflot TU-154 flight from Leningrad to Lvov, USSR.

**July 5, 1990**
**Hijacking** -- Aeroperlas Twin Otter 300 flight from Colon to Panama City, Panama.

**July 10, 1990**
**Hijacking** -- Aeroflot TU-154 flight from Leningrad to Murmansk, USSR.

**July 12, 1990**
**Hijacking** -- Aeroflot TU-154 flight from Leningrad to Murmansk, USSR.

**July 18, 1990**
**Hijacking** -- Aeroflot TU-134 flight from Odessa to Sukhumi, USSR.

**July 23, 1990**
**Hijacking** -- Aeroflot TU-134 flight from Riga to Murmansk, USSR.

**August 16, 1990**
**Hijacking** -- Ethiopian Airlines flight to Yemen.

**August 19, 1990**
**Hijacking** -- Aeroflot TU-154 flight from Neryungri to Yakutsk, USSR.

**August 20, 1990**
**Hijacking** -- American Airlines flight from Charleston, South Carolina was hijacked by a man with a knife.

**August 30, 1990**
**Hijacking** -- Aeroflot AN-2 flight from Voronezh, USSR to unknown destination.

**August 30, 1990**
**Hijacking** -- Aeroflot YAK-42 flight from Moscow to Voronezh, USSR.

**September 13, 1990**
**Hijacking** -- India Airlines flight B-737 from Coimbatore to Madras, India.

**September 25, 1990**
**Hijacking** -- Aeroflot flight from Leningrad to Archangelsk, USSR.

**October 2, 1990**
**Hijacking** -- Xiamen Airlines B-737 flight from Xiamen to Guangzhou, China.

**October 5, 1990**
**Hijacking** -- Aeroflot YAK-40 flight from Novgorod to Petroskoi, USSR.

**October 5, 1990**
**Hijacking** -- Aerotaxi Airlines Cessna-210 flight from San Fernando de Atabapo to Puerto Ayacucho, Venezuela.

**October 7, 1990**
**Hijacking** -- Aeroflot AN-24 flight from Perm to Archangelsk, USSR.

**November 10, 1990**
**Hijacking** -- Thai International Airlines A-320 flight from Rangoon, Burma to Bangkok, Thailand.

**November 12, 1990**
**Hijacking** -- Aeroflot TU-154 flight from Leningrad to Lvov, USSR.

**November 15, 1990**
**Hijacking** -- Aeroflot TU-134 flight from Leningrad to Moscow, USSR.

**November 16, 1990**
**Hijacking** -- Aeroflot TU-134 flight from Tallinn to Moscow, USSR.

**November 29, 1990**
**Hijacking** -- Aeroflot TU-134 flight from Moscow to Sykyvkar, USSR.

**December 2, 1990**
**Hijacking** -- Aeroflot TU-154 flight from Murmansk to Leningrad, USSR.

**December 6, 1990**
**Hijacking** -- CAAC flight from Guangzhou to Quingdao, China.

**December 11, 1990**
**Hijacking** -- Aeroflot YAK-40 flight from Baku to Tbilisi, USSR.

**December 21, 1990**
**Hijacking** -- Aeroflot TU-154 flight from Rostov to Nizhnevartovsk, USSR.

**December 24, 1990**
**Hijacking** -- Aeroflot IL-86 flight from Moscow to Sochi, USSR.

**December 28, 1990**
**Hijacking** -- Air Algiere B-737 flight from Ghardaia to Algiers, Algeria.

**January 7, 1991**
**Hijacking** -- Faucett Airlines Flight 339, Trujillo to Lima, Peru.

**January 21, 1991**
**Hijacking** -- Aeroflot Tupolev-154 (TU-154) aircraft from Tashkent to Odessa.

**February 10, 1991**
**Hijacking** -- Southwest Airlines B-737 Flight 335 from Oakland to Austin.

**February 13, 1991**
**Hijacking** -- Aeroflot Flight 930, from Tbilisi and Moscow.

**March 4, 1991**
**Hijacking** -- Aeroflot Anotnov-24 from Arkhangelsk to Leningrad.

**March 6, 1991**
**Hijacking** -- Transportes Aereos de Bacia Amazonica Airlines (TABA) Flight 835, to Manaus.

**March 14, 1991**
**Hijacking** - Aeroflot Yakovlev-42 from Moscow to Naberezhnye Chelny

**March 26, 1991**
**Hijacking** -- Singapore Airlines Flight 117 from Kuala Lumpur, Malaysia, to Singapore.

**March 28, 1991**
**Hijacking** -- TU-134 aircraft from Arkhangelsk-Leningrad-Kalilingrad.

**March 31, 1991**
**Hijacking** -- Air Algerie B-737 from Bechar to Algiers.

**April 29, 1991**
**Hijacking** -- Aeroflot TU-154 from Barnaul to Moscow.

**June 13, 1991**
**Passenger Bomb Threat** -- Aeroflot TU-154 from Rostov to Moscow.

**June 17, 1991**
**Passenger Bomb Threat** -- Aeroflot TU-154 aircraft from Krasnodar to Krasnoyarsk via Orenburg.

**June 30, 1991**
**Hijacking** -- Somali Airlines aircraft from Djibouti to Mogadishuked.

**August 20, 1991**
**Hijacking** -- San Martin Airlines aircraft from Caqueta to Villavicencio.

**September 7, 1991**
**Hijacking** -- Cessna Caravan 208 of the Colombian SATENA (National Territory Air Service) from Bogota to San Jose del Guaviare.

**September 19, 1991**
**Hijacking** -- Alitalia DC-9 from Rome to Tunis.

**October 11, 1991**
**Hijacking** -- Flight from Rurrenbaque to Trinidad.

**October 16, 1991**
**Hijacking** -- Ethiopian Airlines Twin Otter DHC-6 from Debre Markos to Bahir Dar.

**October 21, 1991**
**Hijacking** -- Czechoslovak Airlines Tupolev-134 from Bratislava to Prague.

**October 27, 1991**
**Hijacking** -- Beechcraft aircraft from Trujillo to Tocache.

**October 27, 1991**
**Hijacking** -- Aero Commander 6-90 twin turboprop from Guayaquil to Lago Agrio.

**November 1991**
**Hijacking Plot Foiled** -- Islamic fundamentalist group to hijack two airplanes outside Spain and fly them into Madrid, where Middle East peace talks were being held. One aircraft was to crash into the Spanish Royal Palace, killing President Bush, Mikhail Gorbachev, and other world leaders. The second plane was intended to crash into a hotel where the Soviet delegation to the conference was staying.

**November 9, 1991**
**Hijacking** -- Aeroflot TU-154 on a flight from Mineralnyye Vody to Ekaterinburg.

**November 13, 1991**
**Hijacking** -- Aeroflot TU-154 from Irkutsk to St. Petersburg.

**November 23, 1991**
**Hijacking** -- Girasol Company twin-engine aircraft departing Tefe.

**November 25, 1991**
**Hijacking** -- Ethiopian Airlines B-737 from Addis Ababa to Dire Dawa, Ethiopia.

**November 25, 1991**
**Hijacking** -- Flight in Papua New Guinea.

**January 31, 1992**
**Hijacking** -- Aerotaxi International Cessna Grand Caravan commuter from Paitilla Airport in Panama City to El Porvenir.

**February 5, 1992**
**Hijacking** -- Ethiopian Airlines Twin Otter DHC-6 aircraft between Addis Ababa and Bahir Dar.

**March 12, 1992**
**Hijacking** -- Aerotaxi International Britten-Norman 2A-6 from El Porvenir to Panama City.

**April 1, 1992**
**Hijacking** -- Ethiopian Airlines 727 from Dire Dawa to Addis Ababa.

**April 9, 1992**
**Hijacking** -- Cessna 172 aircraft during a charter flight from Pine Bluff to Little Rock, Arkansas.

**April 12, 1992**
**Hijacking** -- Ethiopian Airlines Flight 574, a 727, out of Addis Ababa.

**May 16, 1992**
**Hijacking** -- Aerotaca Twin Otter from Bogota to Bucaramanga via Yopal, Colombia.

**May 29, 1992**
**Hijacking** -- Aeroexpreso helicopter between Bogota and Yopal.

**June 7, 1992**
**Hijacking** - Aircraft in Colorado

**June 7, 1992**
**Hijacking** -- Aeroflot-Russian International Airlines Tupolev-154 from Grozny to Moscow.

**July 26, 1992**
**Hijacking** - A Corsica helicopter to Cavallo between Corsica and Sardinia.

**August 13, 1992**
Lvov Air Transport Enterprises YAK-42 from Simferopol to Lvov.

**August 28, 1992**
**Hijacking** -- Ethiopian Airlines 727 from Addis Ababa to Bahir Dar.

**September 4, 1992**
**Hijacking** -- Vietnam Airlines Bulgarian Jes Air A-310 between Bangkok, Thailand, and Ho Chi Minh City, Vietnam.

**September 4, 1992**
**Hijacking** -- Ethiopian Airlines Flight 727 from Dire Dawa to Addis Ababa.

**December 29, 1992**
**Hijacking** -- Aerocaribbean from Havana to Varadero Airport.

**January 22, 1993**
**Hijacking** -- Indian Airlines flight en route from Lucknow to New Delhi.

**February 11, 1993**
**Hijacking** -- Lufthansa flight from Frankfurt, Germany to Addis Ababa, Ethiopia via Cairo, Egypt.

**February 20, 1993**
**Hijacking** -- Aeroflot Flight 2134 from Tjumen, in western Siberia, to St. Petersburg.

**March 12, 1993**
**Hijacking** -- Ethiopian Airlines Aerospatiale/Aeritalia (ATR)-42 from Gambela to Addis Ababa.

**March 27, 1993**
**Hijacking** -- Indian Airlines Flight Airbus A320 from New Delhi to Madras.

**April 6, 1993**
**Hijacking** -- China Southern Airlines 757 from Shenzen to Beijing, China.

**April 10, 1993**
**Hijacking** -- Indian Airlines 737 from Lucknow to New Delhi.

**April 18, 1993**
**Hijacking** -- Colombian airliner Intercontinental de Aviacion DC-9 from Arauca to Bogotá.

**April 24, 1993**
**Hijacking** -- Indian Airlines 737 aircraft to Srinagar from New Delhi.

**June 24, 1993**
**Hijacking** -- Xiamen Airlines B-737-2501 from Changzhou, Jiangsu Province, to Xiamen.

**July 4, 1993**
**Hijacking** -- Royal Swazi National Airways Corporation Fokker F-28 aircraft from Maputo, Mozambique, to Manzini, Swaziland.

**July 25, 1993**
**Hijacking** -- Ethiopian Airlines 757 from Dire Dawa to Addis Ababa.

**August 10, 1993**
**Hijacking** -- Air China 767-200 aircraft from Beijing, China, to Jakarta, Indonesia.

**August 14, 1993**

**Hijacking** -- Aeroflot to Moscow from St. Petersburg.

**August 15, 1993**
**Hijacking** -- Royal Dutch Airlines (KLM) 737 from Tunis to Amsterdam to win release of Shaykh Omar Abdel Rahman.  Several of the Shaykh's followers had been charged in the February 1993, World Trade Center bombing in New York City.

**August 27, 1993**
**Hijacking** -- Alyemda-Democratic Yemen Airlines B-737 from Ar-Riyan to Al-Ghaydah.

**September 15, 1993**
**Hijacking** -- Aeroflot TU-134 from Baku, Azerbaijan, to Perm, Russia.

**September 30, 1993**
**Hijacking** -- Sichuan Airlines Tupolev 154 from China to Taiwan.

**October 22, 1993**
**Hijacking** -- Egypt Air from Cairo, Egypt to Sanaa, Yemen.

**October 25, 1993**
**Hijacking** -- Nigerian Airways Airbus A310 from Lagos to Abuja.

**November 5, 1993**
**Hijacking** -- Xiamen Airlines B-737 from Guangzhou to Xiamen.

**November 8, 1993**
**Hijacking** -- Zheijang Airlines Airbus A300 from Hanzhou to Fuzhou.

**November 12, 1993**
**Hijacking** -- China Northern Airlines MD-82 from Changchun to Fuzhou.

**November 27, 1993**
**Hijacking** -- China Eastern Airlines Fokker 100'2231 from Nanjing to Fuzhou.

**November 29, 1993**
**Hijacking** -- Iran Air Fokker F-27 from Gachsaran to Ahvaz.

**December 8, 1993**
**Hijacking** -- China Northern Airlines MD-82 from Qingdao to Fuzhou. A man with a surgical scalpel overpowered s one of the flight attendants and demands that the pilots open the cockpit door. He claims to have an explosive device.

**December 10, 1993**
**Hijacking** -- Air France Airbus A320 near Nice from Paris.

**December 12, 1993**
**Hijacking** -- Xiamen Airlines 737 from Harbin to Xiamen.

**December 28, 1993**
**Hijacking** -- Fujian Airlines Yunshuji-7 from Ganzhou to Xiamen.

**December 28, 1993**
**Hijacking** -- Air China from Beijing to New York.

**December 28, 1993**
**Hijacking** -- Xiamen Airlines B-727 flight from Ningbo to Xiamen.

**January 13, 1994**
**Hijacking** -- Indian Airlines from Madras to Calcutta.

**January 23, 1994**
**Hijacking** -- Ethiopian Airlines 757 from Dakar, Senegal, to Bamako, Mali.

**January 29, 1994**
**Hijacking** -- China East Airlines Flight 5513 from Shanghai to Hanzhou.

**February 9, 1994**
**Hijacking** -- Ethiopian Airlines B-737 from Bahir Dar to Addis Ababa.

**February 18, 1994**
**Hijacking** -- Chinese Southwest Airlines 737 from Changsha to Fuzhou.

**February 28, 1994**
**Hijacking** -- Air Algerie from Oran to Annaba.

**March 8, 1994**
**Hijacking** -- Saudi Arabian Airlines from Jeddah, Saudi Arabia to Addis Ababa, Ethiopia.

**March 21, 1994**
**Hijacking** -- Meridiana DC-9 from Palermo to Rome.

**April 6, 1994**
**Hijacking** -- Sudan Airways 737 from Khartoum to Dongola.

**April 7, 1994**
**Hijacking and attempted murder of pilots and deliberate crashing of plane into building** -- Federal Express flight commandeered by off-duty pilot fractured skulls of the pilots, and planed to crash into the Federal Express hub at the Memphis airport.  Pilots fought with hijackers and saved the plane.

**April 25, 1994**
**Hijacking** -- Ethiopian Airlines 757 from Jeddah, Saudi Arabia, to Addis Ababa, Ethiopia.

**May 26, 1994**
**Hijacking** -- Garuda Airlines from Indonesia to Australia.

**June 7, 1994**
**Hijacking** -- China Southern Airlines 737 from Fuzhou to Guangzhou.

**June 23, 1994**
**Hijacking** -- Ethiopian Airlines from Gonder to Addis Ababa.

**August 7, 1994**
**Hijacking** -- COPA 737 to Panama City from Guatemala City.

**August 29, 1994**
**Hijacking** -- LATN airliner from Pedro Juan Caballero, Paraguay, to Asuncion.

**September 11, 1994**
**Crash into White House** - Cessna P150 from Maryland through Washington's protected no-fly air space into the White House property.

**October 22, 1994**
**Hijacking** -- Transportes Aereos Da Bacia Amazonica De Haviland Dash-8 from Itaituba, Brazil to Belen.

**October 25, 1994**
**Hijacking** -- Rostov Aviation Enterprises D9-156 from Ashgabad, Turkmenistan, to Rostov, Russia.

**November 3, 1994**
**Hijacking** -- Scandinavian Airlines System (SAS) MD-80 from Bardafoss to Oslo.

**November 24, 1994**
**Hijacking** -- Komiavia TU-134 from Syktyvkar, Russia, to Minsk, Belarus.

**December 5, 1994**
**Hijacking** -- Puntavia LET L-410 from Berbera, Somalia to Djibouti, Djibouti.

**December 11, 1994**
**Bombing** -- Philippine Airlines 747 to Tokyo's Narita Airport bomb under passenger seat. A precursor for al Qaeda's Bojinka Plot, masterminded by Ramzi Yousef and Khalid Sheikh Mohammed.

**December 15, 1994**
**Hijacking** -- TABA commuter Embraer EMB 100 Banderirante between Carauari and Manaus.

**December 24-26, 1994**
**Hijacking** -- Air France flight in Algiers, planned to crash into the Eiffel Tower.

**January 4, 1995**
**Hijacking** -- Sudan Airways Fokker from Khartoum to Merowe, Sudan.

**March 17, 1995**
**Hijacking** -- Ethiopian Airlines 737 from Addis Ababa to Bahr Dar.

**April 10, 1995**
**Hijacking Plot Foiled** -- Plan to fly a plane into the CIA headquarters. Board any American commercial aircraft pretending to be an ordinary passenger, then hijack aircraft, control its cockpit and dive it at the CIA headquarters. No bomb or explosive. It is simply a suicidal mission.

**June 21, 1995**
**Hijacking** -- All Nippon Airways flight 747 from Tokyo to Hokkaido.

**July 1, 1995**
**Hijacking** -- Domodedovo Airlines IL-62 from Yakutsk to Moscow.

**July 30, 1995**
**Hijacking** -- La Costena Airline commuter from Managua to Bluefields, Nicaragua.

**August 3, 1995**
**Hijacking** -- A Chinese man attempts to hijack a China Eastern Airlines Airbus 300 during a flight from Shanghai to Guangzhou.

**August 15, 1995**
**Hijacking** -- A man claiming to have a gasoline bomb hijacks Phoenix Airways Flight 506 and demands transit to Cuba. The hijacking takes place shortly after the Boeing-727-023 aircraft departs Cape Town en route to Johannesburg.

**August 15, 1995**
**Terrorist Attack Threat** -- A threat of terrorist attack by Middle Eastern militants -- possibly a "suicide massacre" -- placed New York's three major airports.

**Hijacking** -- Britten-Norman Islander aircraft from Jackson's Airport in Port Moresby to Asimba, Oro Province [Papua New Guinea].

**September 3, 1995**
**Hijacking** -- Air Inter from Palma de Mallorca, Spain, to Paris, France.

**September 19, 1995**
**Hijacking** -- Iranian flight hijacked by flight steward.

**November 9, 1995**
**Hijacking** -- Olympic Airways from Bangkok, Thailand to Athens.

**December 8, 1995**
**Hijacking Threat** -- Islamic group threatens to hijack Pakistani aircraft and attack Pakistani airports if the Pakistani government does not stop its campaign against al Qaeda.

**December 15, 1995**
**Hijacking** -- Saudi Arabian Airlines from Jeddah, Saudi Arabia to Addis Ababa, Ethiopia.

**December 26, 1995**
**Hijacking** -- Saudi Arabian Airlines from Jeddah to Addis Ababa, Ethiopia.

**January 6, 1996**
**Hijacking** -- Transasia Airways Airbus 321 from Taipei to Tainan.

**March 8, 1996**
**Hijacking** -- Cyprus Turkish Airlines from Ercan Airport in northern Cyprus to Istanbul, Turkey.

**March 10, 1996**
**Hijacking** -- Hainan Airlines 737 aircraft.

**March 24, 1996**
**Hijacking** -- Sudan Airways from Khartoum to Port Sudan.

**March 27, 1996**
**Hijacking** - Egypt Air from Luxor, Egypt.

**April 4, 1996**
**Hijacking** -- Biman Bangladesh Airlines from Dhaka to Barisal.

**July 7, 1996**
**Hijacking** -- Cuban national air service Antonov AN-2, Cubanacan, and forced to land at the U.S. navy base at Guantanamo.

**July 26, 1996**
**Hijacking --** Iberia DC-10 from Barajas Airport in Madrid to Havana, Cuba.

**August 9, 1996**
**Hijacking --** Air Mauritania Fokker 28 from Las Palmas to the capital, Nouakchott.

**August 26, 1996**
**Hijacking --** Sudan Airlines from Khartoum, Sudan to Amman, Jordan.

**October 17, 1996**
**Hijacking --** Aeroflot TU-154 from Moscow, Russia, to Lagos, Nigeria.

**November 23, 1996**
**Hijacking --** Ethiopian Airlines 767 from Addis Ababa, Ethiopia, to Nairobi, Kenya.

**January 7, 1997**
**Hijacking --** Austrian Airlines MD-80 from Berlin, Germany, to Vienna, Austria.

**January 20, 1997**
**Hijacking --** All Nippon Airways 777 from Osaka to Fukuoka.

**February 10, 1997**
**Hijacking --** China Northwest Airlines from Chongqing, Sichuan Province, to Zhuhai, Guangdong Province.

**March 10, 1997**
**Hijacking --** Far East Air Transport 757 from Kaohsiung to Taipei in Taiwan.

**June 2, 1997**
**Hijacking --** Air China 747 or 777 between Beijing and Guangzhou.

**June 9, 1997**
**Hijacking --** Air Malta flight diverted to Cologne-Bonn Airport in Germany.

**October 6, 1997**
**Hijacking --** Iran Air flight from Tehran to Bandar Abbas.

**December 19, 1997**
**Hijacking --** Aero Condor BE-200 from Lima to Chimbote.

**December 22, 1997**
**Hijacking --** China Eastern Airlines between Shanghai and Xiamen.

**January 31, 1998**
**Hijacking --** Atlantic Airlines after takeoff from Bluefields, Nicaragua.

**February 24, 1998**
**Hijacking --** Turkish Airlines Avro RJ100 after takeoff from Adana.

**March 30, 1998**
**Hijacking --** Cyprus Turkish Airlines 727 after takeoff from Cyprus.

**May 24, 1998**
**Hijacking --** Pakistan International Airlines flight from Turbat, in Baluchistan Province.

**June 23, 1998**
**Hijacking --** Iberia flight from Seville diverted to Valencia Airport.

**July 25, 1998**
**Hijacking --** Aviones de Oriente from Caracas to Barinas State.

**September 14, 1998**
**Hijacking --** THY flight from Ankara to Istanbul.

**October 28, 1998**
**Hijacking --** Air China from Beijing to Kunming.

**October 28, 1998**
**Hijacking --** A man with a handgun and a grenade hijacks THY flight 487, which had departed Adana at approximately 7:45 p.m. en route to Ankara.

**March 2, 1999**
**Hijacking --** Flight 5029 from Marseille to Paris and diverts the Airbus A-320 aircraft to Paris's Charles de Gaulle Airport.

**April 12, 1999**
**Hijacking --** Avianca aircraft between Bucaramanga and Bogota.

**June 12, 1999**
**Hijacking --** Xiamen Airlines from Shanghai to Xiamen.

**July 23, 1999**
**Hijacking --** All Nippon Airways after departing Tokyo's Haneda Airport.

**July 30, 1999**
**Hijacking --** Venezuelan Aviones de Oriente Airlines (AVIOR) from Caracas to Guasdualito via Barinas.

**August 25, 1999**
**Hijacking --** Royal Air Moroc flight from Casablanca, Morocco, to Tunis, Tunisia.

**October 19, 1999**
**Hijacking --** EgyptAir 737 shortly after departure from Istanbul, Turkey.

**October 26, 1999**
**Hijacking --** Iran Air domestic between Tehran and Orumiyah.

**November 23, 1999**
**Hijacking --** Zhejiang Airlines between Yiwu and Xiamen.  Hijacker was overtaken by crew.

**December 24, 1999**
**Hijacking --** Indian Airlines Airbus bound from Kathmandu to New Delhi.

**December 24, 1999**
**Hijacking --** Indian Airlines to New Delhi, India, from Kathmandu, Nepal.

**December 28, 1999**
**Hijacking --** Lufthansa commuter jet from Prague, Czech Republic, to Duesseldorf, Germany.

**February 6, 2000**
**Hijacking --** Arian Afghan Airlines 727 from Kabul to Mazar-i-Sharif, Afghanistan.

**February 19, 2000**
**Hijacking --** Colombian Aerotransportes Casanare SA (Aerotaca) plane forced to land at a remote airstrip.

**February 29, 2000**
**Hijacking --** China Southwest Airlines to Fuzhou from Chengdu via Nanchang.

**May 11, 2000**
**Hijacking --** EgyptAir from Cairo to Aswan.

**May 22, 2000**
**Hijacking --** Missionary Aviation Fellowship from Erave to Batiri.

**May 25, 2000**
**Hijacking --** Philippine Airlines Airbus A330.

**July 5, 2000**
**Hijacking --** Royal Jordanian to Damascus, Syria, from Amman, Jordan.

**July 17, 2000**
**Hijacking --** British Airways City Flyer Express to London's Gatwick Airport from Zurich, Switzerland.

**July 27, 2000**
**Hijacking --** National Airlines from New York's JFK International to Las Vegas.

**July 29, 2000**
**Hijacking --** National Airlines 757 set to fly to Las Vegas takes the pilot and co-pilot hostage.

**August 16, 2000**
**Hijacking --** VASP airliner and steal the equivalent of almost (U.S.) $3 million from the cargo hold.

**August 18, 2000**
**Hijacking --** Azerbaijan Airlines between Nakhichevan and Baku.

**September 8, 2000**
**Hijacking --** Colombia's Aires S. A. from Nieva-to-Florencia.

**September 14, 2000**
**Hijacking --** Qatar Airways Airbus A.300 from Doha, Qatar Airport to Amman, Jordan.

**September 14, 2000**
**Hijacking --** Qatar Airways from Doha, Qatar, to Amman, Jordan.

**September 24, 2000**
**Hijacking --** Iran Air flight for Tehran from Shiraz.

**September 27, 2000**
**Hijacking --** Xinhua Airlines 737 from Baotou in Inner Mongolia to Beijing.

**September 28, 2000**
**Hijacking --** Royal Jordanian from Sana'a, Yemen, to Amman, Jordan.

**October 13, 2000**
**Hijacking --** Sabena flight 689 forced to make emergency landing in Malaga, Spain.

**October 14, 2000**
**Hijacking --** Saudi Arabian Airlines bound for London, England.

**October 14, 2000**
**Hijacking --** Saudi Arabian Airlines 777 from Jeddah, Saudi Arabia to London.

**November 1, 2000**
**Hijacking --** North Coast Aviation from Wau to Port Moresby.

**November 11, 2000**
**Hijacking --** Vnukovo Airlines between Makhachkala, Dagestan, and Moscow.

**November 13, 2000**
**Hijacking --** Iranian Ariatour Airlines Yakovlev YAK 40 from Ahvaz to Bandar Abbas.

**January 17, 2001**
**Airport Seizure Attempt --** In India, six members of the Lashkar-e-Tayybah militant group are killed when they attempt to seize a local airport.

**May 2001**
**Airline Uniform/Credential Heist --** An American Airlines crew discovers that their uniforms, documents, and identification badges have been stolen from a hotel.

**July 2001**
**Airspace Closure Due to Potential Terrorist Attack -** Italian government closed airspace over Genoa and mounted anti-aircraft batteries, based on information that Islamic extremists were planning to use an airplane to kill President Bush during the Genoa summit of the Group of Eight industrial powers. There was the possibility of an attack against the U.S. President using an airliner.

**July 1, 2001**
**Terrorist Attack Plot Thwarted --** Djamel Begal, an Algerian member of Al Qaeda, is arrested in the United Arab Emirates upon the discovery of his plot to crash a helicopter into the U.S. Embassy in Paris.

**July 2001**
Los Angeles International Airport was revealed as a target of an Algerian with bomb material, Ahmed Ressam, who was arrested in the state of Washington in late 1999 and later convicted, but the L.A. airport was not revealed as the terrorist target until the trial of an accomplice in July 2001. "The FAA asked all airports and air carriers to assess their vulnerability and come up with common sense ways they might improve security," says agency spokeswoman Rebecca Trexler. The New York trial disclosure prompted the notice, she said.

<u>Sources</u>

*"Airport Security." Federal Aviation Administration. Docket No. 28979; Notice No. 97-13.*

*Aviation Safety Network, Hijackings Database,* <u>http://aviation-safety.net/database/</u>

*"Aviation Security" By Judy Rumerman. U.S. Centennial of Flight Commission. 2003.*
*( http:www.centennialofflight.gov/essay/Government_Role/security/POL18.htm)*

*"Bizarre ordeal recounted in Ethiopian Airlines Crash," CNN World News, November 24, 1996*

*"Criminal Acts Against Civil Aviation." U.S. Department of Transportation. 1986.*

*"Criminal Acts Against Civil Aviation." U.S. Department of Transportation. 1987.*

*"Criminal Acts Against Civil Aviation." U.S. Department of Transportation. 1988.*

*"Criminal Acts Against Civil Aviation." U.S. Department of Transportation. 1989.*

*"Criminal Acts Against Civil Aviation." U.S. Department of Transportation. 1990.*

*"Criminal Acts Against Civil Aviation." U.S. Department of Transportation. 1991.*

*"Criminal Acts Against Civil Aviation." U.S. Department of Transportation. 1992.*

*"Criminal Acts Against Civil Aviation." U.S. Department of Transportation. 1993.*

*"Criminal Acts Against Civil Aviation." U.S. Department of Transportation. 1994.*

*"Criminal Acts Against Civil Aviation." U.S. Department of Transportation. 1995.*

*"Criminal Acts Against Civil Aviation." U.S. Department of Transportation. 1996.*

*"Criminal Acts Against Civil Aviation." U.S. Department of Transportation. 1997.*

*"Criminal Acts Against Civil Aviation." U.S. Department of Transportation. 1998.*

*"Criminal Acts Against Civil Aviation." U.S. Department of Transportation. 1999.*

*"Criminal Acts Against Civil Aviation." U.S. Department of Transportation. 2000.*

*"Domestic News," The Associated Press. September 18, 1980.*

*Donald G. McNeil, Jr. "Hijacking Survivors Recount Terror," The New York Times, November 25, 1996*

*Edward Mickolus and Susan L. Simmons, Terrorism, 1992-95: A chronology of events and a selectively annotated bibliography, Westport, CT: Greenwood Press, 1997.*

*"FAA History Chronology, 1926-1996" Online version of the FAA Historical Chronology: Civil Aviation and the Federal Government, 1926-1996, 1998. (www.archive.org then http://www.faa.gov/apa/history/chronintro.htm)*

*FBI Documents; 9/18/02 Congressional Testimony*

*"Florida-Bound Jet Hijacked to Cuba." The Associated Press. August 27, 1980.*

*"Hijacker Holding 13." The Washington Post. October 21, 1977.*

*"Hijackers threatened pilot with bloodied knife." United Press International. September 30, 1981.*

*"International News." December 10, 1981.*

*"International Terrorism: A Chronology, 1968-1974." By Brian Jenkins and Janera Johnson. RAND. March 1975.*

*Jon Swain, "Revealed: Gadaffi's Air Massacre Plot," Sunday Times, March 28, 2004.*

*Lt. General Mike Canavan, Retired, Testimony before the National Commission on Terrorist Attacks Upon the United States, May 23, 2003.*

*"Pakistan charges Afghanistan back hijacking." United Press International. March 17, 1981.*

*Peter St. John, Air Piracy, Airport Security, and International Terrorism: winning the war against hijackers, Westport, CT: Quorum Books, 1991.*

*"Plane From San Juan Diverted After Hijack Attempt; No Injuries." The Associated Press. December 11, 1988.*

*"Police Shoot Out Tire After Gunman Orders Delta Jet To Take Off," The Associated Press, March 14, 1986.*

*Senate Intelligence Committee Testimony, 9/18/02; Thomas Sancton, "Anatomy of a Hijack," Time, December 26, 1994.*

*The New York Times. May 26, 1970.*

*The New York Times. June 5, 1970.*

*The New York Times. August 20, 1970.*

*The New York Times. November 1, 1970.*

*The New York Times. November 4, 1970.*

*The New York Times. January 23, 1971.*

*The Times Online, 9/14/01*

*"U.S. Sends Plane To Pick Up Hijackers in Cuba." The Associated Press. September 18, 1980.*

*U.S. Department of State, Office of the Historian, Bureau of Public Affairs, "Significant Terrorist Events, 1961 – 2001: A Chronology*

*White House Security Review, May 1995, http://www.prop1.org/park/pave/rev6.htm*

*"Worldwide Significant Criminal Acts Involving Civil Aviation – January-December 1980." U.S. Department of Transportation. Office of Civil Aviation Security.*

*Yonah Alexander and Eugue Sochor, Aerial Piracy and Aviation Security, Boston: Martinus Nijhoff Publishers, 1990.*